**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| YITZCHOK ROKOWSKY, on behalf of himself and all others similarly situated, : | Case No. |
| Plaintiff, | |
| v. | |
| | **JURY TRIAL DEMANDED** |
| VERICITY, INC.; MEMBERS MUTUAL; FIDELITY LIFE ASSOCIATION; and APEX HOLDCO L.P., ERIC RAHE, CALVIN DONG, SCOTT PERRY, RICHARD HEMMINGS, JAMES E. HOHMANN, JAMES SCHACT, LINDA WALKER BYNOE, STEVEN GROOT, JOHN FIBIGER, AND NEIL ASHE | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Yitzchok Rokowsky, on behalf of himself and others similarly situated, by his undersigned attorneys, hereby sues Defendants Vericity, Inc. ("Vericity"), Members Mutual Holding Company ("Members Mutual"), Fidelity Life Association ("Fidelity Life"), Apex Holdco L.P. ("Apex Holdco"), Eric Rahe, Calvin Dong, Scott Perry, Richard Hemmings, James E. Hohmann, James Schact, Linda Walker Bynoe, Steven Groot, John Fibiger, and Neil Ashe (collectively the "Individual Director Defendants") and in support thereof alleges as follows:

## I.  <u>INTRODUCTION</u>

1.  Defendant Fidelity Life is a legal reserve life insurance company organized under the laws of Illinois.  Plaintiff and members of the Class (as defined herein) were life insurance policyholders in Fidelity Life and, as a result, were members of Members Mutual, a mutual

insurance holding company organized under the laws of Illinois. Members Mutual is the parent of Fidelity Life.

2.      In 2018, Members Mutual adopted a Stock Conversion Plan ("the Plan") for the purpose of converting Members Mutual from a mutual to stock form of organization. Pursuant to the Plan, upon conversion of Members Mutual to stock form, Defendant Vericity, a stock holding company, was to acquire all stock of Members Mutual and thus be wholly owned by Vericity. In turn, and also pursuant to the Plan, shares in Vericity would be listed on NASDAQ (symbol "VERY") and offered initially to eligible members of Members Mutual (Plaintiff and the Class) for $10.00 per share.

3.      The Plan, however, was structured so as to improperly constrain Plaintiff and the Class members' rights to acquire stock in Vericity in favor of Vericity's management team, directors and advisory board members and a third-party purchaser. The Plan was structured and executed in such a fashion that it breached Vericity's and its directors' basic fiduciary duties to the members, Plaintiff and the Class.

4.      The Plan purported to offer a combined 14,875,000 shares in a subscription offering and community offering, but its real purpose was to shift control of Vericity away from its individual members, Plaintiff and the Class, to a holding company, Defendant Apex Holdco, the affiliate of the private equity firm, J.C. Flowers & Co., LLC, whose Managing Director, Defendant Eric Rahe, is also Vericity's Board Chairman. In exchange, Vericity's executives would acquire an ownership interest in Apex Holdco.

5.      To complete the Plan, two requirements needed to be satisfied: (1) a minimum of 14,875,000 shares of common stock needed to be sold; and (2) the plan needed two-thirds approval of Vericity shareholders. To secure approval, pursuant to a Stand-by Purchaser

2

Agreement (defined herein), Apex Holdco was enlisted as the stand-by purchaser, to make-up the difference in any shortfall of purchases of common stock by the members to guarantee the sale of 14,875,000 shares.

6.      Unfortunately for Plaintiff and the Class, the fix was in. Publicly, Vericity reported that a total of 20,125,000 shares were offered on a first-priority basis to eligible members of Members Mutual (i.e., Plaintiff and the Class) and on a second-priority basis to the directors and officers of Members Mutual. Vericity actually allocated 2,123,675 million shares to its directors and officers. Then, secondly, Vericity unilaterally capped the amount of shares that Plaintiff and the Class members could purchase at 3,501,648, thus guaranteeing that Apex Holdco's obligations as the stand-by purchaser would be triggered.  Ultimately, Apex Holdco acquired 11,373,352 of 14,875,000 shares—76.5% of Vericity's outstanding shares.

7.      In reality, and subject to the duties owed to shareholders, the stand-by purchaser should have *only* been permitted to exercise its purchase rights if the original shareholders, Plaintiff and the Class, did not exercise their own rights to reach the minimum amount of shares. As a result of this allocation of shares directly to the stand-by purchaser, Plaintiff and the Class have suffered damages.

8.      For sure, the Prospectus itself acknowledged in the section titled "Risks Relating to Ownership of Our Common Stock" that if the third-party purchaser acquired substantial ownership rights in Vericity, shareholders (Plaintiff and the Class) would not be afforded certain protections that stockholders of non-controlled companies have.  Specifically, the Prospectus warned:

> [i]f the standby purchaser acquires a majority of the shares of our
> common stock in the standby offering, the standby purchaser will
> control a majority of the voting power of our outstanding common
> stock and will hold a controlling interest in us. As a result, we

would qualify as a "controlled company" within the meaning of the corporate governance rules of Nasdaq. "Controlled companies" under those rules are companies of which more than 50% of the voting power is held by an individual, a group or another company. If we become a "controlled company" upon the completion of the offerings, we will avail ourselves of the "controlled company" exception under the Nasdaq rules, in which event *we will not be required not to comply with certain corporate governance requirements, including: the requirement that a majority of our board of directors consist of independent directors; the requirement that we have a nominating and corporate governance committee that is composed entirely of independent Directors, or otherwise have director nominees selected by vote of a majority of the independent directors; the requirement that we have a compensation committee that is composed entirely of independent directors; and the requirement for an annual performance evaluation of the nominating and corporate governance and compensation committees*. If the standby purchaser acquires a majority of our shares in the standby offering and we become a "controlled company," ***you will not have the same protections afforded to stockholders of companies that are subject to all of the Nasdaq corporate governance requirement***s.

Prospectus at 27 (emphasis added).

9. These were not "Risks" as described by the Prospectus, rather shifting the company away from the members into a "controlled company" was the desired outcome of Vericity and the Individual Director Defendants.

10. After the transaction closed and Apex Holdco assumed a majority interest in Vericity and without the protections afforded shareholders in non-controlled companies, the Board of Directors announced a special one-time cash distribution of $6.25 per share to common stockholders, which was paid on December 9, 2019. Based on the current number of shares outstanding, the cash distribution was expected to total approximately $93 million, with the Board of Directors receiving $13,272,968.75 and Apex Holdco receiving $71,083,450.

11. Plaintiff seeks recovery on behalf of himself and the Class against Defendants, and brings this action under the Court's diversity jurisdiction as expanded by the Class Action

Fairness Act of 2005, asserting: (i) Illinois statutory claims for the improper deal Defendant

Vericity entered into when it consummated the Stand-by Purchaser Agreement with Apex

Holdco to the detriment of its existing members and (b) violations of state common law claims

for breach of fiduciary duty, breach of contract, unjust enrichment and negligence.

## II.    JURISDICTION AND VENUE

12.    This Court has diversity jurisdiction over the subject matter of the foregoing state

law claims asserted in this class action, pursuant to the provisions of 28 U.S.C. § 1332(d)(2),

because the parties are citizens of diverse states and the amount in controversy, aggregating the

claims of all class members, exceeds the sum of $5,000,000.  The named Plaintiff is a citizen of

New Jersey, and Defendant is considered a citizen of Delaware (state of incorporation) and

Illinois (principal place of business) for purposes of 28 U.S.C. § 1332(c)(1).  Thus, the named

Plaintiff (and one or more of the unnamed class members) is a citizen of a state different from at

least one of the Defendants.

13.    Venue is proper over the foregoing diversity claims within this District because

the Vericity Defendants (defined herein) maintain their principal place of business in Illinois.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Yitzchok Rokowsky is an individual residing in New Jersey who was a

member of Members Mutual as of July 31, 2018.  On or about July 29, 2019, Plaintiff received

the Plan and a stock purchase form.  Plaintiff's stock purchase agreement, however, restricted

him to purchasing 124 shares of stock at $10 per share for a total of $1,240.  Plaintiff raised his

desire to purchase more stock with the Board of Directors.  His request was rejected. Under

protest, Plaintiff purchased the limited shares of additional stock he was allocated.

B.    **Corporate Defendants**

15.    Defendant Vericity offers life insurance protection to the middle American market, targeting domestic households with incomes of between $50,000 and $125,000.  It conducts its business through its two operating subsidiaries: (1) Fidelity Life and (2) Efinancial, LLC.  Fidelity Life distributes its life insurance products through Efinancial and unaffiliated agents.  Efinancial, LLC is a call center-based insurance agency, which markets products for Fidelity Life.  According to the Vericity prospectus ("Prospectus") filed with the U.S. Securities Exchange Commission  ("SEC") on June 20, 2019, to effectuate its business plan, Vericity "requires access to a large quantity of quality sales leads [from third party lead vendors] to keep [its] retail call center agents productive" and it "supplement[s] that lead flow with leads we generate ourselves."  Vericity is incorporated in Delaware and its principal place of business is 8700 W. Bryn Mawr Avenue, Suite 900S, Chicago, Illinois, 60631.

16.    Defendant Fidelity Life is a legal reserve life insurance company organized under the laws of Illinois. In 2007, Defendant Fidelity Life completed a reorganization through which it converted from a mutual insurance company to a stock insurance company.  As part of this reorganization, Members Mutual was formed as an Illinois mutual insurance holding company, and Fidelity Life continued as an Illinois stock life insurance company.

17.    Defendant Members Mutual was, until 2019, a mutual insurance holding company organized under the laws of Illinois, with executive offices located in Chicago, Illinois.

18.    Vericity, Fidelity Life and Members Mutual collectively are referred to as the "Vericity Defendants."

19.    Defendant Apex Holdco is an affiliate of J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co. LLC.  On October 25, 2018, the Vericity Defendants entered

6

into a Stand-by Purchaser Agreement with Apex Holdco which ultimately allowed Apex Holdco to acquire the majority of Vericity's outstanding common shares.

### C.      **Individual Director Defendants**

20.      Defendant, Eric Rahe, is a citizen of the state of New York, who serves as the Chairman of Vericity's Board. Defendant Rahe also serves as the Managing Director of J.C. Flowers & Co. LLC a private equity firm, which is an affiliate of Apex Holdco, the Stand-by Purchaser.

21.      Defendant, Calvin Dong is a citizen of the State of New York who was elected to Vericity's board of directors in 2019. Mr. Dong is Vice President at J.C. Flowers & Co., LLC, which is an affiliate of Apex Holdco, the Stand-by Purchaser.

22.      Defendant, Scott Perry is a citizen of the State of Florida who was elected to Vericity's board of directors in 2019. Mr. Perry has been the CEO of AmeriLife Group Holdings since 2016, which is a portfolio company of a fund advised by J.C. Flowers & Co. LLC, which is an affiliate of Apex Holdco, the Stand-by Purchaser.

23.      Defendant, Richard Hemmings, is a citizen of the State of Illinois, who was elected to the board of directors of Vericity in 2013. Mr. Hemmings served as the Chairman of the board of directors of Members Mutual since its formation in 2007. From 2007 until 2014, Mr. Hemmings also served as the President and Chief Executive Officer of Members Mutual. Mr. Hemmings was permitted to purchase 193,375 shares of Vericity stock as part of the demutualization.

24.      Defendant, James E. Hohmann is a citizen of the State of Illinois, who has served as a director and Chief Executive Officer of Vericity since September 2014. Mr. Hohmann also served as President, and Chief Executive Officer of Members Mutual. Mr. Hohmann also worked

as a private consultant in the life insurance industry, including providing consulting services for Members Mutual. Mr. Hohmann was permitted to purchase 600,000 shares of Vericity stock as part of the demutualization.

25.     Defendant, James W. Schacht is a citizen of the State of Illinois, who was elected to Vericity's board of directors in 2013.  Mr. Schacht served on the board of directors for Members Mutual since 2007. Mr. Schacht was permitted to purchase 10,000 shares of Vericity stock as part of the demutualization.

26.     Defendant, Linda Walker Bynoe is a citizen of the State of Illinois who previously served on Vericity's board of directors until 2018.  Ms. Byone was permitted to purchase 75,000 shares of Vericity stock as part of the demutualization.

27.     Defendant, Steven L. Groot is a citizen of the State of Illinois who previously served on Vericity's board of directors until 2018.  Mr. Groot was permitted to purchase 193,375 shares of Vericity stock as part of the demutualization.

28.     Defendant, John A. Fibiger is a citizen of the State of Texas who previously served on Vericity's board of directors.  Mr. Fibiger was permitted to purchase 10,000 shares of Vericity stock as part of the demutualization.

29.     Defendant, Neil Ashe is a citizen of the State of California who was elected to Vericity's board of directors in 2019.

## IV.     FACTUAL BACKGROUND

### A.     Members Mutual is Formed

30.     In 2007, Fidelity Life completed a reorganization through which it converted from a mutual to a stock insurance company. As part of this reorganization, Members Mutual was formed as an Illinois mutual insurance holding company and Fidelity Life continued as an

8

Illinois stock life insurance company. Each share of Fidelity Life was issued to Vericity Holdings, which was, at the time, an intermediate holding company and a wholly-owned subsidiary of Members Mutual.

31. According to the Prospectus, the following chart was the corporate structure prior to the consummation of the Stock Conversion Plan, as defined in ¶¶ 33-51, below:



32. Members Mutual did not have stockholders, but instead had members who were either holders of an in-force individual insurance policy issued by Fidelity Life or holders of a group master policy also issued by Fidelity Life.

33. Similar to stockholders, Members Mutual's members had certain rights with respect to that company, including voting rights for the election of directors and approval of certain transactions.

34. Unlike a shareholder, a member's interests do not exist separately from the insurance policies issued by Fidelity Life. Thus, membership interests are extinguished by surrender, death, or lapse or cancellation of a policy.

**B.** **The Illinois Statutory Scheme for Demutualization**

35. The demutualization of a mutual insurance company results in the exchange of the participating policyholders' rights and, at times, the other net assets of that company for the

rights of stockholders in the new stock insurance company. In other words, the value of the policies is exchanged for stock. The right to participate as a policyholder in surplus and the right to share in distribution of surplus and other net assets in liquidation are relinquished upon demutualization, except to the extent of policyholder dividends paid from certain assets Vericity refers to as Block A in the "Closed Block."

36.    Demutualization can be beneficial to a converted company by allowing it to raise capital by trading shares. Policyholders can also receive a benefit by being compensated for their ownership stake, typically through cash settlements, stock in the newly-formed company, an increase in policy cash values, or some combination of benefits.

37.    Under Illinois law—215 ILCS § 5/59.1—governing demutualization, in connection with its conversion from a mutual insurance company to a stock insurance company, Members Mutual was required to provide eligible members with subscription rights, without payment, to purchase a portion of the capital stock of the converted stock company or, alternatively, a portion of a corporation owned by the mutual company for purposes of acquiring or holding all of the converted company's stock or a stock insurance company into which the mutual company will be merged. These subscription rights are to be allocated to eligible members through a fair and equitable formula, which may take into account how different classes of policies of the eligible members contributed to the mutual company's surplus.

38.    Only if there is an undersubscription of capital stock by eligible members exercising their subscription rights can shares be sold in a public offering. The Illinois statutory scheme expressly addresses undersubscription in the conversion of a mass mutual to a stock company: "[i]f the number of shares of capital stock not subscribed by eligible members is so small or the additional time or expense required for a public offering of those shares would be

otherwise unwarranted under the circumstances, the plan of conversion may provide for the purchase of the unsubscribed shares by a private placement or other alternative method approved by the Director that is fair and equitable to the eligible members." 215 ILCS § 5/59.6(e) ("Conversion to a Stock Company – Undersubscription"). Likewise, if there is an oversubscription, the code sets out how the conversion plan should provide fair and equitable means for the allocation of shares of capital stock. *Id*., § 5/59.6(d) ("Oversubscription").

39.     The conversion plan may, but is not required to, provide subscription rights to officers and directors of the mutual company. *Id*., § 5/59.7(a) ("Directors and officers subscription rights"). If the plan calls for such subscription rights, they should also be allocated through a fair and equitable formula.  The total number of shares that may be purchased by officers and directors under such a plan takes into consideration the total assets of the mutual company.  For instance, the total number of shares that may be purchased by directors and officers may not exceed 35% of the total number of shares issued where the mutual company has total assets of less than $50 million, or 25% of the total shares issued where the mutual company has total assets of more than $500 million. *Id*., § 5/59.7(a)(ii).  For mutual companies with total assets between $50 million and $500 million, the total number of shares that may be purchased shall be interpolated. *Id*.

40.     The Illinois statutory scheme also requires that a stock conversion plan limit any one person or group of persons acting in concert from acquiring, "through public offering or subscription rights, more than 5% of the capital stock of the converted stock company for a period of 5 years from the effective date of the plan except with the approval of the Director." *Id*., § 5/59.6(i) ("Limitations on acquisition of control").

41.     A "conflict of interest" in the statute prohibits any "director, officer, agent, or employee of the mutual company or any other person" from receiving "any fee, commission, or other valuable consideration, other than his or her usual regular salary and compensation, for in any manner aiding, promoting, or assisting in the conversion except as set forth in the plan approved by the Director." *Id.*, § 5/59.12. This provision does not prohibit the payment of reasonable fees and compensation to attorneys, accountants and actuaries for services performed in the independent practice of their professions, even if the attorney, accountant, or actuary is also a Director of the mutual company.

42.     The Illinois statutes also allow for a "tax-qualified employee stock benefit plan," which "may allocate to a tax-qualified employee benefit plan nontransferable subscription rights to purchase up to 10% of the capital stock of the converted stock company or the stock of another corporation that is participating in the conversion plan[.]" *Id.*, § 5/59.7(b). This plan is permitted "to exercise its subscription rights regardless of the amount of shares purchased by other persons." *Id.*

### C.     Members Mutual's Stock Conversion Plan

43.     On June 20, 2019, Vericity filed the Prospectus with the SEC. Afteward, on or about July 31, 2019, the Board of Directors of Members Mutual approved the Plan to convert from a mutual insurance holding company to a stock company. After completion of the Plan, Members Mutual would become a wholly-owned subsidiary of Vericity.

44.     To effectuate the Plan, Members Mutual offered for purchase between 14,875,000 shares and 20,125,000 shares of common stock at a purchase price of $10 per share.

45.     These shares were offered through a subscription offering and a community offering.

46. The subscription offering was made to eligible Members Mutual members, who were policyholders of Fidelity Life as of July 31, 2018, as well as to Members Mutual's directors and officers.

47. According to the Prospectus, "[c]oncurrently with the subscription offering and subject to the prior right of subscribers in the subscription offering," shares were offered in a community offering "to eligible employees of Members Mutual and possibly to a limited number of other potential investors."

48. To complete the Plan, Vericity was required to meet two conditions: (1) a minimum of 14,875,000 shares of common stock needed to be sold; and (2) the plan needed an affirmative vote of at least two-thirds of the votes cast at a special meeting of the members.

49. The Vericity Defendants left nothing to chance. To ensure the Plan was realized, Members Mutual, Vericity and Fidelity Life entered into the Stand-by Purchaser Agreement with Apex Holdco, dated October 25, 2018 (amended and restated on March 26, 2019), under which Apex Holdco agreed to act as the stand-by purchaser for this offering.

50. Importantly, Apex Holdco is an affiliate of J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co. LLC. A number of Vericity's board members are also high ranking employees of J.C. Flowers, including Defendant Rahe who is Vericity's board chairman and the managing director at Flowers, and Vericity director Dong, who too is a Vice President at Flowers. Apex Holdco's enrichment by virtue of a stock purchase and any dividend would benefit not only Apex, but J.C. Flowers and its senior members including Rahe and Dong.

51. According to the Prospectus, "[i]f the number of shares subscribed for in the subscription offering, (together with any subscriptions accepted in the community offering), is less than 14,875,000 shares, and if all of the conditions to the stand-by purchaser's purchase

commitment have been satisfied, the stand-by purchaser will be obligated to purchase enough shares to guarantee the sale of 14,875,000 shares in the offerings, and may purchase additional shares as may be necessary in order to permit the stand-by purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings."

52.     The Prospectus thus all but guaranteed that Apex Holdco, as the stand-by purchaser, would acquire the majority of shares in the offering and reap the benefits of majority shareholder status, to the detriment of Members Mutual's initial members.

53.     The Prospectus further recognized that, under the terms of the agreement with Apex Holdco, Apex Holdco "will have the right to designate a majority of the nominees to serve on our board of directors, whether or not it acquires a majority of the stock sold in the offerings."

54.     If that were not enough, the Prospectus acknowledged that "the stand-by purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares."

55.     According to the Prospectus, if the stand-by purchaser acquired a majority of Vericity's shares, it "will be able to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders."

56.     According to the Prospectus, the directors and officers of Members Mutual "indicated their intention to subscribe for approximately 2,123,675 shares, or approximately 14% of the shares at the offering minimum."

57.     The Prospectus identified the proposed management purchases in the following table:

| Name | Amount ($) | Number of Shares | Minimum (%) | Maximum (%) |
|---|---|---|---|---|
| Directors: | | | | |
| Linda Walker Bynoe | $750,000 | 75,000 | * | * |
| Steven L. Groot | 1,933,750 | 193,375 | 1.3 | 1.0 |
| Richard A. Hemmings | 1,933,750 | 193,375 | 1.3 | 1.0 |
| James E. Hohmann | 6,000,000 | 600,000 | 4.0 | 3.0 |
| James W. Schacht | 100,000 | 10,000 | * | * |
| John A. Fibiger | 100,000 | 10,000 | * | * |
| Executive Officers (who are not also directors): | | | | |
| James C. Harkensee | 3,123,750 | 312,375 | 2.1 | 1.6 |
| Chris S. Kim | 1,950,000 | 195,000 | 1.3 | 1.0 |
| John Buchanan | 700,000 | 70,000 | * | * |
| Laura R. Zimmerman | 1,000,000 | 100,000 | * | * |
| Chris Campbell | 1,000,000 | 100,000 | * | * |
| | | | | |
| All Directors and Executive Officers as a Group (11 persons) | $18,591,250 | 1,859,125 | 12.5 | 9.2 |
| All Directors and Officers as a Group (19 persons) | $21,236,750 | 2,123,675 | 14.3 | 10.6 |

58.     Vericity's management team, directors and advisory board members also were allowed to participate in an equity incentive plan whereby they would acquire an ownership interest in the stand-by purchaser, Apex Holdco—thus reaping additional benefits not available to Members Mutual's members.  According to the Prospectus, "under the plan, the general partner of the stand-by purchaser may grant awards of Class B units to employees, directors and other service providers of the stand-by purchaser and/or Vericity."  While these Class B units "are non-voting profits interests in the stand-by purchaser that entitle the holders thereof to participate in the appreciation in the value of the stand-by purchaser above an applicable threshold and to thereby share in our future growth," they do not similarly allow Plaintiff and the Class to participate in the stand-by purchaser's future growth.

59.     Instead, with respect to Plaintiff and the Class, the Prospectus provided that "[t]he minimum number of shares that a person may subscribe to purchase is 25 shares," but the "maximum number of shares that a person may subscribe to purchase in the subscription offering

15

is the lesser of 743,750 or the individual maximum purchase limitations described in this prospectus."

60.     Members Mutual's Board of Directors announced that a special meeting of the eligible members of Members Mutual would be held on August 6, 2019, to vote on the Plan.  To become effective, it required approval by the affirmative vote of at least two-thirds of the votes cast at the special meeting.

> ### D.     The Demutualization of Members Mutual is Realized

61.     According to a Form 8-K Vericity filed with the SEC on August 9, 2019, a total of 20,125,000 shares were offered. But the shares were not allocated to eligible members through a fair and equitable formula.  Plaintiff and the Class' shares were capped at 3,501,648.  The Board of Directors meanwhile got 2,123,675 million shares. As a result, the Stand-by Purchaser Agreement was triggered giving Apex 11,373,352 shares (out of 14,875,000) or 76.5% of the company.

62.     The following chart depicts the structure of Vericity after the conversion:



63.     After the closing of the IPO, Apex Holdco established the Apex Holdco L.P. Equity Incentive Plan, thus reserving Class B units representing 20.6% of the fully diluted units of Apex Holdco for issuance to employees, directors, advisory board members and other service providers of Vericity.  The August 9, 2019 Form 8-K noted that these Class B units, while non-voting interests, "entitle[d] holders thereof to participate in the appreciation in the value of the Stand-by Purchaser, as represented by its ownership of the Company's common stock, above a $10 per share threshold[.]"  The former members of Members Mutual—Plaintiff and the Class—were not afforded any Class B units or other equity in Apex Holdco.

17

E. **The Stock Conversion Plan Unlawfully Constrained Members of Members Mutual**

64.     The Prospectus contained a section entitled, "Limits on Your Purchase of Common Stock," which was specifically addressed to members, including Plaintiff and the Class.  This section provided that the Stock Conversion Plan and Illinois law established the maximum purchase limits.

65.     The Prospectus provided that the allocated subscription rights to purchase shares were mailed to each eligible member and that "[n]o eligible member may subscribe to purchase more shares than the number of subscription rights allocated to such member." The Company noted that this maximum purchase right was determined through actuarial analyses conducted by Milliman, Inc., a third-party actuarial consulting firm.

66.     Illinois law limits the amount of stock any shareholder or group of shareholders acting together may acquire through a public offering or subscription rights to 5% of the capital stock for the converted company for the first five years after the conversion, unless prior approval is received by the Insurance Director.  Thus, the cap imposed by Illinois law would have allowed eligible members to purchases up to 5% of Vericity's outstanding shares or between 743,750 and 1,006,250.  215 ILCS § 5/59.6(i).

67.     Instead, however, rather than providing members with the right to purchase shares up to Illinois's statutory cap, eligible members were allocated a "Fixed Component" of 100 subscription rights regardless of the number of qualifying policies they owned and a "Variable Component" determined by a purported actuarial formula that considered past and future contributions to Fidelity Life's surplus of all eligible members' qualifying policies in force when the Stock Conversion Plan was adopted.

18

68.     Upon information and belief, many, if not all, of the members were restricted to far less than the 5% cap in favor of Apex Holdco.  For example, Plaintiff was restricted to 124 shares as his maximum purchase allowance, even though he intended to purchase significantly more shares and informed the company of his desire to do so.

69.     Ultimately, the right of the stand-by purchaser to purchase up to the offering maximum all but guaranteed that it would acquire the majority of shares in the offering and reap the benefits of being the majority shareholder to the detriment of longstanding Members Mutual's members.

70.     The Prospectus acknowledged that "the stand-by purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares."  That was not a forecast, but the plan. At the time the Prospectus was drafted, Vericity knew that the Stand-by Purchase Agreement would be triggered based on the pre-determined allocations to Members Mutual's members.

71.     Among the Risk Factors identified in the Prospectus, Vericity stated that if the stand-by purchaser acquired more than 50% of Vericity's voting power—which it did—the Company would avail itself of the "controlled company" exception to the NASDAQ rules so that it would not have to comply with certain corporate governance requirements, including the requirement that a majority of the board be independent directors, and that the compensation committee, the nominating committee and corporate governance committee be composed of entirely independent directors.

72.     The Prospectus also recognized that Apex Holdco, as the stand-by purchaser, would have the right to designate a majority of the members of Vericity's board.  Indeed,

19

according to the Prospectus, if the stand-by purchaser acquired a majority of Vericity's shares, it "will be able to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders."

73.     As discussed above, Vericity's management team, directors and advisory board members also reaped additional benefits not available to Members Mutual's members. Under the terms of the amended and restated limited partnership agreement of the stand-by purchaser, these insider shareholders are participating in an equity incentive plan that will allow them to acquire an ownership interest in the stand-by purchaser.

**F.      The Limits Placed on Members Mutual's Members Diverged from Other Demutualizations**

74.     A demutualization is merely a change in the form of ownership where a member's interests are transformed into shareholdings, but the identity of the owners stays relatively the same. By contrast, here, the original owners (Plaintiff and the Class) were largely displaced by the stand-by purchaser who acquired 11,373,352, giving the stand-by purchaser over 76% of the outstanding shares of Vericity common stock. By placing limits on the subscription rights of Plaintiff and the Class, Defendants engineered a transaction that delivered more than 76% of Vericity's shares into the hands of one investor and leaving Plaintiff and the Class as minority owners with significantly ***less than 25%*** of the outstanding shares, considering the remaining shares were divided between Members Mutual's members and its directors and officers.

75.     When compared with other comparable demutualizations, the Vericity demutualization resulted in unusually low ownership retained by members. For example, in the Principal Mutual Demutualization, the members retained ***69%*** ownership. Likewise, in the Prudential Demutualization, its members retained over ***78%*** of the shares, and in the MetLife Demutualization, its members retained nearly ***63%***.

**G.** **Defendants' Unlawful Conduct Denied the Class the Opportunity to Participate in Vericity's Stock Appreciation and Special Dividend**

76. Plaintiff and each member of the Class he seeks to represent likewise received only shares for each subscription right exercised, and were not allowed to purchase additional shares beyond the artificial limits placed on each of them by the Vericity Defendants.

77. Plaintiff is typical of the former members of Members Mutual who would have purchased additional shares of Vericity stock at $10 per share if the Vericity Defendants had not capped what they could purchase.

78. On the first day the Vericity share price was published, August 15, 2019, its closing price was $12.00. Thus, the stock value had already appreciated 20%, $2.00 over the subscription rights price after initial trading.

79. The daily closing prices for Vericity stock from when data was first available through November 29, 2019, were as follows:

| Date | Close |
|---|---|
| 8/15/2019 | $12 |
| 8/16/2019 | $12 |
| 8/19/2019 | $14.54 |
| 8/20/2019 | $24 |
| 8/21/2019 | $20.155 |
| 8/22/2019 | $17.05 |
| 8/23/2019 | $16.7 |
| 8/26/2019 | $18 |
| 8/27/2019 | $17.99 |
| 8/28/2019 | $15.25 |
| 8/29/2019 | $16.5 |
| 8/30/2019 | $16 |
| 9/3/2019 | $14.63 |
| 9/4/2019 | $14.57 |
| 9/5/2019 | $14.57 |
| 9/6/2019 | $14.75 |
| 9/9/2019 | $14.65 |

21

| | |
|---|---|
| 9/10/2019 | $14.71 |
| 9/11/2019 | $14.685 |
| 9/12/2019 | $15 |
| 9/13/2019 | $15 |
| 9/16/2019 | $14.6 |
| 9/17/2019 | $14.5 |
| 9/18/2019 | $13.5 |
| 9/19/2019 | $13.05 |
| 9/20/2019 | $13 |
| 9/23/2019 | $13.25 |
| 9/24/2019 | $13.25 |
| 9/25/2019 | $13 |
| 9/26/2019 | $12.7 |
| 9/27/2019 | $13.4 |
| 9/30/2019 | $14 |
| 10/1/2019 | $14 |
| 10/2/2019 | $14 |
| 10/3/2019 | $14 |
| 10/4/2019 | $14 |
| 10/7/2019 | $14 |
| 10/8/2019 | $14 |
| 10/9/2019 | $14 |
| 10/10/2019 | $14 |
| 10/11/2019 | $13.117 |
| 10/14/2019 | $13.216 |
| 10/15/2019 | $13.216 |
| 10/16/2019 | $13.216 |
| 10/17/2019 | $13.216 |
| 10/18/2019 | $13.15 |
| 10/21/2019 | $13.5 |
| 10/22/2019 | $13.32 |
| 10/23/2019 | $13.32 |
| 10/24/2019 | $13.16 |
| 10/25/2019 | $13.17 |
| 10/28/2019 | $13.25 |
| 10/29/2019 | $13.19 |
| 10/30/2019 | $13.19 |
| 10/31/2019 | $13.19 |
| 11/1/2019 | $13.19 |
| 11/4/2019 | $13.19 |
| 11/5/2019 | $13.19 |

| 11/6/2019 | $13.19 |
|---|---|
| 11/7/2019 | $18.15 |
| 11/8/2019 | $20.893 |
| 11/11/2019 | $18.09 |
| 11/12/2019 | $20.781 |
| 11/13/2019 | $20.225 |
| 11/14/2019 | $20.15 |
| 11/15/2019 | $21.25 |
| 11/18/2019 | $22.501 |
| 11/19/2019 | $22.4 |
| 11/20/2019 | $22.708 |
| 11/21/2019 | $22 |
| 11/22/2019 | $19.336 |
| 11/25/2019 | $19.48 |
| 11/26/2019 | $19.5 |
| 11/27/2019 | $19.196 |
| 11/29/2019 | $19.4 |

80.     While all eligible members who exercised subscription rights and received stock at the initial price of $10 per share received an appreciated asset when their share certificates arrived, they were, however, excluded from participating in this price appreciation when the Vericity Defendants limited the amount of shares each eligible member could purchase. Instead, the stand-by purchaser, Apex Holdco, has reaped the benefits of this appreciation, and will continue to do so.

81.     Moreover, the members of Members Mutual who exercised subscription rights will also be unfairly excluded from Vericity's one-time cash distribution. On November 6, 2019, Vericity filed a release on Form 8-K announcing a special one-time cash distribution of $6.25 per share to common stock holders of record as of November 21, 2019,  which was paid on December 9, 2019.

82. Since members of Members Mutual were restrained from purchasing additional shares of Vericity common stock by the Vericity Defendants, these members will not enjoy the cash distribution on each additional share each would have purchased.

## V.    CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action under Rules 23(a), b(1) and (b)(3) of Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") defined as:

> All persons who were participating Members Mutual policyholders and whose rights were contracted through the plan of demutualization of Members Mutual.  The transaction is described by Defendants in materials consisting of, among other things, the Prospectus on Form 424B, filed with the U.S. Securities and Exchange Commission on June 20, 2019 (the "Prospectus").

84. Plaintiff Rokowsky is a member of the Class he seeks to represent.

85. The members of the Class number in the thousands and are so numerous that joinder of all Members is impracticable, as required by Fed. R. Civ. P. 23(a)(1).  While the exact number and identity of all Class members is unknown to Plaintiff at the present time, that information is identifiable and will be ascertained from Defendants' records through appropriate discovery.  With respect to members, the Prospectus provided that "[t]he minimum number of shares that a person may subscribe to purchase is 25 shares," but the "maximum number of shares that a person may subscribe to purchase in the subscription offering is the lesser of 743,750 or the individual maximum purchase limitations described in [the] prospectus." Therefore, Plaintiff alleges that the Class certainly consists of tens of thousands, if not hundreds of thousands, of persons.

86. There are questions of law or fact common to all members of the Class in satisfaction of the requirements of Fed. R. Civ. P. 23(a)(2).  Moreover, such common questions

predominate over any questions affecting only individual members of the Class, as required by

Fed. R. Civ. P. 23(b)(3).

87.   These common legal and factual questions derive from a common nucleus of

operative facts relating to and including, without limitation:

(a)   whether the Stand-by Purchase Agreement with Apex Holdco was improper;

(b)   whether Defendants improperly limited the number of shares members of Members Mutual could acquire through the subscription offering in violation of Illinois law;

(c)   whether the launch of the Vericity IPO was conducted to shift control of Vericity from members of Members Mutual to the Stand-by Purchaser (Apex Holdco);

(d)   whether Vericity's management, team, directors and advisory board members improperly received benefits not available to other shareholders through the terms of the amended and restated limited partnership agreement of the stand-by purchaser, allowing them to acquire an ownership interest in the stand-by purchaser;

(e)   whether Defendants are liable to the members of the Class for the damages they suffered by artificially limiting the number of shares they could purchase under the terms of the Stock Conversion Plan;

(f)   whether Defendants are liable to the members of the Class for the damages they suffered when Vericity issued a special dividend based on the number of shares owned by the shareholders of Vericity;

(g)   whether the Vericity Defendants were unjustly enriched by cost savings derived from their misuse of the arbitrary limits placed on Members Mutual's members' right to purchase shares to eliminate hundreds if not thousands of Class members from the Vericity shareholder population;

(h)   whether Apex Holdco was unjustly enriched by its receiving the lion's share of stock issued by Vericity through the Stock Conversion Plan;

(i)   whether Vericity Defendants were unjustly enriched by way of the cost savings in shareholder servicing costs that they enjoyed as the

result of their scheme to improperly eliminate hundreds of
thousands of members from the Vericity shareholder population;

(j)     whether the Vericity Defendants breached fiduciary duties they
owed to the members of the Class;

(k)     whether the Vericity Defendants breached duties of reasonable
care they owed to the members of the Class; and

(l)     whether the Vericity Defendants breached contractual obligations
they owed to the members of the Class.

88.     As the lead Plaintiff, Rokowsky's claims are typical of the claims of the Class he

seeks to represent, pursuant to Fed. R. Civ. P. 23(a)(3). There are no conflicts between

Rokowsky's interests and the interests of the members of the Class as a whole.

89.     Rokowsky will fairly and adequately protect and represent the interests of the

Class, as required by Fed. R. Civ. P. 23(a)(4). Rokowsky's interests are not antagonistic to or in

conflict with the interests of any other member of the Class. Moreover, Rokowsky has retained

competent counsel experienced in class action litigation to represent the Class.

90.     Defendants, and each of them, have acted on grounds generally applicable to the

Class as a whole thereby making the final injunctive relief or corresponding declaratory relief

sought in this Class Action Complaint appropriate with respect to the Class as a whole in

satisfaction of the requirements of Fed. R. Civ. P. 23(b)(2).

91.     A class action is superior to other available methods for the fair and efficient

adjudication of this litigation, in satisfaction of the requirements of Fed. R. Civ. P. 23(b)(3),

since individual joinder of all members of the Class is impracticable. Because damages suffered

by individual class members of the Class are relatively small in comparison to the expense and

burden of prosecuting this litigation, class members of the Class cannot redress the wrongs done

to them on an individual basis. Even if the class members of the Class were able individually to

prosecute their individual actions, it would be unduly burdensome on the courts to proceed with thousands of individual cases. By contrast, the class action device presents far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

## VI. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE ILLINOIS INSURANCE STATUTES
### 215 ILCS § 5/59.1, *et seq.*
### (Against all Defendants)

92. Plaintiff re-alleges and incorporates by reference the allegations set forth above as if the same were fully rewritten herein.

93. Under Illinois demutualization laws, Members Mutual was required to provide eligible members with subscription rights without payment to purchase a portion of the capital stock of the converted stock company or, alternatively, a corporation owned by the mutual company for purposes of acquiring or holding all of the converted company's stock or a stock insurance company into which the mutual company would be merged. These subscription rights were to be allocated to eligible members through a fair and equitable formula, which may take into account how different classes of policies of the eligible members contributed to the mutual company's surplus.

94. The applicable Illinois statutes provide that if there is an undersubscription of capital stock by eligible members exercising their subscription rights, those shares are to be sold in a public offering. "If the number of shares of capital stock not subscribed by eligible members is so small or the additional time or expense required for a public offering of those shares would be otherwise unwarranted under the circumstances, the plan of conversion may provide for the purchase of the unsubscribed shares by a private placement or other alternative method approved

by the Director that is fair and equitable to the eligible members." Similarly, if there is an oversubscription, the conversion plan should provide fair and equitable means for the capital stock.

95. The applicable Illinois statutes do provide a limit for such, but not one as oppressive as that imposed by the Vericity Defendants. They provide that a stock conversion plan can limit any one person or group of persons acting in concert from acquiring, "through public offering or subscription rights, more than 5% of the capital stock of the converted stock company for a period of 5 years from the effective date of the plan except with the approval of the Director." The cap imposed by Illinois law restricted eligible members to purchases of no more than 5% of Vericity's outstanding shares or between 743,750 and 1,006,250.

96. Rather than providing members with the right to purchase shares up to Illinois's statutory cap, eligible members were allocated a "Fixed Component" of 100 subscription rights regardless of the number of qualifying policies they owned and a "Variable Component" determined by an actuarial formula that considers past and future contributions to Fidelity Life's surplus of all eligible members' qualifying policies in force when the Plan was adopted.

97. Upon information and belief, many, if not all, of the Class members were restricted to far less than the 5% cap in favor of Apex Holdco.

98. Upon information and belief, the Stand-by Purchaser Agreement was an improper contract between the parties, which illegally capped Plaintiff and the Class from acquiring more shares of Vericity in the offering and shifted the control of Vericity to Apex Holdco.

99. The Prospectus recognized that Apex Holdco, as the stand-by purchaser, would have the right to designate a majority of the members of Vericity's board. Indeed, according to the Prospectus, if the stand-by purchaser acquired a majority of Vericity's shares, it "will be able

to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders."

100.     As discussed above, Vericity's management team, directors and advisory board members also reaped additional benefits not available to Members Mutual's members.  Under the terms of the amended and restated limited partnership agreement of the stand-by purchaser, these insider shareholders are participating in an equity incentive plan that will allow them to acquire an ownership interest in the stand-by purchaser.

101.     Vericity is also liable to the same extent as Members Mutual and Fidelity Life for the foregoing failures and violations of statutory obligations to the eligible members as the successor in interest and parent of Members Mutual and Fidelity Life under common management and control with Members Mutual and Fidelity Life.

102.     As a direct and proximate result of each such statutory violation, the members of the Class, including without limitation Plaintiff Rokowsky, have been damaged because they were denied the ability to acquire more shares of Vericity's stock and participate in its share price appreciation and special one-time cash distribution.

103.     The Vericity Defendants are jointly and severally liable for the foregoing damages.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
<u>**(Against Vericity & Individual Director Defendants)**</u>

104.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if the same were fully rewritten herein.

105.     The Vericity and Individual Director Defendants owed certain fiduciary duties to Plaintiff and the other members of the Class, including without limitation the fiduciary duties of due care, loyalty and good faith and fair dealing with respect to their membership interests, the

29

demutualization transaction and the conversion of Members Mutual from a mutual insurance company to a stock company.

106. A director's duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.

107. In setting an unfairly low number of subscription rights, and knowing that members of the Class were willing and able to purchase more than this restricted amount of shares, the Vericity Defendants have each breached their fiduciary duties owed to Plaintiff and the members of the Class.

108. Furthermore, the Vericity Defendants have each breached their fiduciary duties owed to Plaintiff and the members of the Class by placing their corporate interests in streamlining the shareholder base and granting benefits to Vericity's directors and officers otherwise not available to the original members, in conflict with the best interests of their members in receiving fair and equitable right to participate in Vericity.

109. As a direct and proximate result of the foregoing breaches of fiduciaries duties by the Vericity Defendants, and each of them, the members of the Class, including without limitation Plaintiff, have been damaged because they received less subscription rights and an equally diminished right to participate in Vericity's stock price appreciation and the special one-time cash distribution.

110. The foregoing breaches of fiduciary duties were committed intentionally, or with reckless or callous indifference to the protected rights of the Class to receive fair, reasonable, equitable and adequate subscription rights.

111.     The Vericity Defendants are jointly and severally liable for the foregoing damages.

## COUNT III
## NEGLIGENCE
### (Against Vericity & Individual Director Defendants)

112.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if the same were fully rewritten herein.

113.     The Vericity and Individual Director Defendants assumed a duty toward Plaintiff and the members of the Class, among others, or had the duty imposed upon them by Illinois law, for making the final determination for allocating subscription rights to Members Mutual's members with respect to the Vericity offering that was fair, reasonable, equitable and adequate to them.

114.     The Vericity Defendants failed to exercise reasonable care in discharging their duties to Plaintiff and the members of the Class by improperly restraining Members Mutual's members by improperly limiting each of them from purchasing additional shares of Vericity in the offering.  As a direct and proximate result of the foregoing breaches of duties by the Vericity Defendants, and each of them, the members of the Class, including without limitation Plaintiff, have been damaged because they received less subscription rights and an equally diminished right to participate in Vericity's stock price appreciation and the special one-time cash distribution.

115.     It was foreseeable to the Vericity Defendants that the unfair and unreasonable limit on subscription rights to Members Mutual's members would harm the members of the Class who lost control of Vericity, were not able to participate in the appreciation of Vericity's surge in share price after the offering or fully participate in the special one-time cash distribution.

116.    The unfair and unreasonable limit of subscription rights directly and proximately caused the members of the Class, including without limitation Plaintiff, to unfairly relinquish control of Vericity, and restrict participation in the appreciation of Vericity's surge in share price after the offering and the special one-time cash distribution.

117.    The Vericity Defendants are jointly and severally liable for the foregoing damages.

## COUNT IV
## BREACH OF CONTRACT
(<u>Against Vericity Defendants</u>)

118.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if the same were fully rewritten herein.

119.    The relationship between a member of a mutual insurance company and the mutual insurance company itself is contractual in nature as the result of an express or implied contract between them.

120.    Under Illinois demutualization laws, Members Mutual was required to provide eligible members with subscription rights without payment to purchase a portion of the capital stock of the converted stock company or, alternatively, a corporation owned by the mutual company for purposes of acquiring or holding all of the converted company's stock or a stock insurance company into which the mutual company would be merged.  These subscription rights are to be allocated to eligible members through a fair and equitable formula, which may take into account how different classes of policies of the eligible members contributed to the mutual company's surplus.

121.    The only limitations on subscription rights set by Illinois law restricts the amount of stock any shareholder or group of shareholders acting together may acquire through a public offering or subscription rights to 5% of the capital stock for the converted company for the first

five years after the conversion, unless prior approval is received by the Insurance Director. Thus, the cap imposed by Illinois law permitted eligible members to purchases up to 5% of Vericity's outstanding shares or between 743,750 and 1,006,250.

122.    A mutual insurance company's statutory and common law obligations to pay fair, reasonable, equitable and adequate consideration to eligible members in exchange for their respective membership interests in connection with a demutualization transaction arises from a number of sources, including without limitation (i) the contractual relationship between member and mutual insurance company, (ii) well-established business practices, (iii) prior course of dealings between members and mutual insurance company and (iv) the settled expectations of the parties.  By operation of law, this obligation has been incorporated into the terms of the express or implied contract between member and the mutual insurance company, regardless of whether it is specifically stated as such therein.

123.    The Vericity Defendants' contractual obligation to pay fair compensation to the eligible members in exchange for their respective membership interests also derives from the Plan described above.

124.    Thus, by virtue of the contracts with their members, Members Mutual and Fidelity Life and their successor, Vericity, were contractually required to provide each member subscription rights up to, at minimum, the statutory maximum before allowing the stand-by purchaser to purchase any remaining shares upon demutualization.  To the extent such contractual obligations may not be specifically stated in any written contract into which the Vericity Defendants entered, such contractual terms are implied by operation of law.

125.    The Vericity Defendants have breached the contracts with the members of the Class, including without limitation Plaintiff, by constraining their subscription rights and causing

33

an equally diminished right to participate in Vericity's stock price appreciation and the special one-time cash distribution.

126.    As a direct and proximate result of the Vericity Defendants' breaches of contract, the members of the Class, including without limitation Plaintiff, have been damaged because they were forced to relinquish control of Vericity, and restricted from fully participating in the appreciation of Vericity's surge in share price after the offering and the special one-time cash distribution.

127.    The Vericity Defendants are jointly and severally liable for the foregoing damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(<u>All Defendants</u>)**

128.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if the same were fully rewritten herein.

129.    The Vericity Defendants have been unjustly enriched by the cost savings in shareholder servicing costs that they enjoyed as the result of their scheme to improperly eliminate hundreds of thousands of members from the Vericity shareholder population.

130.    Apex Holdco has been unjustly enriched to the extent that it was afforded the right to purchase over 73% of Vericity's outstanding common stock and now exercises control over Vericity, enjoys the significant appreciation in its holdings in Vericity since the offering was completed, and received a greater share of the special one-time cash distribution.

131.    Defendants, and each of them respectively, should be required and ordered to disgorge the full amounts by which each has been unjustly enriched, and such sums should be returned to the members of the Class, including without limitation Plaintiff, all of whom have been damaged as the direct and proximate result of such unjust enrichment.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court:

a.      certify the proposed class, appoint Plaintiff as a class representative and appoint Plaintiff's counsel as class counsel;

b.      issue a judgment that Defendants violated Illinois Insurance Statutes by illegally capping Plaintiff and the Class members purchase rights as part of the initial stock offering;

c.      issue a judgment that Vericity and the Individual Director Defendants breached their duties to Plaintiff and the Class, which proximately caused them damages;

d.      issue a judgment that Vericity and the Individual Director Defendants breached their contractual agreements with Plaintiff and the Class, which caused them damages;

e.      issue a judgment that Defendants were unjustly enriched as a result of their actions related to the initial stock offering; and

f.      award any other relief the Court deems reasonable and necessary.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Date: January 21, 2020                    Respectfully submitted,

By:     /Mark R. Miller
        Edward A. Wallace
        Mark R. Miller
        **WEXLER WALLACE, LLP**
        55 W Monroe St
        Suite 3300
        Chicago, IL 60603
        (312) 346-2222
        *eaw@wexlerwallace.com*
        *mrm@wexlerwallace.com*

        **SALTZ MONGELUZZI**
        **BARRETT & BENDESKY, P.C.**
        Simon B. Paris
        Patrick Howard
        Charles J. Kocher
        1650 Market Street, 52nd Floor
        Philadelphia, PA 19013
        215.496.8282
        215.496.0999 (fax)
        *Sparis@smbb.com*
        *Phoward@smbb.com*
        *Ckocher@smbb.com*

        **ROGERS CASTOR**
        Lance Rogers
        Daniel J. Mirarchi
        26 E. Athens Ave.
        Ardmore, PA 19003
        610-649-1880
        877-649-1880 (fax)
        *Lance@RogercCastor.com*
        *Dan@RogersCastor.com*

36

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
Raina Borrelli
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
*DGustafson@gustafsongluek.com*
*RBorrelli@gustafsongluek.com*

**BONI, ZACK & SNYDER LLC**
Michael J. Boni
Joshua D. Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
(610) 822-0206 (fax)
*mboni@bonizack.com*
*jsnyder@bonizack.com*