# Exhibit B

424B4 1 d544725d424b4.htm 424B4

[Table of Contents](#)

**Filed pursuant to Rule 424(b)(4)**
**Registration No. 333-231952**

**PROSPECTUS**



This is the initial public offering of Vericity, Inc. We are offering up to 20,125,000 shares of our common stock for sale at a price of $10.00 per share in connection with the conversion of Members Mutual Holding Company, or Members Mutual, from mutual to stock form of organization. Immediately following the conversion, we will acquire all of the newly issued shares of common stock of converted Members Mutual.

We are offering shares of our common stock in a subscription offering and a community offering. The subscription offering will be made to eligible members of Members Mutual, who were the policyholders of Fidelity Life Association, an Illinois life insurance company and indirect subsidiary of Members Mutual, as of July 31, 2018, and to the directors and officers of Members Mutual. The subscription offering will end at 5:00 PM, Central Time, on July 29, 2019. Concurrently with the subscription offering and subject to the prior right of subscribers in the subscription offering, shares will be offered in an offering we refer to as the community offering to eligible employees of Members Mutual and possibly to a limited number of other potential investors.

Our ability to complete this offering is subject to two conditions. First, a minimum of 14,875,000 shares of common stock must be sold to complete this offering. Second, Members Mutual's plan of conversion and amended and restated articles of incorporation must be approved by the affirmative vote of at least two-thirds of the votes cast at the special meeting of members to be held on August 6, 2019. Until such time as these conditions are satisfied, all funds submitted to purchase shares will be held in escrow with Computershare Trust Company, N.A. If the offering is terminated, purchasers will have their funds promptly returned without interest. A portion of the net offering proceeds may not be invested in our company but may be used to pay a special dividend. All purchasers of stock in this offering who remain stockholders until the ex-dividend date set with respect to the special dividend, if one is declared, would be eligible to receive the special dividend.

In addition, we have entered into an agreement with Apex Holdco L.P., an affiliate of J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co. LLC, under which Apex Holdco L.P. has agreed to act as the standby purchaser for this offering. If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, is less than 14,875,000 shares, and if all of the conditions to the standby purchaser's purchase commitment have been satisfied, the standby purchaser will be obligated to purchase enough shares to guarantee the sale of 14,875,000 shares in the offerings, and may purchase additional shares as may be necessary in order to permit the standby purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings. Under our agreement with the standby purchaser, the standby purchaser will have the right to designate a majority of the nominees to serve on our board of directors. We refer to the offering of shares to the standby purchaser as the standby offering, and to the subscription offering, the community offering, and the standby offering collectively as the offerings.

In fulfilling its standby purchase commitment, the standby purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares. The directors and officers of Members Mutual have indicated their intention to subscribe for approximately 2,123,675 shares, or approximately 14% of the shares at the offering minimum. Due to the standby purchaser's commitment, the level of sales to eligible members and directors and officers of Members Mutual will not impact the condition that at least 14,875,000 shares must be sold to complete this offering. Accordingly, the sale of the minimum number of shares necessary to complete this offering does not indicate that sales have been made to investors who have no financial or other interest in the offerings, and the sale of the minimum number of shares should not be viewed as an indication of the merits of this offering.

The minimum number of shares that a person may subscribe to purchase is 25 shares. The maximum number of shares that a person may subscribe to purchase in the subscription offering is the lesser of 743,750 or the individual maximum purchase limitations described in this prospectus. If orders are received for more shares than shares offered, shares will be allocated in the manner and priority described in this prospectus.

Raymond James & Associates, Inc. will act as our marketing agent and will use its best efforts to assist us in selling our common stock in this offering, but Raymond James is not obligated to purchase any shares of common stock that are being offered for sale. Any commissions paid in connection with the purchase of shares of common stock in this offering will be paid by us from the gross proceeds of the offering.

There is currently no public market for our common stock. Our common stock has been approved for listing on the NASDAQ Capital Market under the symbol "VERY."

***We are an "emerging growth company" and a "smaller reporting company" as defined under applicable federal securities laws and Securities and Exchange Commission rules and will be eligible for reduced public company reporting requirements. See "Summary—Implications of Being an Emerging Growth Company and a Smaller Reporting Company."***

**Investing in our common stock involves risks. For a discussion of the material risks that you should consider, see "Risk Factors" beginning on page 13 of this prospectus.**

**OFFERING SUMMARY**
**Price: $10.00 per share**

| | Minimum | Maximum |
|---|---|---|
| Number of shares offered | 14,875,000 | 20,125,000 |
| Gross offering proceeds | $ 148,750,000 | $ 201,250,000 |
| Estimated offering expenses | $ 9,696,188 | $ 9,696,188 |
| Commissions(1)(2) | $ 3,525,398 | $ 2,012,500 |
| Net proceeds | $ 135,528,415 | $ 189,541,312 |
| Net proceeds per share | $ 9.11 | $ 9.42 |

(1) Represents commissions to be paid to Raymond James, based on 1.0% of the proceeds from shares sold in the subscription offering, up to 6.0% of the proceeds from shares sold to other potential investors in the community offering, and 3.0% of the proceeds from the shares sold to the standby purchaser. No commission will be paid on the sale of shares sold to directors, officers and eligible employees. Any shares sold to the standby purchaser in the standby offering will be sold in a private placement to close concurrently with the subscription offering at a price equal to the public offering price in this offering. The shares sold to the standby purchaser in the standby offering are not being registered as part of this offering and will be restricted securities. See "The Conversion and Offering—Marketing Arrangements" for a description of the marketing agent compensation.

(2) Assumes (x) at the offering minimum, 1,500,000 shares are sold in the subscription offering to eligible members, 2,123,675 shares are sold in the subscription offering to directors and officers of Members Mutual and 11,251,325 shares are sold in the standby offering to the standby purchaser; and (y) at the maximum, that all 20,125,000 shares are sold in the subscription offering to eligible members. We are unable to predict the number of shares the eligible members, eligible employees or other potential investors may subscribe for, and the number of shares the standby purchaser may acquire.

**None of the Securities and Exchange Commission, the Illinois Department of Insurance or any state securities commission has approved or disapproved of these securities or determined if this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

For assistance, please call the Stock Information Center at 1-866-420-6746.

## Raymond James

The date of this Prospectus is June 20, 2019

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights information contained elsewhere in this prospectus. Before making a decision to purchase our common stock, you should read the entire prospectus carefully, including the "Risk Factors" and "Forward-Looking Statements" sections and our consolidated financial statements and the notes to those financial statements.*

**Overview**

We provide life insurance protection targeted to the middle American market. We believe there is a substantial unmet need for life insurance, particularly among domestic households with annual incomes of between $50,000 and $125,000, a market we refer to as our target Middle Market. We strive to deliver to this market affordable, easy to understand term and whole life insurance products through a consumer-friendly and efficient sales process. Through innovation in product design and distribution that provides access to the Middle Market, including call center and web-enabled sales and underwriting processes, quick issuance of policies and an emphasis on products not medically underwritten at the time of sale, we believe we are well positioned to make life insurance more affordable and accessible to the Middle Market.

We conduct our business through our two operating subsidiaries, Fidelity Life Association, an Illinois-domiciled life insurance company chartered in 1896, and Efinancial, LLC, a call center-based insurance agency. Fidelity Life distributes life insurance products through Efinancial and other unaffiliated agents and is licensed in the District of Columbia and every state except New York and Wyoming. A.M. Best has assigned an "A-" (Excellent) rating to Fidelity Life, which is the fourth highest out of fifteen ratings. Fidelity Life is located in Chicago, Illinois.

Efinancial markets life products for Fidelity Life and, as of March 31, 2019, had agency relationships with 25 unaffiliated insurance companies. Efinancial's primary operations are conducted through employee agents from two call center locations in Bellevue, Washington and Chicago, Illinois, which we refer to as our retail channel, and through independent agents and other marketing organizations, which we refer to as our wholesale channel. In addition to offering Fidelity Life products, Efinancial also sells insurance products of unaffiliated carriers. Efinancial's principal office is located in Bellevue, Washington.

We believe our ability to unconditionally issue policies either during or within 24 to 48 hours of the initial call differentiates us from our competitors. Leveraging our patented ***RAPID***ecision® sales and underwriting processes, we can sell a life insurance policy to a consumer before medical underwriting is complete. We are able to complete an initial underwriting process for most of our life insurance applicants either during or shortly after the initial call, and if not, within 24 to 48 hours after that initial call. For the three months ended March 31, 2019, approximately 90% of our policy applications processed through our ***RAPID***ecision® underwriting process received an underwriting disposition on or shortly after the initial sales call. Approximately one-half of the remaining applications received final underwriting decisions within the next 24 to 48 hours.

Our ***RAPID***ecision®Life product provides coverage at the point of issue that is a blend of all-cause term life insurance for part of the coverage and accidental death insurance for the remainder of the total face amount. If a policyholder completes medical underwriting after the initial sale of the ***RAPID***ecision®Life product, the policy benefits may be improved based on the underwriting results to increase the proportion of all-cause term life insurance coverage, typically with no increase in premium. In some instances, based upon the results of predictive analytic models, the consumer can qualify for the full amount of all-cause coverage without medical testing.

For the three months ended March 31, 2019 and years ended December 31, 2018 and December 31, 2017, we had total consolidated revenue of $33.2 million, $123.9 million and $115.9 million, net life premium revenue of $23.1 million, $88.6 million and $82.9 million, and a net loss of $6.2 million, $13.8 million and $8.2 million, respectively. As of March 31, 2019, we had total assets of $662.9 million and equity of $179.2 million.

**Our Approach**

Our business model is predicated upon gaining cost effective access to the Middle Market, engaging consumers in our sales process for life insurance with products that have higher placement rates than traditional fully underwritten term life insurance in a call center environment, and issuing those products quickly. We require access to a large quantity of quality

Table of Contents

sales leads to keep our retail call center agents productive. Currently, we acquire most of our sales leads from third party lead vendors. We supplement that lead flow with leads we generate ourselves. More significantly, we are rapidly increasing our affinity business with non-life insurance partners that provide their customers or prospects as leads, and we market and sell life insurance products to those leads.

We tend to sell policies with lower face amounts, resulting in more affordable options for our customers. Although not the lowest priced, our products are competitive and they represent an attractive consumer value considering the coverage they provide and the relative simplicity of our sales and underwriting processes. Our business model allows us to capture end-to-end data beginning with the acquisition of sales leads through the final disposition of life insurance policies. With this data, we plan to develop and apply predictive analytics to realize efficiencies at various points in the sales process.

**Our Competitive Strengths**

We believe that we are strategically positioned to take advantage of the following competitive strengths:

- ***Middle Market access.*** The sales contacts made through Efinancial's call centers are focused on the Middle Market. This stands in contrast to the life insurance industry at large, which tends to market to a more affluent clientele.
- ***Multi-channel distribution.*** We reach Middle Market consumers through multiple distribution channels. Through our retail channel, we engage consumers through Efinancial's call centers using sales leads that we acquire or generate ourselves, and we leverage our product and sales processes with affinity partners to extend our reach to Middle Market consumers seeking affordable, accessible life insurance. Through our wholesale channel, we offer other carriers' products through unaffiliated distributors. In addition, Fidelity Life also offers its products through select unaffiliated distributors.
- ***Patented products and processes***. Our ***RAPID***ecision® Life product features a system-and-method patented process that affords higher and faster placement rates than traditional fully underwritten term life insurance in a call center environment. Through our process, policy placement usually occurs during the initial interaction, which leads to customer satisfaction and improved economics in our call centers. Our efficient process contrasts with much of the industry, where the underwriting process extends well beyond the initial interaction. In addition, our flagship ***RAPID***ecision® Life product uses predictive analytics at certain ages and face amounts to place all-cause coverage products during the initial interaction without a medical examination for qualified customers. The product is priced to be profitable even at lower policy amounts, which allows us to align our offerings with Middle Market consumers' ability to afford life insurance.
- ***End-to-end lead and policy data.*** As a life insurance company and a direct distributor, we are positioned to gather end-to-end lead and policy data to develop predictive analytical models that can be applied to identify the characteristics of prospects who are more likely to exhibit favorable placement, persistency and mortality experience. We plan to apply this insight to optimize our marketing, sales and underwriting processes and product development.

**Our Growth Strategies**

We intend to use our competitive strengths to grow our business through the following strategies:

- ***Capitalize on the unmet need for life insurance in our target market.*** We believe we are well positioned to meet demand where there is currently a substantial unmet need for life insurance in the Middle Market. Using our quick-issue products together with our distribution platform, we plan to increase sales to Middle Market consumers by providing a convenient experience to purchase life insurance at an affordable price.
- ***Use predictive analytics to generate more productive sales leads***. By converting data we generate through our distribution platform into actionable insight using statistical analysis, we will seek to be more efficient in our acquisition and use of leads, improving our call center placement ratios and overall profitability.
- ***Enhance and extend affinity partnerships***. We plan to continue and selectively deepen our existing affinity partnerships and develop new and complementary affinity relationships and partnerships. We expect this will expand and diversify our sources of quality leads.

Table of Contents

- ***Expand call center operations and improve efficiency.*** To drive sustainable premium and Efinancial commission growth, we plan to expand our Efinancial call center operations by hiring additional agents. In addition, we evaluate our product offerings and product providers in order to examine whether we are addressing the needs and preferences of the Middle Market.
- ***Explore alternative means of distribution.*** We are currently exploring distribution alternatives beyond our call center and independent distributors, including digital and on-line sales.

**Our Challenges and Risks**

Our company and our business are subject to numerous risks as more fully described in the section of this prospectus entitled "Risk Factors." As part of your evaluation of our business, you should consider the challenges and risks we face in implementing our business strategies:

- ***We have incurred net losses over the last nine years.*** A significant percentage of Fidelity Life's in-force policies have been written since 2007, and as a result we do not have an established legacy book of business and associated revenue streams like many larger life insurance companies. The lack of cash flows typically associated with a legacy business puts Fidelity Life at a disadvantage in comparison with other life insurance carriers that have a more established book of business and associated revenue streams. We have also incurred a net loss in each of the nine prior fiscal years, resulting in an aggregate of approximately $111.7 million in net losses over that period, including losses of $13.8 million and $8.2 million for the years ended December 31, 2018 and December 31, 2017, respectively. In addition, we have incurred a loss of $6.2 million for the three months ended March 31, 2019. Our losses are due principally to operating expenses and corporate overhead exceeding revenues of our agency and insurance segments, and our inability to defer a majority of commission expense on policies produced by our affiliated agency, Efinancial.
- ***We expect to continue to incur net losses as we develop our distribution platform.*** We plan to increase sales through our affiliated distributor, Efinancial, in order to increase our scale to cover our operating expenses and corporate overhead. However, generally accepted accounting principles in the United States (GAAP) require that we immediately expense that portion of our policy acquisition costs for policies placed through our affiliated agency, Efinancial, that cannot be directly tied to the placement of a policy. As a result of this immediate expense recognition for sales through Efinancial, we incur a net loss in the first year on each policy sold through Efinancial. If we are successful in increasing our premium writings through our distribution platform over each of the next several years, we expect that the impact of the immediate expense recognition will continue to contribute to our incurring consolidated net losses and reduction of our consolidated equity in each such year.
- ***Our call center-based distribution model may not be sustainable.*** The products and processes that we use to reach the Middle Market rely heavily on retail call center-based sales. There are relatively few such call centers being operated by independent distributors. The call centers that we are familiar with tend to have low placement ratios on medically underwritten products because of the time delay involved in issuing policies and the lack of face to face sales support typically provided by traditional agents. We have developed innovative products and processes designed to streamline the sale of life insurance and improve call center placement ratios, and have made significant investments in cultivating leads and improving our sales process. We cannot assure you that our business model, which is focused on selling quick-issue policies to the Middle Market through our retail call center distribution platform, will prove to be viable or sustainable. If we are not successful in utilizing our products and processes to penetrate our target Middle Market, or if we are unable to hire, develop and retain well qualified individuals to staff our retail call centers, we will not generate sufficient revenues to offset our expenses, which will result in a material and adverse effect on our business, financial condition and results of operations.
- ***Our target market continues to face a difficult economic environment.*** While economic conditions have stabilized and improved in a number of areas, economic challenges still remain. Many middle American families, including those that comprise our target Middle Market, have experienced financial hardships and stagnating income levels. We believe that these economic pressures have reduced demand for our life insurance products due to challenging consumer economics, including increased demands on disposable income to pay for increasing costs of living, including health insurance, savings goals and general living expenses. Economic challenges may continue to adversely affect our business in the future.

Table of Contents

**Business Segments**

We manage our business through three segments:

- ***Agency.*** Our agency segment operates through Efinancial. Efinancial sells insurance products through its call center distribution platform and through its independent agents and other marketing organizations.
- ***Insurance.*** Our insurance segment operates through Fidelity Life. Fidelity Life engages in the principal business lines of core life, non-core life, closed block, and annuities and assumed life. In its core life and non-core life business lines, Fidelity Life offers primarily term life insurance products, and to a lesser extent accidental death and final expense products. We currently do not offer annuity contracts, separate account variable products or universal life products.
- ***Corporate.*** Our corporate segment consists primarily of a small amount of capital required to be maintained for regulatory purposes, and also includes certain expenses considered to be corporate and not allocated to our agency or insurance segments.

**Implications of Being an Emerging Growth Company and a Smaller Reporting Company**

As a company with less than $1.07 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, commonly known as the JOBS Act. An emerging growth company may take advantage of specified reduced reporting requirements and reduction of other obligations that are otherwise generally applicable to public companies. These provisions include:

- a requirement to include in this prospectus only two years of audited financial statements, two years of selected financial information, and two years of related Management Discussion & Analysis;
- exemption from the auditor attestation requirement on the effectiveness of our internal control over financial reporting;
- reduced disclosure about our executive compensation arrangements; and
- no stockholder non-binding advisory votes on executive compensation or golden parachute arrangements.

We may take advantage of these provisions until the earlier of five years or such time as we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.07 billion in annual revenues, have more than $700 million in market value of our capital stock held by non-affiliates, or issue more than $1.0 billion of non-convertible debt over a three-year period.

Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. We have elected to take advantage of the benefits of this extended transition period until we are no longer an emerging growth company or until we affirmatively and irrevocably opt out of this exemption. Our financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

As a company with less than $250 million of public float, we qualify as a "smaller reporting company" as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended, or the Exchange Act. As a smaller reporting company we are able to take advantage of reduced disclosure requirements, such as simplified executive compensation disclosures and reduced financial statement disclosure requirements in our SEC filings. We plan to take advantage of some or all of the reduced compliance obligations applicable to emerging growth companies and smaller reporting companies.

**Our History**

We formed Vericity so that it could acquire all of the capital stock of converted Members Mutual as part of the conversion. Prior to the conversion, Vericity has not engaged and will not engage in any operations and does not have any assets or liabilities. After the conversion, Vericity's primary assets will be the outstanding capital stock of converted Members Mutual and the net proceeds of the offerings described in this prospectus. Vericity Holdings, Inc. is a wholly-owned subsidiary of Members Mutual and the intermediate holding company for Efinancial and Fidelity Life.

Table of Contents

In 2007, Fidelity Life completed a reorganization in which it converted from a mutual to a stock insurance company within a newly created mutual holding company structure. As part of the reorganization, Members Mutual was formed as an Illinois mutual insurance holding company and Fidelity Life continued its existence as an Illinois stock life insurance company. All of the shares of Fidelity Life were issued to Vericity Holdings, an intermediate holding company that, in turn, was initially a wholly-owned subsidiary of Members Mutual. In the reorganization, policyholders' membership interests in Fidelity Life automatically became membership interests in Members Mutual, but policyholders' contractual rights remained with Fidelity Life. Since the effective date of the reorganization, each person who has become a Fidelity Life policyholder has automatically become a member of Members Mutual and retains that membership interest as long as the Fidelity Life policy owned by the member remains in force.

In 2009, Vericity Holdings acquired Efinancial from its owners. As part of the consideration for the acquisition of Efinancial, the owners were issued shares of common stock of Vericity Holdings. These shares have since been redeemed and Vericity Holdings is wholly-owned by Members Mutual.

Our principal executive offices are located at 8700 West Bryn Mawr Avenue, Suite 900S, Chicago, Illinois, 60631, and our phone number is (312) 379-2397. Our website address is www.vericity.com. Information contained on our website is not incorporated by reference into this prospectus, and such information should not be considered to be part of this prospectus.

**Our Structure Prior to the Conversion**

Since Fidelity Life converted from mutual to stock form in 2007, we have operated under a mutual holding company structure. Our current corporate structure is shown in the following chart:




* As required by Illinois law, prior to the conversion, Vericity, Inc. is owned by Members Mutual. Prior to the conversion, Vericity, Inc. has not engaged in any operations and does not have any assets or liabilities. The one (1) outstanding share of Vericity, Inc. is owned by Members Mutual and will be cancelled upon completion of this offering.

** As required by Illinois law, prior to the conversion, the stock of Vericity Holdings is held in trust for the benefit of the policyholders of Fidelity Life.

**Our Structure Following the Conversion**

Immediately upon the conversion of Members Mutual, all of the authorized capital stock of converted Members Mutual will be issued to Vericity, and the common stock of Vericity held by converted Members Mutual will be cancelled, such that, upon completion of this series of actions, the issued and outstanding shares of our common stock will consist solely of the shares of common stock sold in the offerings.

Table of Contents

Following the completion of these actions, assuming that (i) fewer than 14,875,000 shares are sold in the subscription offering and community offering, or (ii) that fewer than 20,125,000 shares are sold in the subscription offering and that the standby purchaser elects to purchase shares in the standby offering, the corporate structure of Vericity, Inc. will be as shown in the following chart:




In fulfilling its standby purchase commitment, the standby purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares. The directors and officers of Members Mutual have indicated their intention to subscribe for approximately 2,123,675 shares, or approximately 14% of the shares at the offering minimum.

**The Conversion of Members Mutual from Mutual to Stock Form**

Members Mutual is an Illinois-domiciled mutual insurance holding company. As a mutual company, it has no stockholders but it does have members. A member of Members Mutual is either the holder of an in-force individual insurance policy issued by Fidelity Life or the holder of a group master policy issued by Fidelity Life.

Like stockholders, the members have certain rights with respect to Members Mutual such as voting rights with respect to the election of directors and approval of certain fundamental transactions, including the conversion of Members Mutual from mutual to stock form. However, unlike shares held by stockholders, the membership interests in Members Mutual are not transferable and do not exist separately from the related insurance policies issued by Fidelity Life. Therefore, these membership interests are extinguished when a member's policy with Fidelity Life is terminated by surrender, death, lapse or cancellation. Those membership interests will also be extinguished upon conversion of Members Mutual from mutual to stock form in accordance with Illinois law and the plan of conversion.

The board of directors of Members Mutual adopted a plan of conversion on July 31, 2018, as amended and restated on September 16, 2018 and March 25, 2019, under which Members Mutual will convert from a mutual insurance holding company to a stock company. Following the conversion, Members Mutual will become a wholly-owned subsidiary of Vericity. A special meeting of the eligible members of Members Mutual (those members who were the policyholders of Fidelity Life as of the close of business on July 31, 2018) will be held on August 6, 2019, to approve the plan of conversion. To become effective, the plan must be approved by the affirmative vote of at least two-thirds of the votes cast at the special meeting.

As part of the conversion, we are offering for sale between 14,875,000 shares and 20,125,000 shares of our common stock at a purchase price of $10.00 per share on a first priority basis to eligible members, and second to the directors and officers of Members Mutual. All purchasers of our common stock in this offering will pay the same cash price per share. If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community

Table of Contents

offering, is less than 14,875,000 shares, Apex Holdco L.P., an affiliate of J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co. LLC, has agreed to act as the standby purchaser for this offering and to purchase the number of shares of our common stock equal to the difference between 14,875,000 and the number of shares of common stock subscribed for in the subscription offering together with the number of shares for which subscriptions are accepted in the community offering, and may purchase additional shares as may be necessary in order to permit the standby purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings. Under the terms of our agreement with the standby purchaser, the standby purchaser will have the right to designate a majority of the nominees to serve on our board of directors, whether or not it acquires a majority of the stock sold in the offerings. All membership interests in Members Mutual will be extinguished upon completion of the subscription offering and the plan of conversion, regardless of whether an eligible member exercises subscription rights received under the plan of conversion.

**The Subscription Offering**

We are offering shares of our common stock in a subscription offering. The subscription offering will end at 5:00 PM, Central Time, on July 29, 2019. In the subscription offering, 20,125,000 shares of common stock are being offered on a first priority basis to the members of Members Mutual who were policyholders of Fidelity Life as of the close of business on July 31, 2018, who we refer to as eligible members, and second to the directors and officers of Members Mutual.

The number of shares of common stock issued will not exceed 20,125,000 shares. Shares purchased by the directors and officers of Members Mutual will be purchased for investment and not for resale and will be counted toward satisfaction of the minimum number of shares needed to be sold to complete this offering. We refer to this offering of the common stock to the eligible members and the directors and officers of Members Mutual as the "subscription offering."

**The Community Offering**

If less than 20,125,000 shares are subscribed for in the subscription offering, we will offer shares to eligible employees under the Employee Bonus Program and may offer shares to other potential investors in what we refer to as the community offering. In the community offering, the Company may accept, in its sole and absolute discretion, orders received in the following order of priority: (1) orders from eligible employees who subscribe for shares of common stock as part of the Employee Bonus Program, and (2) if the number of subscribers or the number of shares of common stock subscribed for by participants in the subscription offering, together with any shares subscribed for by eligible employees, is not sufficient to qualify Vericity for listing on the Nasdaq Capital Market, the Company may accept, in its sole discretion, orders for shares of common stock from select investors in the community offering as may be necessary in order for Vericity to qualify for listing on the Nasdaq Capital Market.

The Company may commence the community offering concurrently with, at any time during, or as soon as practicable after the end of, the subscription offering, and the community offering must be completed within 30 days after the end of the subscription offering, unless extended by the Company. Other than eligible employees, whose subscriptions are subject to the terms of the Employee Bonus Program, the maximum amount that any person together with any associate may, directly or indirectly, subscribe for or purchase in the community offering, shall not exceed 743,750 shares of common stock.

**The Employee Bonus Program**

In connection with the conversion, Members Mutual has adopted a bonus program for eligible employees who, in recognition of their efforts on behalf of Members Mutual to position it to become a publicly-traded stock company, will be given the opportunity to receive a bonus payable either in $1,000 cash or 100 shares of common stock of Vericity, in either case together with an additional $250 cash to help defray taxes payable with respect to the bonus. The Employee Bonus Program will be conducted as part of the community offering and is subject to completion of the conversion.

It is the intention of the Company to accept all orders of stock from eligible employees in the Employee Bonus Program so long as the total number of shares of common stock subscribed for by participants in the subscription offering together with shares subscribed for by eligible employees in the Employee Bonus Program is less than 20,125,000. In the event the total exceeds 20,125,000 shares, no shares of common stock will be issued to eligible employees under the Employee Bonus Program and the bonus will be paid in cash, subject to completion of the conversion.

Table of Contents

**The Standby Purchaser**

Apex Holdco L.P., the standby purchaser, was formed on October 1, 2018 to acquire shares of our common stock pursuant to the standby purchase agreement. Prior to the completion of the standby offering, the standby purchaser has not engaged in any business operations and does not have any assets or liabilities (other than its rights and obligations under the standby purchase agreement). The standby purchaser is managed by Apex Holdco GP LLC, its general partner. Apex Holdco GP LLC is an affiliate of J.C. Flowers & Co. LLC.

At this time it is not possible to determine the number of shares of common stock of the Company that the standby purchaser will purchase pursuant to the standby purchase agreement. However, in fulfilling its standby purchase commitment, the standby purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares. Pursuant to the standby purchase agreement, after the completion of the offerings, the standby purchaser will have the right to designate a majority of the members of our board of directors. If the standby purchaser acquires a majority of our shares in the standby offering, the standby purchaser will be able to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders.

J.C. Flowers & Co. LLC was founded in 1998 and is a leading private investment firm dedicated to investing globally in the financial services industry. J.C. Flowers & Co. LLC invests across a range of deal types and industry sectors including banking, insurance and reinsurance, securities, services and asset management, and specialty finance. J.C. Flowers & Co. LLC is registered with the Securities and Exchange Commission as an investment adviser. With approximately $6 billion of assets under management, J.C. Flowers & Co. LLC has offices in New York and London. Mr. J. Christopher Flowers is the sole owner of, and the managing member of, J.C. Flowers & Co. LLC.

**Standby Purchase Agreement**

Members Mutual, Vericity and Fidelity Life entered into the standby purchase agreement with the standby purchaser on October 5, 2018, as amended and restated on March 26, 2019, pursuant to which the standby purchaser agreed, subject to certain conditions, to acquire from us at the subscription price of $10.00 per share the number of shares equal to the difference between the offering minimum of 14,875,000 shares and the number of shares of common stock subscribed for in the subscription offering together with any subscriptions for shares accepted in the community offering. In addition, the standby purchaser has the right to purchase additional shares up to the offering maximum, which additional shares may permit the standby purchaser to acquire up to a majority of the stock sold in the offerings. Under the terms of our agreement with the standby purchaser, the standby purchaser will have the right to designate a majority of the nominees to serve on our board of directors, whether or not it acquires a majority of the stock sold in the offerings. Shares purchased by the standby purchaser in the standby offering will be purchased for investment and not for resale and will be counted toward satisfaction of the minimum number of shares needed to be sold to complete this offering. For a description of the terms and conditions of the standby purchase agreement, see "The Conversion and Offering—Description of the Standby Purchase Agreement."

We refer to the offering of shares to the standby purchaser as the standby offering. We refer to the subscription offering, the community offering and the standby offering collectively as the offerings.

**Conditions to Completion of the Conversion and this Offering**

Our ability to complete this offering is subject to two conditions. First, a minimum of 14,875,000 shares of common stock must be sold to complete this offering. Second, Members Mutual's plan of conversion and amended and restated articles of incorporation must be approved by the affirmative vote of at least two-thirds of the votes cast at the special meeting of members to be held on August 6, 2019. No funds will be released from the escrow account until both of these conditions have been satisfied.

If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, is less than 14,875,000 shares, and if all of the conditions to the standby purchaser's purchase commitment have been satisfied, the standby purchaser will be obligated to purchase enough shares in the standby offering to guarantee the sale of the minimum number of shares necessary to complete this offering. In that event, the level of sales to eligible members and directors and officers of Members Mutual will not impact the condition that at least 14,875,000 shares must be sold to complete this offering. Accordingly, the sale of the minimum number of shares necessary to complete this

Table of Contents

offering does not indicate that sales have been made to investors who have no financial or other interest in the offerings, and the sale of the minimum number of shares should not be viewed as an indication of the merits of this offering.

**Termination of this Offering**

Subject to the provisions of the plan of conversion and the standby purchase agreement, we have the right to cancel this offering at any time. In addition, the completion of this offering is subject to market conditions and other factors beyond our control. If this offering is not completed, all funds received will be promptly returned to purchasers without interest.

**Stock Pricing and Number of Shares to be Issued**

The plan of conversion requires that the range of the value of the total number of shares to be issued in this offering must be based on a valuation of our estimated consolidated pro forma market value. Under the plan of conversion, the valuation must be in the form of a range consisting of a midpoint valuation, a valuation fifteen percent (15%) above the midpoint valuation and a valuation fifteen percent (15%) below the midpoint valuation. We retained Boenning & Scattergood, Inc. to determine the valuation range for this offering. Boenning & Scattergood, Inc. has determined that, as of April 11, 2018, the estimated consolidated pro forma market value of Members Mutual is $175,000,000 at the midpoint, and the range of value of the total number of shares of common stock to be issued in the offering is between a minimum value of $148,750,000 and a maximum value of $201,250,000. We plan to issue between 14,875,000 and 20,125,000 shares of our common stock in this offering. This range was determined by dividing the $10.00 price per share into the range of Boenning & Scattergood, Inc.'s valuation.

We determined to offer the common stock in the subscription offering at the price of $10.00 per share to ensure a sufficient number of shares are available for purchase by eligible members. In addition, Raymond James advised us that the $10.00 per share offering price is commonly used in mutual-to-stock conversions of other insurance companies and savings banks and savings associations that use the subscription rights conversion model. These were the only factors considered by our board of directors in determining to offer shares of common stock at $10.00 per share.

**How Do I Buy Stock in this Offering?**

If you wish to purchase shares of common stock in the subscription offering, you must sign and complete the stock order form that accompanies this prospectus and send it to us with your payment such that your order is received before the offering deadline. You may submit your order to us by overnight delivery to the address indicated for this purpose on the top of the stock order form or by mail using the stock order reply envelope provided. Payment by check or money order must accompany the stock order form. No cash or third party checks will be accepted. All checks or money orders must be made payable to "Computershare Trust Company, N.A., as escrow agent for Vericity, Inc." We may permit certain persons whose subscriptions are accepted in the community offering to make payment of the purchase price by a wire transfer to the escrow agent.

The completed stock order form and payment in full for the shares ordered must be received (not postmarked) no later than 5:00 PM, Central Time, on July 29, 2019. Once submitted, your order is irrevocable without our consent unless we terminate this offering. Our consent to any modification or withdrawal request may or may not be given in our sole discretion. We may reject a stock order form if it is incomplete, improperly completed, or not timely received.

If you are an eligible employee and wish to purchase 100 shares of stock under the Employee Bonus Program, you must complete the Employee Bonus Program Election Form and follow the instructions provided.

**Offering Deadline**

All subscription rights will expire at 5:00 PM, Central Time, on July 29, 2019. We expect that the community offering will terminate on or about the same time. Subscription rights not exercised prior to this deadline will be void, whether or not we have been able to locate each person entitled to receive subscription rights.

**Limits on Your Purchase of Common Stock**

The plan of conversion and Illinois law establish the following minimum and maximum purchase limitations for participants (including such participant's associates or a group acting in concert) in the subscription offering:

- No person may subscribe for fewer than 25 shares in this offering.

Table of Contents

- Each eligible member has been allocated subscription rights to purchase the number of shares that is printed on the stock order form mailed to each such eligible member. No eligible member may subscribe to purchase more shares than the number of subscription rights allocated to such member. The number of subscription rights allocated to each eligible member was determined in accordance with actuarial analyses described in the plan of conversion.
- Subject to the prior rights of eligible members to subscribe for up to 20,125,000 shares in this offering, no director or officer of Members Mutual may purchase more than such person's individual management purchase limit. Members Mutual has determined each individual management purchase limit based on positions held and compensation. In no event may the directors and officers of Members Mutual, in their capacities as such, purchase more than 4,016,250 shares of the stock sold in the offerings.
- In addition to the limitations set forth above, no person (other than the standby purchaser) may acquire, directly or indirectly, in this offering or any public offering, more than 5% of the capital stock of Vericity for a period of five years from the effective date of the conversion without the approval of the Illinois Director of Insurance.

The subscription of any person who subscribes for more shares than the person's maximum purchase limitation as set forth on the stock order form will be disregarded in its entirety or reduced to the person's maximum purchase limitation, at the discretion of Vericity.

We have the right in our absolute discretion and without liability to any participant in the subscription offering, the community offering or to any other person to determine which proposed persons and which subscriptions and orders in this offering meet the criteria provided in the plan of conversion for eligibility to purchase shares of common stock and the number of shares eligible for purchase by any person. Our determination of these matters will be final and binding on all parties and all persons.

**Oversubscription**

If eligible members subscribe for more than 20,125,000 shares, the shares of common stock will be allocated so as to permit each subscribing eligible member, to the extent possible, to purchase up to the lesser of the number of shares subscribed for or 100 shares. Any remaining shares will be allocated among the eligible members whose subscriptions remain unsatisfied in the proportion in which the number of shares as to which each such eligible member's subscription remains unsatisfied bears to the aggregate number of shares as to which all such eligible members' subscriptions remain unsatisfied.

**Actuarial Opinion**

We retained Milliman, Inc., an independent actuarial consulting firm, to advise us in connection with actuarial matters involved in the allocation of subscription rights and the establishment of the individual maximum purchase limitations. The opinion of Steven I. Schreiber, Principal of Milliman, dated March 25, 2019, relating to the proposed allocation of subscription rights among eligible members in consideration for the extinguishment of their membership interests in Members Mutual, states (in reliance upon the matters described in such opinion) that the principles, methodology and the allocation instructions for allocating consideration among the eligible members and for allocating shares in the event of an over subscription, each as set forth in the plan of conversion, are fair and equitable from an actuarial point of view. The opinion of Steven I. Schreiber is an exhibit to the registration statement of which this prospectus is a part, and is available for inspection in the manner set forth in the section titled "Additional Information." A copy of the actuarial opinion is also on file and available for inspection at our principal executive offices.

**Management Purchases of Stock**

The directors and officers of Members Mutual, in their capacities as such, may not purchase in the aggregate more than 4,016,250 shares, which represents 27% of the shares at the minimum of the offering range. If the eligible members subscribe for less than the maximum number of shares, the directors and officers of Members Mutual have indicated their intention to purchase approximately 2,123,675 shares of common stock in the subscription offering. The directors and officers of Members Mutual are not obligated to purchase this number of shares, and in the aggregate they may purchase a greater or smaller number of shares. See "The Conversion and Offering—Proposed Management Purchases."

If there are insufficient shares remaining after the subscriptions of eligible members to satisfy in full all of the subscriptions of directors and officers of Members Mutual, the available shares of common stock will be allocated among the

Table of Contents

subscribing management participants in the proportion in which the number of shares as to which each such management participant's subscription bears to the aggregate number of shares subscribed for by all management participants.

**Undersubscription**

If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, is less than 14,875,000 shares, the standby purchaser has agreed to purchase enough shares in the standby offering to guarantee the sale of the minimum number of shares necessary to complete this offering, and may purchase additional shares as may be necessary in order to permit the standby purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings. In that event, the level of sales to eligible members and directors and officers of Members Mutual will not impact the condition that at least 14,875,000 shares must be sold to complete this offering. Accordingly, the sale of the minimum number of shares necessary to complete this offering does not indicate that sales have been made to investors who have no financial or other interest in the offerings, and the sale of the minimum number of shares should not be viewed as an indication of the merits of this offering.

**Benefits to Management**

Members of our management, our directors and advisory board members will participate in an equity incentive plan to be established under the terms of the amended and restated limited partnership agreement of the standby purchaser. The plan will be established to promote the long-term growth and profitability of the standby purchaser and all of our stockholders by providing employees, directors and service providers who are or will be involved in our growth with an opportunity to acquire an ownership interest in the standby purchaser, thereby encouraging such persons to contribute to and participate in our success. Under the plan, the general partner of the standby purchaser may grant awards of Class B units to employees, directors and other service providers of the standby purchaser and/or Vericity. Class B units are non-voting profits interests in the standby purchaser that entitle the holders thereof to participate in the appreciation in the value of the standby purchaser above an applicable threshold and to thereby share in our future growth. The grant of equity-based awards to our management and directors is intended to encourage the creation of long-term value for our stockholders by helping to align the interests of the participants under the plan with those of our stockholders and to promote employee retention and ownership. See "Executive Compensation—Apex Holdco Equity Incentive Plan."

**Shares Outstanding Immediately After the Offerings**

A minimum of 14,875,000 shares and a maximum of 20,125,000 shares of our common stock will be issued and outstanding after the offerings.

**Use of Proceeds**

As required under Illinois law, the plan of conversion requires that the total price of the stock to be issued in the conversion must be equal to the estimated pro forma market value of converted Members Mutual as determined by an independent appraiser, which is $148.8 million at the minimum of the offering range. Accordingly, we must sell shares at an aggregate price at least equal to $148.8 million in the offerings. We estimate the net proceeds from the offerings will be between $135.5 million at the minimum of the offering range and $189.5 million at the maximum of the offering range. See the "Offering Summary" on the front cover of the prospectus for the assumptions used to arrive at these amounts. The amount of net proceeds from the sale of common stock in the offerings will depend on the total number of shares actually sold in the subscription offering, the community offering, and the standby offering.

Initially, we plan to retain substantially all of the net proceeds from the offerings at Vericity. The standby stock purchase agreement provides that within six months following the closing of this offering, our board will direct management to undertake and complete a capital needs assessment to project the amount of capital reasonably needed to be maintained at Vericity to support adequate operating capital levels at Fidelity Life and Efinancial. Depending on the results of the assessment, we may allocate a portion of the net proceeds from the offerings to support our insurance and agency businesses, and more particularly to (i) reduce our use of reinsurance to finance growth, while continuing to emphasize risk management; (ii) make investments to strengthen our infrastructure, including our IT platforms; (iii) selectively deploy new capital to acquire and bolster talent in key areas of competency linked to competitive advantage; and (iv) pay amounts due on account of the acceleration of Long-Term Incentive Plan awards (as described below). We expect that any unallocated net proceeds from the offerings will be used for general corporate purposes, including paying holding company expenses, and potentially paying a special cash dividend to our stockholders or repurchasing shares of our common stock. In connection with the

Table of Contents

approval of the conversion by the Illinois Director of Insurance, we agreed, for a period of twenty-four months following the completion of the offerings, to either maintain $20 million of the proceeds of the offerings at Vericity or use all or a portion of that $20 million to fund our operations.

If as a result of the capital needs assessment, management determines that the amount of capital retained at Vericity exceeds the reasonable current and near term projected operating capital needs, management will determine the amount of excess capital (if any) that may be available for distribution to stockholders and may recommend the declaration of a special dividend to stockholders in an amount not to exceed any such excess capital. The amount of any special dividend would not equal or exceed one hundred percent of the net proceeds. However, there can be no assurance that our board of directors will declare any dividend. Any decision regarding the declaration or amount of any dividend will be in the sole discretion of the board of directors of Vericity and will depend on many factors, including the capital needs assessment, the amount of net proceeds from this offering, general economic and business conditions, Vericity's financial results and condition, legal and regulatory requirements and any other factors that the Vericity board may deem relevant.

The following table illustrates the effect on the estimated net proceeds available to the Company following the payment of a potential special dividend in the projected amounts as shown below. This table is presented for illustrative purposes only and does not represent a commitment regarding the payment of a special dividend in any amount, including the amounts shown below:

| | Offering Minimum | | | | Offering Maximum | | | |
|---|---|---|---|---|---|---|---|---|
| | (dollars in millions except share and per share data) | | | | | | | |
| Projected dividend per share | $2 | $4 | $6 | $7 | $2 | $4 | $6 | $7 |
| Effective pre-tax net investment per share | $8 | $6 | $4 | $3 | $8 | $6 | $4 | $3 |
| Gross offering proceeds | $148.8 | $148.8 | $148.8 | $148.8 | $201.3 | $201.3 | $201.3 | $201.3 |
| Estimated offering expenses | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 |
| Estimated commissions | 3.5 | 3.5 | 3.5 | 3.5 | 2.0 | 2.0 | 2.0 | 2.0 |
| Estimated dividend payout | 29.8 | 59.5 | 89.3 | 104.1 | 40.3 | 80.5 | 120.8 | 140.9 |
| Estimated net proceeds | $105.8 | $ 76.1 | $ 46.3 | $ 31.5 | $149.3 | $109.1 | $ 68.8 | $ 48.7 |

Under the terms of the standby purchase agreement and our bylaws, upon completion of the offerings, the standby purchaser will have the right to designate a majority of the nominees to serve on our board of directors, and the board will determine the amount and timing of any special dividend, if a special dividend is declared. If the standby purchaser acquires a majority of our shares sold in the offerings, the standby purchaser would receive a majority of the amount of any excess capital distributed to stockholders as a special dividend in proportion to its stock ownership.

On a short-term basis, the proceeds retained at Vericity will be initially invested primarily in U.S. government securities, other federal agency securities, and other securities consistent with our investment policy until utilized.

**Dividend Policy**

Following completion of this offering, our board of directors will have the authority to declare dividends on our shares of common stock. We currently do not have any plans to pay ordinary cash dividends to our stockholders. Any decision to pay a dividend will depend on many factors, including our financial condition and results of operations, liquidity requirements, market opportunities, capital requirements of our subsidiaries, legal requirements, intercompany dividends from our subsidiaries and other factors as the board of directors deems relevant. For additional information regarding restrictions on our ability to pay dividends, see "Dividend Policy." For information regarding the potential payment of a special cash dividend following a capital needs assessment to be conducted within six months of the closing of this offering, see "Dividend Policy—Capital Needs Assessment; Potential Special Dividend."

**Market for Common Stock**

Our common stock has been approved for listing on the NASDAQ Capital Market under the symbol "VERY."

**How You May Obtain Additional Information Regarding this Offering**

If you have any questions regarding the stock offering, please call the Stock Information Center at 1-866-420-6746, Monday through Friday between 10:00 a.m. and 4:00 p.m., Central Time to speak with a representative of Raymond James.

we note that there also exists uncertainty regarding the determination of the number of subscription rights deemed issued to each eligible member because such calculation depends on the number of eligible members who ultimately exercise subscription rights, how many subscription rights each eligible member exercises and how much the eligible members' subscription rights may be cut back in the event of an oversubscription. You should consult your tax advisors with respect to the potential tax consequences to you of the receipt, exercise and expiration of subscription rights. For more information see "Federal Income Tax Considerations—Tax Consequences of Subscription Rights."

**The broad valuation range of the subscription offering and the rights of the standby purchaser make your percentage ownership of Vericity uncertain.**

The number of shares offered in the subscription offering is based on Boenning & Scattergood, Inc.'s valuation of the consolidated pro forma market value of Members Mutual. Boenning & Scattergood, Inc. has determined that, as of April 11, 2018, the estimated consolidated pro forma market value of Members Mutual is $175 million, and the range of value of the total number of shares of Vericity common stock to be issued in the offering is between $148.8 million and $201.3 million.

There is a difference of approximately $52.5 million between the minimum and maximum of the offering range. The aggregate dollar value of the shares sold in the subscription offering must be within this estimated valuation range. As a result, the percentage interest in Vericity that a purchaser of shares in this offering will have is greater if 14,875,000 shares are sold than if 20,125,000 shares are sold.

**The amount of the net proceeds from the offerings is uncertain, and we will have broad discretion over the use of the net proceeds from the offerings.**

The amount of proceeds from the sale of common stock in the offerings will depend on the total number of shares actually sold in the subscription offering, the community offering and the standby offering, for which a higher commission percentage is applicable. As a result, the net proceeds from the sale of common stock cannot be determined until this offering is completed. However, because of the standby purchaser's commitment, we expect to receive net proceeds of at least $135.5 million. See "Use of Proceeds."

**Risks Relating to Ownership of Our Common Stock**

**Upon completion of the offerings, we may be a "controlled company" within the meaning of Nasdaq Stock Market ("Nasdaq") rules, and as a result, would qualify for, and rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.**

If the standby purchaser acquires a majority of the shares of our common stock in the standby offering, the standby purchaser will control a majority of the voting power of our outstanding common stock and will hold a controlling interest in us. As a result, we would qualify as a "controlled company" within the meaning of the corporate governance rules of Nasdaq. "Controlled companies" under those rules are companies of which more than 50% of the voting power is held by an individual, a group or another company. If we become a "controlled company" upon the completion of the offerings, we will avail ourselves of the "controlled company" exception under the Nasdaq rules, in which event we will not be required not to comply with certain corporate governance requirements, including:

- the requirement that a majority of our board of directors consist of independent directors;
- the requirement that we have a nominating and corporate governance committee that is composed entirely of independent Directors, or otherwise have director nominees selected by vote of a majority of the independent directors;
- the requirement that we have a compensation committee that is composed entirely of independent directors; and
- the requirement for an annual performance evaluation of the nominating and corporate governance and compensation committees.

If the standby purchaser acquires a majority of our shares in the standby offering and we become a "controlled company," you will not have the same protections afforded to stockholders of companies that are subject to all of the Nasdaq corporate governance requirements.

Table of Contents

## THE CONVERSION AND OFFERING

### General

As a mutual insurance holding company, Members Mutual does not have stockholders. It has members. A member of Members Mutual is the holder of an in-force policy of insurance of Fidelity Life. With respect to in-force group insurance coverage issued by Fidelity Life, the member is the holder of the master insurance policy. In accordance with Illinois law and the articles of incorporation and bylaws of Members Mutual, the members of Members Mutual are entitled to certain membership rights, including the right to elect directors and to approve this conversion. In an insurance company organized as a stock company, policyholders have no governance rights, which reside with stockholders, and instead have only contractual rights under their insurance policies.

### Background and Reasons for the Conversion

Members Mutual believes that the state of the life insurance business in the United States currently presents it with the opportunity to extend its reach into its target market and provide affordable, accessible life insurance solutions to this market. With the development of its "***RAPID***ecision®" product portfolio and distribution processes that permit underwriting to be completed immediately or within 24 to 48 hours after the initial call, Members Mutual has sought to make the sale of life insurance simpler and more efficient. Following its conversion into a mutual holding company structure in 2007, Members Mutual began to explore ways to increase its access to capital in order to pursue increased marketing, acquisitions and organic growth of distribution and sales of life insurance to the Middle Market. In furtherance of this objective, Members Mutual acquired Efinancial in 2009. Since then, Members Mutual has examined various alternatives ranging from maintenance of the status quo, mergers with other mutual companies, expansion or acquisition of other lines of business or companies and various forms of demutualization of Members Mutual permitted by Illinois law, and actively pursued certain of these alternatives at various times during that period. However, none of those prior efforts resulted in a consummated transaction.

After careful study and consideration, Members Mutual has concluded that the subscription rights method of demutualization, backstopped by a standby purchaser that will commit to purchase at least enough unsubscribed shares in the subscription rights conversion to ensure the successful completion of the conversion offering, best suits Members Mutual's circumstances. In reaching this conclusion, the board of directors of Members Mutual considered the difficulty Members Mutual would have executing a stand-alone subscription rights conversion and existing as a stand-alone public company over the next several years, given its history and outlook of reported GAAP losses. Members Mutual also considered, among other things, that a subscription rights demutualization backstopped by a standby purchaser would:

- permit Members Mutual to undertake a substantial capital raising transaction;
- provide an improved ability to access future capital as a publicly traded stock company, enable Members Mutual to seek to achieve scale and position it to execute against its middle market opportunity;
- substantially mitigate the risk of an unsuccessful offering because of the standby purchaser's commitment;
- enhance corporate flexibility for future strategic options;
- afford members an opportunity to participate in the success of Members Mutual through the purchase of stock; and
- improve the visibility of the Fidelity Life and Efinancial brands.

In furtherance of these objectives, in January 2018 Members Mutual and its advisors began to identify parties who might be interested in acting as the standby purchaser for the conversion offering. Beginning in February, Members Mutual, through its advisors, contacted thirty-six parties to assess their interest in acting as the standby purchaser in Members Mutual's proposed subscription rights conversion. Twenty-two of the parties contacted signed a confidentiality agreement including standstill provisions and received a confidential information memorandum about the Company. From April through the end of July 2018, Members Mutual's advisors conducted a competitive bidding process with the interested parties, including both strategic and financial partners. In early April, eight of the parties submitted first round indications of interest to serve as standby purchaser. During April and May, Members Mutual invited six of the parties to conduct further due diligence, including meetings with the Company's management and advisors. Following these meetings, five parties submitted second round bids. After review of these bids, Members Mutual and its advisors identified three parties that they determined to be the most viable potential standby purchaser partners and one potential strategic partner that had proposed an alternative transaction structure. During June, Members Mutual and its advisors continued to engage with these four parties in order to further assess and discuss the bids. After additional discussions with these parties and review of the final bids, in early July Members Mutual entered into exclusive negotiations with J.C. Flowers & Co. LLC ("JCF") to negotiate the standby purchase agreement under which an affiliate of JCF would act as the standby purchaser.

Table of Contents

On July 31, 2018, the board of directors of Members Mutual unanimously adopted the plan of conversion, subject to the approval of the Director of the Illinois Insurance Department and the eligible members of Members Mutual. On September 16, 2018, the board of directors of Members Mutual approved an amended and restated plan of conversion. On September 20, 2018, the boards of directors of Members Mutual, Vericity and Fidelity Life authorized the entry into the standby purchase agreement pursuant to which an affiliate of JCF will be the standby purchaser under the plan of conversion, and authorized senior management to execute the standby purchase agreement on behalf of the companies. The standby purchase agreement was executed by Members Mutual, Vericity, Fidelity Life and the standby purchaser on October 5, 2018. On March 25, 2019, the board of directors of Members Mutual approved a further amended and restated plan of conversion to reflect the addition of the community offering, and on March 25, 2019, the boards of directors of Members Mutual, Vericity and Fidelity Life approved and authorized entry into an amended and restated standby stock purchase agreement with the standby purchaser. On March 26, 2019, the parties executed the amended and restated standby stock purchase agreement, which is referred to in this prospectus as the standby stock purchase agreement.

The Illinois Insurance Code requires that we obtain the approval of the Illinois Director of Insurance prior to effecting a conversion of Members Mutual, which we received on June 4, 2019. The standby purchaser's commitment to purchase shares of our stock in the standby offering also was approved by the Illinois Director of Insurance on June 4, 2019. Approval by the Illinois Director of Insurance is not a recommendation or endorsement of this offering. In connection with the approval of the conversion by the Illinois Director of Insurance, we agreed, for a period of twenty-four months following the completion of the offerings, to (i) seek the prior approval of the Illinois Department of Insurance for any declaration of an ordinary dividend by Fidelity Life, and (ii) either maintain $20 million of the proceeds of the offerings at Vericity or use all or a portion of that $20 million to fund our operations. The plan of conversion is also subject to the approval of the eligible members of Members Mutual as of July 31, 2018, at a special meeting to be held on August 6, 2019. To be effective, the plan must be approved by the affirmative vote of at least two-thirds of the votes cast by eligible members at the special meeting.

The plan of conversion provides that we will offer shares of our common stock for sale in a subscription offering to eligible members of Members Mutual and the directors and officers of Members Mutual. If fewer than 20,125,000 shares are subscribed for in the subscription offering, it is anticipated that shares of common stock will be offered in the community offering to eligible employees and possibly to other potential investors. The standby purchaser has agreed to purchase the number of shares of our common stock equal to the difference between 14,875,000 and the number of shares of common stock subscribed for in the subscription offering, together with any subscriptions for shares accepted in the community offering, and may purchase additional shares as may be necessary in order to permit the standby purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings. Under the terms of our agreement with the standby purchaser, the standby purchaser will have the right to designate a majority of the nominees to serve on our board of directors. See "—Subscription Offering and Subscription Rights" and "—Description of the Standby Purchase Agreement—Post-Closing Covenants—Corporate Governance Matters."

Following the adoption of the plan of conversion and the amended and restated articles of incorporation of Members Mutual (that will, among other things, create and authorize the shares of capital stock of converted Members Mutual) by the eligible members at the special meeting, the conversion will be accomplished by:

- filing with the Illinois Director of Insurance the minutes of the special meeting at which the plan of conversion is adopted along with the amended and restated articles of incorporation and bylaws of converted Members Mutual;
- issuance of all of the shares of capital stock of converted Members Mutual to Vericity; and
- issuance of the shares of common stock sold in the offerings.

The conversion will be effected only if subscriptions and orders are received for at least 14,875,000 shares of common stock, including shares purchased by the standby purchaser, and the plan of conversion and amended and restated articles of incorporation of Members Mutual are approved by at least two-thirds of the votes cast by eligible members of Members Mutual at a special meeting to be held on August 6, 2019.

If the conversion fails to be completed for any reason, Members Mutual will continue as the mutual holding company for Vericity Holdings, Inc. and its subsidiaries. In that event, the members of Members Mutual will retain the membership rights described above.

A copy of the plan of conversion is available by contacting our principal executive offices located at 8700 W. Bryn Mawr Avenue, Suite 900S, Chicago, Illinois, 60631, attention: General Counsel. A copy of the plan also was sent to each eligible member of Members Mutual along with the notice of the special meeting. The plan also is filed as an exhibit to the registration statement of which this prospectus is a part. Copies of the registration statement and exhibits thereto may be obtained from the SEC. See "Additional Information."

Table of Contents

**Effect of Conversion on Members Mutual and its Members**

***Termination of Membership Interests.*** In the conversion, Members Mutual will be converted into stock form pursuant to Section 59.1 of the Illinois Insurance Code. In accordance with Section 59.1 of the Illinois Insurance Code, the corporate existence of Members Mutual will be continued in converted Members Mutual, and all property of every type will be vested in converted Members Mutual, and converted Members Mutual will assume all the obligations and liabilities of Members Mutual.

Upon completion of the conversion and the issuance of all its capital stock to Vericity, converted Members Mutual will be a stock holding company and wholly owned subsidiary of Vericity. Pursuant to the plan of conversion, all membership interests in Members Mutual held by the policyholders of Fidelity Life will terminate as a result of the conversion, regardless of whether an eligible member exercises subscription rights received under the plan of conversion. However, the conversion will have no effect on the contractual rights of the policyholders of Fidelity Life.

***Continuity of Insurance Coverage and Business Operations.*** This conversion will not change the insurance protection or premiums under insurance policies issued by Fidelity Life. During and immediately following the conversion, the normal business of issuing insurance policies will continue without change or interruption and Fidelity Life will continue to provide insurance coverage to policyholders under current policies. All of our officers at the time of this offering will retain their same positions immediately after the conversion. See "Management—Directors and Executive Officers."

***Voting Rights.*** After the conversion, the policyholders of Fidelity Life will no longer be members of Members Mutual and will no longer have the right to elect the directors of Members Mutual or approve transactions involving Members Mutual. Instead, voting rights in Members Mutual will be held by Vericity, which will own all of the outstanding capital stock of converted Members Mutual. Voting rights in Vericity will be held by the stockholders of Vericity, subject to the terms of the certificate of incorporation and bylaws of Vericity and to the provisions of the DGCL and federal law. See "Description of Capital Stock—Common Stock" for a description of our common stock.

**Subscription Offering and Subscription Rights**

We are offering shares of our common stock in a subscription offering to members of Members Mutual who were policyholders of Fidelity Life as of the close of business on July 31, 2018, who we refer to as eligible members and to the directors and officers of Members Mutual. The subscription offering will end at 5:00 PM, Central Time, on July 29, 2019. In the subscription offering we are offering 20,125,000 shares of common stock in the following order of priority:

***Priority 1: Eligible Members.*** Each eligible member of Members Mutual will receive, without payment, nontransferable subscription rights to purchase shares, subject to the purchase limitations and all the other terms and conditions of the plan of conversion. See "—Limitations on Purchases of Common Stock."

If eligible members subscribe for more than 20,125,000 shares, the shares of common stock will be allocated so as to permit each subscribing eligible member, to the extent possible, to purchase up to the lesser of the number of shares subscribed for or 100 shares. Any remaining shares will be allocated among the eligible members whose subscriptions remain unsatisfied in the proportion in which the number of shares as to which each such eligible member's subscription remains unsatisfied bears to the aggregate number of shares as to which all such eligible members' subscriptions remain unsatisfied.

***Priority 2: Directors and Officers.*** Subject to the prior rights of eligible members to subscribe for up to 20,125,000 shares in this offering, each director and officer of Members Mutual will receive, without payment, non-transferable subscription rights to purchase shares, subject to the purchase limitations and all other terms and conditions of the plan of conversion. See "—Limitations on Purchases of Common Stock." Shares purchased by the directors and officers of Members Mutual will be purchased for investment and not for resale and will be counted toward satisfaction of the minimum number of shares needed to be sold to complete this offering.

If there are insufficient shares remaining after the subscriptions of eligible members to satisfy in full all of the subscriptions of directors and officers of Members Mutual, the available shares of common stock will be allocated among the subscribing management participants in the proportion in which the number of shares as to which each such management participant's subscription bears to the aggregate number of shares subscribed for by all management participants.

All subscriptions received will be subject to the maximum and minimum purchase limitations set forth in the plan of conversion and as described below under "—Limitations on Purchases of Common Stock."

Table of Contents

**The Community Offering**

If less than 20,125,000 shares are subscribed for in the subscription offering, we will offer shares to eligible employees under the Employee Bonus Program and may offer shares to other potential investors in what we refer to as the community offering. In the community offering, the Company may accept, in its sole and absolute discretion, orders received in the following order of priority: (1) orders from eligible employees who subscribe for shares of common stock as part of the Employee Bonus Program, and (2) if the number of subscribers or the number of shares of common stock subscribed for by participants in the subscription offering, together with any shares subscribed for by eligible employees, is not sufficient to qualify Vericity for listing on the Nasdaq Capital Market, the Company may accept, in its sole discretion, orders for shares of common stock from select investors in the community offering as may be necessary in order for Vericity to qualify for listing on the Nasdaq Capital Market.

The Company may commence the community offering concurrently with, at any time during, or as soon as practicable after the end of, the subscription offering, and the community offering must be completed within 30 days after the end of the subscription offering, unless extended by the Company. Other than eligible employees, whose subscriptions are subject to the terms of the Employee Bonus Program, the maximum amount that any person together with any associate may, directly or indirectly, subscribe for or purchase in the community offering, shall not exceed 743,750 shares of common stock.

**The Employee Bonus Program**

In connection with the conversion, Members Mutual has adopted a bonus program for eligible employees who, in recognition of their efforts on behalf of Members Mutual to position it to become a publicly-traded stock company, will be given the opportunity to receive a bonus payable either in $1,000 cash or 100 shares of common stock of Vericity, in either case together with an additional $250 cash to help defray taxes payable with respect to the bonus. The Employee Bonus Program will be conducted as part of the community offering and is subject to completion of the conversion.

It is the intention of the Company to accept all orders of stock from eligible employees in the Employee Bonus Program so long as the total number of shares of common stock subscribed for by participants in the subscription offering together with shares subscribed for by eligible employees in the Employee Bonus Program is less than 20,125,000. In the event the total number of shares subscribed for in the subscription offering and the Employee Bonus Program exceeds 20,125,000 shares, no shares of common stock will be issued to eligible employees under the Employee Bonus Program and the bonus will be paid in cash, subject to completion of the conversion.

**The Standby Purchaser**

Apex Holdco L.P., the standby purchaser, was formed on October 1, 2018 to acquire shares of our common stock pursuant to the standby purchase agreement. Prior to the completion of the standby offering, the standby purchaser has not engaged in any business operations and does not have any assets or liabilities (other than its rights and obligations under the standby purchase agreement). The standby purchaser is managed by Apex Holdco GP LLC, its general partner. Apex Holdco GP LLC is an affiliate of J.C. Flowers & Co. LLC.

At this time it is not possible to determine the number of shares of common stock of the Company that the standby purchaser will purchase pursuant to the standby purchase agreement. However, in fulfilling its standby purchase commitment, the standby purchaser will acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares. Pursuant to the standby purchase agreement, after the completion of the offerings, the standby purchaser will have the right to designate a majority of the members of our board of directors whether or not it acquires a majority of the stock sold in the offering. If the standby purchaser acquires a majority of our shares in the standby offering, the standby purchaser will be able to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders.

J.C. Flowers & Co. LLC was founded in 1998 and is a leading private investment firm dedicated to investing globally in the financial services industry. J.C. Flowers & Co. LLC invests across a range of deal types and industry sectors including banking, insurance and reinsurance, securities, services and asset management, and specialty finance. J.C. Flowers & Co. LLC is registered with the Securities and Exchange Commission as an investment adviser. With approximately $6 billion of assets under management, J.C. Flowers & Co. LLC has offices in New York and London. Mr. J. Christopher Flowers is the sole owner of, and the managing member of, J.C. Flowers & Co. LLC.

Table of Contents

**Description of the Standby Purchase Agreement**

The following is a summary of the material terms of the standby purchase agreement. It is qualified in its entirety by reference to the standby purchase agreement, a copy of which is attached as an exhibit to the registration statement of which this prospectus is a part, and is available for inspection in the manner set forth in the section titled "Additional Information."

***The Standby Purchase Commitment***

Members Mutual, Vericity and Fidelity Life entered into the standby purchase agreement with the standby purchaser on October 5, 2018, as amended and restated on March 26, 2019, pursuant to which the standby purchaser agreed, subject to certain conditions, to acquire from us at the subscription price of $10.00 per share the number of shares equal to the difference between the offering minimum of 14,875,000 shares and the number of shares of common stock subscribed for in the subscription offering, together with any subscriptions for shares accepted in the community offering. In addition, the standby purchaser has the right to purchase additional shares up to the offering maximum, which additional shares may permit the standby purchaser to acquire up to a majority of the stock sold in the offerings. Shares purchased by the standby purchaser in the standby offering will be purchased for investment and not for resale and will be counted toward satisfaction of the minimum number of shares needed to be sold to complete the subscription offering. The shares purchased by the standby purchaser in the standby offering are referred to as the "standby shares." The standby purchaser's payment obligations (including any payment due for damages) under the standby purchase agreement have been guaranteed by its affiliate, J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co. LLC.

***Conditions to Closing the Standby Offering***

The obligations of the parties to consummate the standby offering are subject to customary closing conditions, including, among others:

*Mutual Conditions to Close:*

(1) the absence of any governmental order prohibiting the transactions;

(2) the approval by the Director of the Illinois Department of Insurance (the "Illinois Director") of the plan of conversion, the amended and restated articles of converted Members Mutual and the acquisition of the standby shares by the standby purchaser (the "Illinois Approvals") shall have been receive and not revoked;

(3) if applicable, Hart-Scott-Rodino approval shall have been obtained and not revoked;

(4) the approval of the plan of conversion and the amended and restated articles of converted Members Mutual by at least two-thirds of the eligible members voting in person or by proxy at the special meeting;

(5) the effectiveness of, and absence of a stop order relating to, the registration statement of which this prospectus is a part;

(6) the satisfaction or waiver of all of the conditions precedent to the consummation of the offerings as set forth in the plan of conversion; and

(7) the closing of the subscription offering shall be consummated simultaneously with the standby offering.

*Members Mutual and Vericity Conditions to Close:*

(1) the accuracy of the representations and warranties of the standby purchaser, except for any inaccuracies that would not have a material adverse effect, in the standby purchase agreement as of the effective date of this registration statement;

(2) the standby purchaser having performed in all material respects its obligations under the standby purchase agreement; and

(3) the delivery of a certificate by the standby purchaser to Members Mutual and Vericity confirming the same.

*Standby Purchaser Conditions to Close:*

(1) the accuracy of the representations and warranties (other than representations concerning authority, capitalization and broker fees), except for inaccuracies that would not have a material adverse effect, of Vericity and Members Mutual in the standby purchase agreement as of the effective date of this registration statement;

Table of Contents

(2) the accuracy of representations of Vericity and Members Mutual concerning authority, capitalization and broker fees as of the closing date;

(3) Members Mutual and Vericity having performed in all material respects their obligations under the standby purchase agreement;

(4) no material adverse effect having occurred between the date of the standby purchase agreement and the effective date of the registration statement;

(5) the Illinois Department of Insurance shall not have revoked its prior written approval of that certain Reinsurance Agreement, effective July 1, 2013 between Fidelity Life Association and Hannover Life Reassurance Company of America or that certain Amended and Restated Reinsurance Agreement effective July 1, 2016 between Fidelity Life Association and Hannover Life Reassurance Company of America; and

(6) the delivery of certificates by Members Mutual and Vericity confirming the matters described in clauses (1) through (4) above and that the resolutions adopted by the Vericity board authorizing the transaction remain in effect.

***Special Meeting of the Members of Members Mutual***

Members Mutual has agreed that, subject to its right to terminate the standby purchase agreement under certain conditions, it will duly call and hold a special meeting of members for the purpose of voting to adopt the plan of conversion and the amended and restated articles of incorporation of converted Members Mutual, as soon as practicable after the later of (i) the date upon which both the plan of conversion and the acquisition of the standby shares by the standby purchaser by the Illinois Director have been approved, and (ii) the effective date of the registration statement. Notice of the special meeting will be mailed at least 30 days prior to the date of the special meeting.

***Post-Closing Covenants***

*Corporate Governance Matters*

At the closing, the bylaws of Vericity will be amended and restated to provide, during the period (the "standstill period") between the closing and the sale or other business combination pursuant to which all the outstanding capital stock of Vericity is sold (other than any equity rollover made by the standby purchaser not to exceed 10% of the common stock owned by the standby purchaser) in a single transaction in which all stockholders of Vericity are offered the same consideration (a "sale of the company") to a third party not affiliated with the standby purchaser (a "third party purchaser"), that among other things:

(1) the board of directors of Vericity will consist of designees appointed by the standby purchaser (the "standby purchaser designees") and designees appointed by Members Mutual (the "company designees");

(2) the number of company designees shall not exceed six (6) nor at any time be less than two (2) and that the number of standby purchaser designees at any given time shall be one (1) more than the number of company designees but in no event less than three (3); provided, that if among the company designees and the standby purchaser designees there are insufficient independent directors available to satisfy the independence requirements under the rules of the Nasdaq stock market or the SEC relating to the number of independent directors required to serve on the board of directors or any committee thereof, the standby purchaser shall have the right to designate the minimum number of additional directors necessary to satisfy such applicable independence requirements; provided, further, that while the standby purchaser shall have the right to designate such additional directors and their successors or replacements, such additional directors shall not be deemed to be standby purchaser designees under the standby purchase agreement;

(3) the compensation payable to the company designees may not be decreased without the consent of a majority of the company designees, and may not be increased without the consent of a majority of the standby purchaser designees;

(4) in the event of any vacancy in the office of any standby purchaser designee, a majority of the remaining standby purchaser designees will have the right to designate a replacement, and in the event of any vacancy in the office of any company designee, a majority of the remaining company designees will have the right to designate a replacement, in each case to fill the vacancy, provided that in the case of a vacancy of a company designee, the standby purchaser may elect to reduce the size of the board of directors by two with one of the standby purchaser designees resigning such that the standby purchaser will continue to have one more designee than the number of company designees;

Table of Contents

(5) at any election of directors of Vericity, a majority of the standby purchaser designees will have the right to nominate the successors of the standby purchaser designees (and as applicable such additional directors as are necessary to satisfy the independence requirements under the rules of the Nasdaq stock market or the SEC), and a majority of the company designees will have the right to nominate the successors of the company designees;

(6) an advisory board will be established to provide general policy advice to the board, with members serving until the earlier of (i) the consummation of a sale of the company to a third party purchaser, (ii) the termination of the advisory board on the fifth anniversary of the closing, or (iii) the member's death, retirement, resignation or removal for cause;

(7) in the event that there are no remaining company designees to designate successor company designees, a majority of the members of the advisory board will have the right to designate successor or replacement company designees; and

(8) members of the advisory board will be entitled to the same compensation and expense reimbursement as the company designees, and separate rights to third-party indemnification and advancement of expenses for service on the advisory board.

Effective upon the closing, the compensation payable to the company designees shall be $100,000 per year. These post-closing governance provisions are intended to be for the benefit of (a) Members Mutual and its affiliates and will be enforceable by the company designees against the standby purchaser and Vericity and its affiliates, and (b) the standby purchaser and will be enforceable by the standby purchaser against the company designees, as applicable, during the standstill period.

*Standstill Period:*

***Minority Protections.*** During the standstill period, the standby purchaser agrees:

(1) it will not vote its shares to (a) remove or seek to remove any company designee from the board of directors, unless approved by a majority of the company designees or for cause, or (b) approve or seek to approve a material amendment (as defined below) to the restated charter or restated bylaws of Vericity, unless approved by a majority of the company designees (except that this provision shall not prevent the standby purchaser from voting its shares in favor of the sale of the company to a third party purchaser);

(2) it will vote all its shares as recommended by a majority of the company designees with respect to (i) the election of company designees as directors and (ii) the removal of any standby purchaser designee for cause;

(3) it and Vericity will consider in good faith the reasonable recommendations from the chief executive officer to maintain or enhance the "A-" A.M. Best rating of Fidelity Life and as may be required by the Illinois Department of Insurance; and

(4) that any transaction between the standby purchaser or any of its affiliates, on the one hand, and Vericity or any of its subsidiaries, on the other hand, shall be subject to approval by the company designees, and the standby purchaser designees shall recuse themselves from voting on the approval of such transactions, provided that the standby purchaser designees are not required to recuse themselves from any decision approving only ordinary course transactions on arm's length terms between a portfolio company of the standby purchaser or its affiliates and Vericity or its subsidiaries.

In addition, during the Standstill Period, Fidelity Life has agreed that following the conversion it will not pay any dividend in respect of its capital stock, unless approved by a majority of the company designees.

As used in clause (1) above, a "material amendment" is defined as an amendment that amends or seeks to amend the restated charter or restated bylaws of Vericity in any manner that would (i) except with respect to the creation and/or issuance of one or more series of preferred stock of Vericity, adversely affect the voting or other rights, interests or economic value of the common stock held by any Vericity stockholder, (ii) affect the voting or other rights, interests or economic value of the common stock held by any Vericity stockholder disproportionately as compared to the standby purchaser, (iii) seek to effect a reverse stock split, recapitalization, or reclassification of the common stock of Vericity, (iv) amend Article IV of the restated charter (except with respect to the creation and/or issuance of one or more series of preferred stock of Vericity), Article V or Article X of the restated charter, (v) amend Article VIII of the restated charter in any manner that would adversely affect the rights of the company designees thereunder; or (vi) amend Article III, Article IV, Section 5.2, or Section 7.12 of the restated bylaws.

Table of Contents

These minority protection provisions are intended to be for the benefit of Members Mutual and its affiliates and will be enforceable by the company designees against the standby purchaser and Vericity and its affiliates during the standstill period.

***Standstill Protections.*** During the standstill period, except in connection with a sale of the company to a third party purchaser, without the approval of a majority of the company designees, the standby purchaser will not, directly or indirectly seek to, among other things:

(1) make any solicitation of proxies or consents, influence any person with respect to the voting of any shares of Vericity, or solicit the approval of any stockholder proposals;

(2) seek, propose or make any statement (except for (i) the standby purchaser designees acting solely in their capacity as directors of Vericity, (ii) by offers or proposals to the board which do not require or result in public disclosure, or (iii) communications to existing and prospective investors and limited partners in the standby purchaser's parent fund and affiliated investment vehicles thereof which do not require or result in public disclosure or an amendment to a Schedule 13D or any other filings of the standby purchaser pursuant to the Exchange Act regarding the standby purchaser's beneficial ownership in Vericity, in each case in connection with the sale of the company to a third party purchaser) with respect to any business combination transaction or sale of assets involving Vericity or any of its affiliates;

(3) directly or indirectly acquire (with certain exceptions) any equity securities, debt securities or assets of Vericity or any of its subsidiaries;

(4) form, join, or participate in a "group" (as defined in section 13(d)(3) of the Securities Exchange Act of 1934) with respect to any shares of common stock, other than a group composed solely of the standby purchaser;

(5) subject any shares of Vericity to voting trust or other voting arrangement;

(6) seek to control or influence the management of Vericity or its board or policies or make any demand for a stockholder list or to inspect the books or records of Vericity or its affiliates;

(7) seek to nominate, elect or remove directors to the board of Vericity other than as provided for in the standby purchase agreement;

(8) have any discussions or enter into any arrangements with or encourage any other person in connection with any of the foregoing (including by granting any waiver to any legal or other firm that represented or was engaged by the standby purchaser or its affiliates or any of their legal counsel with respect to Vericity, which waiver would permit any such firm to represent any person in connection with matters relating to Vericity); or

(9) sell, assign, lend, or otherwise dispose of any standby shares, directly or indirectly, or otherwise take any action inconsistent with the foregoing.

These standstill provisions are intended to be for the benefit of Members Mutual and its affiliates and will be enforceable by the company designees against the standby purchaser and Vericity and its affiliates during the standstill period. For the avoidance of doubt, the standstill provisions will not prevent the Vericity board or the standby purchaser or its affiliates from taking actions to solicit, assist or encourage a third party purchaser solely in connection with a potential sale of the company to such third party purchaser.

***Post-Closing Protection Period***

During the period between the closing date and the earlier of the three year anniversary of the closing date and the expiration of the standstill period, the standby purchaser and Vericity agree that James Hohmann will serve as chief executive officer of Vericity, subject to his earlier death, resignation or removal for cause.

In addition, the standby purchaser and Vericity agree that, except as may otherwise be recommended by the chief executive officer:

(1) for a period of two years following the closing, Vericity and its subsidiaries will (i) not conduct a material reduction in the total number of their employees compared to the total number employed at the closing or reduce the compensation of their employees in a manner that is less favorable in the aggregate to that provided prior to the closing (subject to maintenance of satisfactory performance evaluations), and (ii) will not amend any benefit plans of Vericity or its subsidiaries in effect upon the closing (subject to the rights therein to terminate or amend such plans, only upon the recommendation of the chief executive officer); provided, that these provisions are not intended as a guarantee of employment or of any benefits, or to prohibit the chief executive officer from making employee changes as business needs may dictate; and

Table of Contents

(2) for a period of three years following the closing, Vericity will cause Fidelity Life and Efinancial to maintain their principal places of business at their current locations in Chicago and Bellevue.

***Termination***

*Termination by Mutual Consent:*

The standby purchase agreement may be terminated by mutual written agreement of Vericity, Members Mutual and the standby purchaser.

*Termination by Members Mutual or the Standby Purchaser:*

The standby purchase agreement may be terminated by Members Mutual or the standby purchaser if:

(1) the approval by the eligible members is not obtained at the special meeting,

(2) the closing is not consummated before September 30, 2019, or

(3) there is any governmental order prohibiting the completion of the transaction.

*Termination by Members Mutual:*

The standby purchase agreement may be terminated by Members Mutual if:

(1) the standby purchaser materially breaches and does not timely cure any breaches of its representations, warranties, covenants or agreements (provided that neither Members Mutual nor Vericity is in material breach of any of their respective representations or covenants in the agreement); or

(2) Members Mutual has abandoned the plan of conversion and terminated the subscription offering prior to the eligible member approval at the special meeting.

*Termination by the Standby Purchaser:*

The standby purchase agreement may be terminated by the standby purchaser:

(1) if Members Mutual or Vericity materially breaches, and do not timely cure, any breaches of their respective representations or warranties prior to the effective date of the registration statement of which this prospectus is a part (provided that the standby purchaser is not in material breach of any of its representations or covenants in the agreement); or

(2) within five (5) days of the receipt of the Illinois Approvals, if and only if the Illinois Approvals contain or require, in good faith determination of the standby purchaser, the imposition of a burdensome condition.

***Burdensome Condition***

A "burdensome condition" is defined as any condition, requirement or arrangement that would (i) be reasonably likely to materially change the manner in which Members Mutual or any of its subsidiaries has conducted its business in the normal course, (ii) require any material capital contribution, (iii) require any maintenance agreement or keep well obligation that imposes any condition, restriction or obligation that is not required by applicable law, (iii) impose any dividend limitation other than those provided under applicable law; (v) require the material amendment of or modification of the terms of any material agreement between or among any of Vericity or any of its subsidiaries, or (vi) require any changes to the size, composition or voting or consent rights of the board of directors of Vericity or any of its subsidiaries, of the standby purchaser designees or company designees, or the standby purchaser.

***Abandonment of the Plan of Conversion***

Members Mutual may "abandon" the plan of conversion and terminate the subscription offering upon determining in good faith that continued prosecution of the plan of conversion and subscription offering would (i) have a material adverse effect (as defined in the standby purchase agreement), (ii) materially affect the aggregate economic benefits reasonably anticipated by Vericity from the transactions contemplated under the standby purchase agreement, or (iii) result in any condition or limitation that would materially limit or impose a material financial burden on the ability of Vericity to operate any subsidiary in a manner consistent with past practice.

Table of Contents

If the standby purchase agreement is terminated by Members Mutual due to abandonment of the plan of conversion, Members Mutual will reimburse the standby purchaser for reasonable transaction expenses up to $750,000.

***Capital Needs Assessment***

The standby purchase agreement provides that within six months following the closing of this offering, the Vericity board shall direct Vericity management to undertake and complete an assessment (the "capital needs assessment") of the current and projected capital reasonably required to be maintained at Vericity to support the current and near term projected adequacy of capital levels at Fidelity Life and Efinancial and holding company expenses at Vericity. If as a result of this assessment, Vericity management determines that the amount of capital in Vericity exceeds the reasonable current and near term projected capital requirements, Vericity management shall determine the amount of excess capital (if any) that may be available for distribution to the stockholders of Vericity as a return of capital in the form of a special dividend and may recommend to the Vericity board that it consider the declaration of a special dividend in an amount not to exceed the amount of excess capital. Notwithstanding the foregoing, any decision regarding the declaration of any dividend, and the amount thereof, will be in the sole discretion of the board of directors of Vericity and will depend on many factors, including without limitation the capital needs assessment, general economic and business conditions, Vericity's financial results and condition, legal and regulatory requirements and any other factors that the Vericity board may deem relevant.

***Regulatory Filings***

The standby purchaser, Members Mutual, and Vericity have agreed to make all filings required by the Illinois Department of Insurance, or any other relevant jurisdiction, as promptly as possible, and with the SEC with respect to the registration statement of which this prospectus is a part. The parties have agreed to use their reasonable best efforts to cooperate with each other in timely making all filings and seeking all required consents, approvals, notices, or authorizations for the transactions, and to provide the other party with a reasonable opportunity to review such documents prior to the filing thereof and reasonably consider any comments suggested by the other party or its counsel. The parties have further agreed to use their reasonable best efforts to take all other actions necessary to consummate the transactions contemplated in the standby purchase agreement.

Vericity has agreed (other than in respect to information furnished by the standby purchaser) that (i) the registration statement, on the date it becomes effective, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading and (ii) the prospectus, at the expiration of the subscription offering period, will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

***Director and Officer Indemnification and Insurance***

The standby purchase agreement provides that all rights to indemnification, advancement of expenses and exculpation by Vericity and its subsidiaries of each person who was or may become a director or officer of such entity will continue in full force and effect in accordance with their respective terms. Vericity has also agreed that at or prior to the closing date, it will enter into indemnification agreements with each of the standby purchasers designees and advisory board members in a form previously agreed to by the parties. Further, for a period of six (6) years following the closing, the current policies (or substantially similar policies) of directors' and officers' liability insurance will be maintained by Vericity and its subsidiaries. Each of the directors and officers shall be third-party beneficiaries of this provision.

***Operating Covenants***

From the date of the standby purchase agreement until the closing date, each of Members Mutual and its subsidiaries has agreed to customary operating covenants, including, among other things not to: (1) adopt or propose any change to its charter or bylaws, (2) issue or redeem any of its capital stock, (3) declare, set aside, or pay any cash or non-cash dividend, (4) merge or consolidate with any other entity or acquire any material assets or equity of any other entity, (5) sell or encumber any material assets, (6) enter into or amend any material employment agreement or any benefit plan or to pay any employee compensation or benefit except in the ordinary course of business, (7) change any method of accounting or accounting practice, (8) make or change any material tax election, settle any material tax claim or file any tax return that is materially inconsistent with past practice, (9) enter into, modify or amend in any material respect or terminate any material contract, (10) abandon, modify, waive, terminate or otherwise change any of its insurance licenses, (11) enter into any material agreement or consent order with government entities, (12) make any material loans except in the ordinary course of

Table of Contents

business, (13) enter into any material new line of business, (14) materially alter the practices or rates related to earned commission from external customers, (15) settle any material litigation, (16) form or cause the formation of any subsidiary, (17) amend the terms of the compensation payable to the investment bankers in connection with the subscription offering and/or the standby offering, and (18) acquire or dispose of any material properties.

***Representations and Warranties***

The standby purchase agreement contains certain customary representations and warranties. Each of Members Mutual, Vericity, and the standby purchaser has made representations and warranties regarding, among other things: (i) organization; (ii) authority to enter into the agreement and related documents; (iii) required regulatory filings and consents and approvals of governmental authorities; (iv) the accuracy of statements made in the registration statement; and (v) brokers' fees payable in connection with the offerings.

Standby purchaser has made additional representations and warranties related to: (i) its status as an accredited investor; (ii) tax matters; (iii) that it has, or will have at closing, available funds to enable it to consummate the transaction; and (iv) that it has undertaken its own independent investigation of Vericity and its subsidiaries.

Members Mutual has made additional representations and warranties related to: (i) capitalization; (ii) GAAP financial statements; (iii) statutory financial statements; (iv) absence of a material adverse effect since June 30, 2018; (v) compliance with applicable laws; (vi) regulatory filings; (vii) tax matters; (viii) labor matters; (ix) benefit plans; (x) absence of undisclosed liabilities; (xi) litigation; (xii) material contracts; (xiii) intellectual property; (xiv) privacy policies; (xv) anti-bribery, anti-corruption, anti-money laundering laws; (xvi) sanctions; and (xvii) related party transactions.

Vericity has made additional representations and warranties related to: (i) capitalization; (ii) validity and issuance of stock; and (iii) the availability of an exemption from registration of the stock issued in the standby offering.

*Closing*

The closing of the transactions contemplated by the standby purchase agreement will occur as soon as possible after, and in any event within three (3) business days after the satisfaction (or if applicable, waiver) of all closing conditions.

**Stock Pricing and Number of Shares to be Issued**

The plan of conversion requires that the range of the value of the total number of shares to be issued in this offering must be based on a valuation of our estimated consolidated pro forma market value. Under the plan of conversion, the valuation must be in the form of a range consisting of a midpoint valuation, a valuation fifteen percent (15%) above the midpoint valuation and a valuation fifteen percent (15%) below the midpoint valuation. We retained Boenning & Scattergood, Inc. to determine the valuation range for this offering. Boenning & Scattergood, Inc. has determined that, as of April 11, 2018, the estimated consolidated pro forma market value of Members Mutual is $175,000,000 at the midpoint, and the range of value of the total number of shares of common stock to be issued in the offering is between a minimum value of $148,750,000 and a maximum value of $201,250,000. We plan to issue between 14,875,000 and 20,125,000 shares in the offering. This range was determined by dividing the $10.00 price per share into the range of Boenning & Scattergood, Inc.'s valuation. Shares purchased by the directors and officers of Members Mutual will be purchased for investment and not for resale and will be counted toward satisfaction of the minimum number of shares needed to be sold to complete this offering.

We determined to offer the common stock in the subscription offering at the price of $10.00 per share to ensure a sufficient number of shares are available for purchase by eligible members. In addition, Raymond James advised us that the $10.00 per share offering price is commonly used in mutual-to-stock conversions of other insurance companies and savings banks and savings associations that use the subscription rights conversion model. These were the only factors considered by our board of directors in determining to offer shares of common stock at $10.00 per share.

There is a difference of $52.5 million between the low end and the high end of the estimated valuation range of Boenning & Scattergood, Inc.'s valuation. As a result, the percentage interest in Vericity that a purchaser of shares in this offering will have is greater if 14,875,000 shares are sold than if 20,125,000 shares are sold. In addition, assuming that the actual consolidated market value of Members Mutual will be within the broad estimated valuation range, this consolidated market value may be materially more or less than the total amount of subscriptions and orders received. Therefore, purchasers, in total and on a per share basis, may pay more for the common stock than the actual market value.

We cannot assure you that the market price for the common stock immediately following this offering will equal or exceed $10.00 per share.

Table of Contents

**If Subscriptions Received in the Subscription Offering Meet or Exceed the Maximum Number of Shares Offered**

If, after the subscription offering, the number of shares subscribed for by eligible members and the directors and officers of Members Mutual in the subscription offering is equal to or greater than 20,125,000 shares, this offering will be promptly completed. In the event of an oversubscription in the subscription offering by eligible members or the directors and officers of Members Mutual, shares of common stock will be allocated among the subscribing participants as described above under "—Subscription Offering and Subscription Rights."

**If Subscriptions Received in the Subscription and Community Offerings Meet or Exceed the Required Minimum**

If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering is equal to or greater than 14,875,000 shares, but less than 20,125,000 shares, then this offering will be promptly completed. In this event, the standby purchaser may also purchase any unsubscribed shares, provided that we will not issue more than 20,125,000 shares in the offerings.

**If Subscriptions Received in the Subscription and Community Offerings Do Not Meet or Exceed the Minimum**

If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, is less than 14,875,000 shares, the standby purchaser has agreed to purchase enough shares in the standby offering to guarantee the sale of the minimum number of shares necessary to complete this offering, and may purchase additional shares as may be necessary in order to permit the standby purchaser to acquire a majority of the shares sold, provided that no more than 20,125,000 shares may be sold in the offerings. In that event, the level of sales to eligible members and directors and officers of Members Mutual will not impact the condition that at least 14,875,000 shares must be sold to complete this offering. Accordingly, the sale of the minimum number of shares necessary to complete this offering does not indicate that sales have been made to investors who have no financial or other interest in the offerings, and the sale of the minimum number of shares should not be viewed as an indication of the merits of this offering.

**Costs of the Conversion and Offering**

We expect to incur significant costs to complete the conversion and this offering, including among others legal, accounting, valuation and printing expenses, as well as filing fees, exchange listing costs and commissions and expenses for the marketing and sale of the shares of our common stock. We expect the expenses of the conversion and this offering (including commissions) to be approximately $13.2 million and $11.7 million, or approximately 8.9% and 5.8% of the gross proceeds, at the minimum and the maximum of the offering range, respectively, resulting in net proceeds to us of approximately $135.5 million at the minimum and $189.5 million at the maximum of the offering range. See the "Offering Summary" on the front cover of the prospectus for the assumptions used to arrive at these amounts.

**Offering Deadline**

All subscription rights will expire at 5:00 PM, Central Time, on July 29, 2019. Subscription rights not exercised prior to this deadline will be void, whether or not we have been able to locate each person entitled to receive subscription rights. We reserve the right in our sole discretion to terminate this offering at any time and for any reason, in which case we will cancel your order and return your payment without interest.

**Use of Order Forms in this Offering**

If you wish to purchase shares of common stock in the subscription offering or if you are an investor (other than an eligible employee) whose subscription has been accepted in the community offering, you must sign and complete the stock order form that accompanies this prospectus and send it to us with your payment such that your order is received before the offering deadline. You may submit your order to us by overnight delivery to the address indicated for this purpose on the top of the stock order form or by mail using the stock order reply envelope provided. Payment by check or money order must accompany the stock order form. No cash or third party checks will be accepted. All checks or money orders must be made payable to "Computershare Trust Company, N.A., as escrow agent for Vericity, Inc." We may permit certain persons whose subscriptions are accepted in the community offering to make payment of the purchase price by a wire transfer to the escrow agent.

The completed stock order form and payment in full for the shares ordered in the subscription offering must be received (not postmarked) no later than 5:00 PM, Central Time, on July 29, 2019. We expect that the community offering will terminate on or about the same time. Once submitted, your order is irrevocable without our consent, unless we terminate this offering. Our consent to any modification or withdrawal request may or may not be given in our sole discretion.

Table of Contents

If you are an eligible employee and wish to purchase 100 shares of stock under the Employee Bonus Program, you must complete the Employee Bonus Program Election Form and follow the instructions provided.

No prospectus will be mailed any later than five days prior to the expiration date of this offering, or hand delivered any later than two days prior to such date. This procedure is intended to ensure that each purchaser receives a prospectus at least 48 hours prior to the expiration of this offering in accordance with Rule 15c2-8 under the Securities Exchange Act of 1934. Execution of the stock order form will confirm receipt or delivery in accordance with Rule 15c2-8. Stock order forms will be distributed only with or preceded by a prospectus. We reserve the right to reject photocopies and facsimile copies of stock order forms.

A subscription right may be exercised only by the participant to whom it is issued and only for such person's own account. The subscription rights granted under our plan of conversion are nontransferable. Each eligible member or other participant subscribing for shares of common stock is required to represent that such member is purchasing the shares for such member's own account. Each eligible participant also must represent that such participant has no agreement or understanding with any other person for the sale or transfer of the shares. We are not aware of any restrictions that would prohibit eligible members purchasing shares of common stock in the subscription offering who are not officers or directors of Members Mutual from freely transferring shares after this offering. See "—Limitations on Resales."

We will have the absolute right, in our sole discretion, and without liability to any person, to reject any stock order form, including but not limited to a stock order form that is:

- not timely received;
- improperly completed or executed;
- is not accompanied by payment in full for the shares of common stock subscribed for; or
- submitted by a person who we believe is making false representations or who we believe may be violating, evading or circumventing the terms and conditions of the plan of conversion.

We may, but are not required to, waive any improperly completed or executed stock order form. We also may require the submission of a corrected stock order form or the remittance of full payment for the shares of common stock subscribed for by any date that we specify. Our interpretations of the terms and conditions of the plan of conversion and determinations concerning the acceptability of the stock order forms will be final, conclusive and binding upon all persons. We (and our directors, officers, employees and agents) will not be liable to any person in connection with any interpretation or determination.

**Payment for Shares**

When you submit a completed stock order form to us, you must include payment in full for all shares of common stock covered by such order form. Payment may be made by check or money order in U.S. dollars and must be made payable to "Computershare Trust Company, N.A., as escrow agent for Vericity, Inc." We may permit certain persons whose subscriptions are accepted in the community offering to make payment of the purchase price by a wire transfer to the escrow agent. Payments will be placed in an escrow account at Computershare Trust Company, N.A., who will serve as the escrow agent. The escrow account will be administered by the escrow agent. An executed stock order form, once received by us, may not be modified or rescinded without our consent; provided, however, that no order form will be accepted until Vericity's Registration Statement of which this prospectus is a part has been declared effective by the SEC, and any order form received prior to that time will be rejected and no sale of common stock will be made in respect thereof. Funds accompanying stock order forms will not be released to us by the escrow agent until this offering is completed and all of the conditions to completion of the conversion and the offering have been satisfied.

**Delivery of Shares of Common Stock Purchased in the Subscription Offering**

All shares of common stock sold will be issued in book entry form. Stock certificates will not be issued. A statement reflecting ownership of shares of common stock issued in the subscription offering will be mailed by our transfer agent to the persons entitled thereto at the registration address noted by them on their stock order forms as soon as practicable following consummation of the conversion and offering. We expect trading in the stock to begin on the day of completion of the conversion and offering or the next business day. The conversion and offering are expected to be completed as soon as practicable following satisfaction of the conditions described below in "—Conditions to Completion of the Conversion and this Offering." Until a statement reflecting ownership of shares of common stock is available and delivered to purchasers, purchasers may not be able to sell the shares of common stock which they ordered, even though the common stock will have

Table of Contents

begun trading. Your ability to sell the shares of common stock before receiving your statement will depend on arrangements you may make with a brokerage firm.

**Stock Information Center**

If you have any questions regarding this offering, please call the Stock Information Center at 1-866-420-6746, Monday through Friday from 10:00 a.m. to 4:00 p.m., Central Time to speak with a representative of Raymond James. The Stock Information Center will be closed on weekends and holidays.

**Persons Who Cannot Exercise Subscription Rights**

Vericity will make reasonable efforts to comply with the securities laws of all states in the United States in which eligible members reside. However, Vericity and Members Mutual are not required to offer stock in the subscription offering to any person who resides in a foreign country or resides in a state or territory of the United States with respect to which the granting of subscription rights or the offer or sale of shares of common stock to such persons would require Vericity, or its officers, trustees or employees, under the laws of such jurisdiction, to register as a broker, dealer, salesman or selling agent or to register or otherwise qualify its securities for sale in such jurisdiction or to qualify as a foreign corporation or file a consent to service of process in such jurisdiction.

**Conditions to Completion of the Conversion and this Offering**

Our ability to complete this offering is subject to two conditions. First, a minimum of 14,875,000 shares of common stock must be sold to complete this offering. Second, Members Mutual's plan of conversion and amended and restated articles of incorporation must be approved by the affirmative vote of at least two-thirds of the votes cast at the special meeting of members to be held on August 6, 2019. No funds will be released from the escrow account until both of these conditions have been satisfied.

If the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, is less than 14,875,000 shares, and if all of the conditions to the standby purchaser's purchase commitment have been satisfied, the standby purchaser will be obligated to purchase enough shares in the standby offering to guarantee the sale of the minimum number of shares necessary to complete this offering. In that event, the level of sales to eligible members and directors and officers of Members Mutual will not impact the condition that at least 14,875,000 shares must be sold to complete this offering. Accordingly, the sale of the minimum number of shares necessary to complete this offering does not indicate that sales have been made to investors who have no financial or other interest in the offerings, and the sale of the minimum number of shares should not be viewed as an indication of the merits of this offering.

If these conditions are not satisfied for any reason, we may elect to terminate this offering, in which case all funds delivered to us for the purchase of stock in this offering will be promptly returned to subscribers without interest.

**Limitations on Purchases of Common Stock**

*Minimum Purchase Limitation*

The plan of conversion provides that no person may subscribe for fewer than 25 shares in this offering.

*Maximum Purchase Limitations*

***Eligible Members.*** The plan of conversion provides that no eligible member, together with such person's associates or a group acting in concert, may directly or indirectly, subscribe for or purchase in this offering more than such member's individual maximum purchase limit. Each eligible member's individual maximum purchase limit will be printed on the stock order form that is mailed to each eligible member along with a copy of the prospectus. The maximum purchase limit is based on an allocation of (i) a fixed minimum number (100) of subscription rights, regardless of the number of policies owned by such eligible member, plus (ii) a variable number of subscription rights, if any, determined based on actuarial formulas that take into account the past and anticipated future contributions to Fidelity Life's surplus of all of the eligible member's policies that were in force on the adoption date of the plan of conversion. Such allocations were determined in accordance with actuarial analyses included with the plan of conversion.

Each eligible member's maximum purchase limit will range between 100 shares and 743,750 shares, based on the actuarial allocation described above. Notwithstanding an eligible member's individual maximum purchase limit, eligible members may not purchase in the aggregate more than 20,125,000 shares. In the event that all eligible members subscribe for their individual maximum purchase limit, the subscription offering would be oversubscribed. In the event of an

oversubscription in the subscription offering, subscriber's subscriptions will be cut back and a total of 20,125,000 shares of common stock will be allocated among the subscribing participants as described above under "—Subscription Offering and Subscription Rights."

***Directors and Officers.*** Subject to the prior rights of eligible members to subscribe for up to 20,125,000 shares in this offering, the plan of conversion provides that no director or officer of Members Mutual may directly or indirectly, subscribe for or purchase in this offering more than such person's individual management purchase limit. Members Mutual has determined each individual management purchase limit based on factors including years of service, positions held and compensation. A subscribing director or officer of Members Mutual who is also an eligible member will be deemed to subscribe first in such person's capacity as an eligible member. Under Illinois law, the plan of conversion and the terms of this offering, the directors and officers of Members Mutual, in their capacities as such, are subject to limitations on how many shares they may purchase, and in this offering may not purchase in the aggregate more than 4,016,250 shares.

In the event that there are insufficient shares remaining after subscriptions by the eligible members to satisfy in full all of the subscriptions by directors and officers of Members Mutual, the shares available will be allocated among the subscribing management participants as described above under "—Subscription Offering and Subscription Rights."

***Eligible Employees and Other Investors in the Community Offering.*** If the number of shares of common stock subscribed for by eligible members in the subscription offering, together with shares of common stock subscribed for by eligible employees under the Employee Bonus Program, exceeds 20,125,000, no shares of common stock will be issued to eligible employees under the Employee Bonus Program and the bonus will be paid in cash, subject to completion of the conversion.

Excluding subscriptions by eligible employees, which are subject to the terms of the Employee Bonus Program, the maximum amount of common stock that any investor, together with any associate, may, directly or indirectly, subscribe for or purchase in the community offering, shall not exceed 743,750 shares.

***Other Limitations.*** In addition to the limitations set forth above, under Illinois law and the plan of conversion, no person or a group of persons acting in concert (other than the standby purchaser), may acquire, directly or indirectly, in this offering or any public offering, more than 5% of the capital stock of Vericity for a period of five years from the effective date of the conversion without the approval of the Illinois Director of Insurance.

*General Matters Regarding Purchase Limitations*

For purposes of the limitations described above, an associate of a person includes:

- any relative or spouse of such person, or any relative of such person's spouse, who shares the same home as such person;
- any corporation or other organization (other than the Company or a majority-owned subsidiary of the Company) of which such person is an officer, director, or partner, or of which such person is, directly or indirectly, a beneficial owner of 10% or more of any class of equity securities;
- any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity (exclusive of any employee stock benefit plan of the Company); and
- any person acting in concert with any of the persons or entities listed above.

The subscription of any person who subscribes for more shares than the person's maximum purchase limitation as set forth on the stock order form will be disregarded in its entirety or reduced to the person's maximum purchase limitation, at the discretion of Vericity.

There were approximately 215,500 eligible members of Members Mutual as of July 31, 2018, the date the plan of conversion was adopted by the board of directors of Members Mutual. If subscriptions by eligible members for common stock meet or exceed the maximum of the estimated valuation range set forth in Boenning & Scattergood, Inc.'s valuation, we will be obligated to sell to eligible members the maximum number of shares offered. We are unable to predict the number of eligible members that may participate in the subscription offering or the extent of their participation.

The directors and officers of Members Mutual will not be deemed to be associates of one another or a group acting in concert with one another solely as a result of their capacities as such.

Table of Contents

Each person purchasing common stock in this offering will be deemed to confirm that the purchase does not conflict with the purchase limitations under the plan of conversion or otherwise imposed by law. We have the right to take any action as we may, in our sole discretion, deem necessary, appropriate or advisable in order to monitor and enforce the terms, conditions, limitations and restrictions described above and in the plan of conversion and the terms, conditions and representations contained in the order form, including, but not limited to, our absolute right to reject, limit or revoke acceptance of any order and to delay, terminate or refuse to consummate any sale of common stock which we believe might violate, or is designed to, or is any part of a plan to, evade or circumvent such terms, conditions, eligibility requirements, limitations, restrictions and representations. Any such action will be final, conclusive and binding on all persons, and we will be free from any liability to any person on account of any such action. To that end, if any person violates the purchase limitations, we will have the right to purchase from that person at the purchase price of $10.00 per share, all shares acquired by the person in excess of the purchase limitation. If the person has sold these excess shares, we are entitled to receive the difference between the aggregate purchase price paid by the person for the excess shares and the proceeds received by the person from the sale of the excess shares. This right of Vericity to purchase excess shares is assignable.

**Marketing Arrangements**

We have engaged Raymond James and Griffin as financial advisors to consult with and advise and assist us in connection with these offerings. Raymond James and Griffin are broker-dealers registered with the Securities and Exchange Commission and are members of the Financial Industry Regulatory Authority. In their role as financial advisors, Raymond James and Griffin will:

- assist us in assessing the financial and securities market implications of the plan of conversion;
- assist us in the identification and evaluation of potential investors and strategies leading to an investment as part of the plan of conversion (an "Investment") or alternative plan of conversion that does not involve a subscription offering by Members Mutual (a "Transaction");
- assist us in the dissemination of descriptive information regarding the Company to potential investors;
- assist us in negotiating financial and business terms and conditions with potential investors and in evaluating and qualifying competing offers, including the evaluation of any securities or other assets offered as part of a Transaction;
- assist us in negotiating certain agreements ancillary to an Investment or a Transaction;
- assist us in presenting alternative Investment or Transaction proposals to the Company's board of directors;
- assist us in presenting alternative Investment or Transaction proposals to the Illinois Department of Insurance and/or other regulators, as requested;
- assist us in structuring and in communicating the terms of the plan of conversion and subscription offering;
- assist us in the preparation of all documents for execution of the plan of conversion, including the prospectus, stock order and certification form and all marketing materials;
- assist us in analyzing proposals from outside vendors in connection with the plan of conversion;
- assist us in scheduling and preparing for meetings with other broker dealers, as necessary;
- establish a stock information center, which shall provide a toll-free hotline to assist with policyholder inquiries; and
- provide such other general advice and assistance as may be reasonably requested and agreed upon by Raymond James, Griffin and us.

We have also engaged Raymond James to act as our records agent in connection with the plan of conversion. In its role as records agent, Raymond James will provide the following services: (a) processing of Fidelity Life's policyholder records for each record date required by the plan of conversion, consolidation of policyholder records by ownership, identification of subscription priorities, calculation of member votes, and coordination with the Company's financial printer for all required subscriber and member mailings; (b) processing of all stock orders received in the conversion, with daily status reporting to Company management; (c) allocating shares to qualifying subscribers if the offering is oversubscribed; coordination with the Company's transfer agent and escrow agent for stock issuance and any required refund check processing; and (d) providing member proxy tabulation and reporting services, target group identification and reporting for solicitation efforts, proxy reminder mailings; act as, or support as needed, the inspector of election for the special meeting of members.

Table of Contents

For these services, Raymond James and Griffin each received retainer fees of $150,000, for a total of $300,000. We will pay Raymond James and Griffin an investment fee equal to 3.0% of the funds provided through the standby purchaser, which fee shall be allocated 75% to Raymond James and 25% to Griffin. Upon closing of the subscription offering, we will pay Raymond James a marketing fee equal to 1.0% of the aggregate dollar value of all shares of the Company's common stock sold through the subscription offering, excluding subscriptions by the directors and officers of Members Mutual. Upon closing of the community offering, we will pay Raymond James and Griffin a marketing fee equal to 3.0% of the aggregate value of shares purchased by persons identified by the Standby Purchaser and 6.0% of the aggregate value of shares purchased by other persons in the community offering, which shall be allocated 75% to Raymond James and 25% to Griffin. We have also paid Raymond James a non-refundable cash fee of $25,000 to serve as our records agent. Any retainer fees previously paid will be credited toward any investment fee payable.

In addition, whether or not the subscription offering is completed and in addition to any fees payable to Raymond James and Griffin, we will reimburse Raymond James and Griffin for all of their reasonable out-of-pocket expenses incurred in connection with, or arising out of, their engagement, up to a maximum of $50,000. In addition, Raymond James and Griffin will be reimbursed for the fees and the reasonable out-of-pocket expenses of their legal counsel, not to exceed $207,500. In the event of unusual circumstances or delays, or a resolicitation in connection with the subscription offering, this expense limit may be increased by mutual consent by an additional amount not to exceed $15,000 for fees of legal counsel and $5,000 for other out-of-pocket expenses. We have agreed to indemnify Raymond James and Griffin, together with their respective officers, directors, stockholders, employees, agents and controlling persons, from and against certain liabilities arising from their engagement with us.

Our directors and officers may participate in the solicitation of offers to purchase common stock. These persons will be reimbursed for their reasonable out-of-pocket expenses incurred in connection with the solicitation. Other trained employees of Members Mutual or its affiliates may assist in this offering in ministerial capacities, providing clerical work in effecting a sales transaction or answering questions of a ministerial nature. Questions of prospective purchasers will be directed to executive officers of Members Mutual or registered representatives of Raymond James. Our other employees have been instructed not to solicit offers to purchase shares of common stock or provide advice regarding the purchase of common stock. We will rely on Rule 3a4-1 under the Exchange Act, and sales of common stock will be conducted within the requirements of Rule 3a4-1, so as to permit officers, directors and employees to participate in the sale of common stock. None of our officers, directors or employees will be compensated in connection with their participation in this offering by the payment of commissions or other remuneration based either directly or indirectly on the transactions in the shares of common stock.

This offering will comply with the requirements of Rule 10b-9 under the Exchange Act.

**Actuarial Opinion**

We retained Milliman, Inc., an independent actuarial consulting firm, to advise us in connection with actuarial matters involved in the allocation of subscription rights and the establishment of the individual maximum purchase limitations. The opinion of Steven I. Schreiber, Principal of Milliman, dated March 25, 2019, relating to the proposed allocation of subscription rights among eligible members in consideration for the extinguishment of their membership interests in Members Mutual, states (in reliance upon the matters described in such opinion) that the principles, methodology and the allocation instructions for allocating consideration among the eligible members and for allocating shares in the event of an over subscription, each as set forth in the plan of conversion, are fair and equitable from an actuarial point of view. The opinion of Steven I. Schreiber is an exhibit to the registration statement of which this prospectus is a part, and is available for inspection in the manner set forth in the section titled "Additional Information." A copy of the actuarial opinion is also on file and available for inspection at our principal executive offices.

Table of Contents

**Proposed Management Purchases**

The following table lists the approximate number of shares of common stock that each of the directors and executive officers of Members Mutual intend to purchase in this offering. In addition, non-executive officers of Members Mutual have indicated their intention to subscribe for an aggregate of 264,550 shares in this offering. The directors and executive officers listed below do not have any agreements or obligation to purchase the amounts shown below. Subject to the purchase limitations described above, each director or executive officer may elect to purchase an amount greater or less than those shown below. For purposes of the following table, we have assumed that sufficient shares will be available to satisfy subscriptions at the minimum and the maximum of the offering range.

| Name | Amount ($) | Number of Shares | Percent of Stock Owned | |
|---|---|---|---|---|
| | | | Minimum (%) | Maximum (%) |
| Directors: | | | | |
| Linda Walker Bynoe | $ 750,000 | 75,000 | * | * |
| Steven L. Groot | 1,933,750 | 193,375 | 1.3 | 1.0 |
| Richard A. Hemmings | 1,933,750 | 193,375 | 1.3 | 1.0 |
| James E. Hohmann | 6,000,000 | 600,000 | 4.0 | 3.0 |
| James W. Schacht | 100,000 | 10,000 | * | * |
| John A. Fibiger | 100,000 | 10,000 | * | * |
| Executive Officers (who are not also directors): | | | | |
| James C. Harkensee | 3,123,750 | 312,375 | 2.1 | 1.6 |
| Chris S. Kim | 1,950,000 | 195,000 | 1.3 | 1.0 |
| John Buchanan | 700,000 | 70,000 | * | * |
| Laura R. Zimmerman | 1,000,000 | 100,000 | * | * |
| Chris Campbell | 1,000,000 | 100,000 | * | * |
| All Directors and Executive Officers as a Group (11 persons) | $18,591,250 | 1,859,125 | 12.5 | 9.2 |
| All Directors and Officers as a Group (19 persons) | $21,236,750 | 2,123,675 | 14.3 | 10.6 |

**Limitations on Resales**

The common stock issued in this offering will be freely transferable under the Securities Act of 1933. However, the transfer of shares purchased by the directors and officers of Members Mutual pursuant to subscription rights granted to them will be restricted for a period of one year from the effective date of the conversion pursuant to the plan of conversion and Section 59.1(7)(a)(iii) of the Illinois Insurance Code. The directors and executive officers of Vericity also are subject to additional resale restrictions under Rule 144 of the Securities Act of 1933. Shares of common stock issued to directors and officers will bear a legend giving appropriate notice of these restrictions. We will give instructions to the transfer agent for the common stock regarding these transfer restrictions. Any shares issued to the directors and officers of Vericity as a stock dividend, stock split or otherwise with respect to restricted stock will be subject to the same restrictions. Shares acquired by the directors and executive officers after the completion of this offering will be subject to the requirements of Rule 144. See "Management—Directors and Executive Officers." The shares purchased by the standby purchaser will be restricted securities and subject to trading limitations under applicable law and the standby purchase agreement.

**The Appraisal**

The plan of conversion requires that the total number of shares of common stock to be issued in this offering must be based on the estimated consolidated pro forma market value of the converted Members Mutual, as determined on the basis of an independent evaluation. This pro forma market value may be that value that is estimated to be necessary to attract full subscription for the shares, as indicated by the independent evaluation, which we refer to as the appraisal.

The plan of conversion requires that the appraisal be made by an independent appraiser experienced in the valuation of insurance companies. In January 2018, we retained Boenning & Scattergood, Inc., or Boenning, to determine the estimated consolidated pro forma market value and corresponding valuation range for this offering. Under our plan of conversion, the valuation range means the range of the value of the total number of shares of common stock to be issued in this offering, based on the estimated consolidated pro forma market value of converted Members Mutual in accordance with Section 59.1(6)(f) of the Illinois Insurance Code. Boenning is engaged regularly in the valuation of insurance companies and other financial institutions. Except for our retention of Boenning in 2013 and 2016 in connection with our evaluation of

Table of Contents

completing the conversion at that time, there is no pre-existing relationship between Boenning and Members Mutual. Boenning will be paid a fixed fee of $150,000 plus out-of-pocket expenses. This fee is not contingent on the completion of the offering. We agreed, among other things, to indemnify Boenning from and against any and all loss or expenses, including reasonable attorney's fees, in connection with its appraisal and other services, except if such loss or expenses are the result of willful misconduct or gross negligence on the part of Boenning.

Boenning made its appraisal in reliance upon the information provided by our management, including the financial statements. Boenning also considered the following factors, among others:

- the present operating results and financial condition of the Company and current economic conditions;
- certain historical, financial and other information relating to the Company;
- a comparative evaluation of the operating and financial statistics of the Company with those of other similarly situated publicly traded insurance companies;
- the aggregate size of the offering of the common stock of Vericity, Inc., determined by Boenning;
- the impact of the conversion offering on our net worth and earnings potential as determined by Boenning;
- the trading market for securities of comparable institutions and general conditions in the market for such securities; and
- the value which Boenning estimates to be necessary to attract a full subscription of our common stock.

In conducting its analysis of Members Mutual, Boenning placed emphasis on various financial and operating characteristics of Members Mutual, including our lines of business and competitive position in the industry, our relative size and premium volume, our lack of profitability in recent years, and our ratio of equity capital to total assets.

Members Mutual's board of directors met with representatives of Boenning on July 31, 2018. Boenning reviewed the appraisal with the board of directors, including the factors considered by Boenning in reaching its conclusion and the assumptions made and the methodology used by Boenning. Boenning's representatives also answered the questions presented by the Board regarding the appraisal.

In preparing the appraisal, Boenning visited the Company's offices in Chicago, IL and Bellevue, WA in connection with a prior appraisal and conducted discussions with our management concerning our business and future prospects. Boenning reviewed and discussed with our management our unaudited GAAP and statutory financial statements for the years ended December 31, 2015, December 31, 2016 and December 31, 2017.

In deriving the estimated consolidated pro forma market value of converted Members Mutual, Boenning utilized the comparative market valuation approach. The comparative market valuation approach estimates a value by reviewing the relevant market pricing characteristics of comparable companies that are publicly traded. Since there are no publicly traded companies that are truly comparable to the Company, Boenning selected a peer group of publicly-traded life and health ("L&H") insurance companies that potentially share similar operating and valuation characteristics with the Company based on a review of selected financial data for L&H insurance companies listed on U.S. stock exchanges as compiled from data obtained from S&P Global Market Intelligence ("Capital IQ" or "SNL Financial"), a leading provider of financial and market data. In general, Boenning considered operating characteristics and marketability and liquidity factors to select the individual members of the Comparable Group from the universe of publicly-traded L&H insurance companies ("Public L&H Insurance Group"). The operating characteristics included financial variables such as profitability, capitalization, growth, risk exposure, liquidity, and other factors such as lines of business and management strategies. Marketability and liquidity factors included the relative ease and promptness with which a security may be sold when desired, the existence of buying interest as well as selling interest, trading volumes, and the spread between the bid and ask price for a security. Boenning's initial screen of the Public L&H Insurance Group produced a list of 22 L&H insurance companies with assets ranging from $49.0 million to $832.1 billion and equity ranging from $2.2 million to $58.9 billion. Boenning further refined this list to a group of six comparable companies (the "Comparable Group") based on criteria relating to total equity size, level of life premiums to total premiums written, operating performance issues and target market segment. While none of the companies in the Comparable Group is a perfectly comparable company from a valuation standpoint, Boenning determined that the Comparable Group on the whole provided a meaningful basis of financial comparison for its valuation purposes.

Table of Contents

The following table sets forth the publicly traded insurance companies used by Boenning in its comparative market valuation approach and certain financial data reviewed by Boenning regarding these companies and Members Mutual as of or for the year ended December 31, 2017 (unless otherwise noted).

| | | Operating Performance of the Comparable Group | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 3 Year Average | | |
| Company Name | Ticker | Total Policy Income ($000) | Total Revenue ($000) | Policy Income/ Equity (%) | Net Income ($000) | Inv. Yield (%) | ROAA (%) | ROAE (%) | ROAA (%) | ROAE (%) | Net Margin (%) |
| Torchmark Corporation | TMK | 3,282,935 | 4,155,573 | 52.68 | 1,454,494 | 5.13 | 6.46 | 28.57 | 3.88 | 17.39 | 35.00 |
| Primerica, Inc. | PRI | 961,338 | 1,689,102 | 67.74 | 350,255 | 2.90 | 2.93 | 27.38 | 2.23 | 20.54 | 20.74 |
| FBL Financial Group, Inc. | FFG | 308,683 | 735,478 | 22.23 | 194,355 | 4.96 | 1.98 | 15.55 | 1.45 | 11.29 | 26.43 |
| Kansas City Life Insurance Company | KCLI | 293,953 | 450,702 | 39.88 | 51,541 | 4.28 | 1.15 | 7.34 | 0.76 | 4.85 | 11.44 |
| Security National Financial Corporation | SNFCA | 70,412 | 276,925 | 47.39 | 14,113 | 4.94 | 1.44 | 10.22 | 1.59 | 10.99 | 5.10 |
| UTG, Inc. | UTGN | 7,457 | 28,734 | 6.75 | 4,813 | 5.82 | 1.19 | 4.94 | 0.62 | 2.66 | 16.75 |
| Group Aggregate | | | | | | | | | | | |
| Comparable Group Mean | | 820,796 | 1,222,752 | 39.45 | 344,929 | 4.67 | 2.53 | 15.67 | 1.76 | 11.29 | 19.24 |
| Comparable Group Median | | 301,318 | 593,090 | 43.64 | 122,948 | 4.95 | 1.71 | 12.88 | 1.52 | 11.14 | 18.74 |
| MMHC | | 82,873 | 115,870 | 42.24 | (8,241) | 3.85 | (1.25) | (4.13) | (1.59) | (5.03) | (7.11) |

Source: SNL Financial and company financial statements

The Company's total revenue of $115.9 million for the year ended December 31, 2017 was within the range of the Comparable Group, but materially below the Comparable Group's mean and median total revenue of $1.2 billion and $593.1 million, respectively. All of the companies in the Comparable Group had positive return on average assets ("ROAA") and return on average equity ("ROAE") for the year ended December 31, 2017, and all of the companies in the Comparable Group had positive ROAA and ROAE over a three year average. Members Mutual generated losses over the year ended December 31, 2017, with ROAA and ROAE that were both negative at (1.25%) and (4.13%). Members Mutual's ROAA and ROAE compared unfavorably to the Comparable Group during the last three years, as the Company generated negative returns whereas the Comparable Group medians were meaningfully positive. The Company's total policy income of $82.9 million for the year ended December 31, 2017 was in the lower half of the range of the Comparable Group. The Comparable Group's mean and median total policy income was $820.8 million and $301.3 million, respectively. Additionally, Members Mutual had an investment yield of 3.85%, which was lower than the Comparable Group's median of 4.95%. Members Mutual's net margin of (7.11%) was also lower than the Comparable Group's mean of 19.24% and median of 18.74%.

The following tables compares the Company with the Comparable Group in regard to selected ratios commonly used as life insurance industry metrics.

**Ratio Analysis of the Comparable Group**
**As of and for Fiscal Period Ended 12/31/2017 Unless Otherwise Noted**

| | | Lapse & Surrender Ratio (%) | Benefit Ratio (%) | Expense Ratio (%) | Commission Ratio (%) | Surplus Notes/ C&S (%) | Dividend Payout Ratio (%) | Fixed Maturities/ Total Investments (%) | Effective Tax Rate (%) |
|---|---|---|---|---|---|---|---|---|---|
| Torchmark Corporation | TMK | 21.02 | 43.31 | 16.30 | 29.41 | 4.18 | 4.91 | 95.69 | (75.56) |
| Primerica, Inc. | PRI | 8.85 | 11.05 | 62.49 | 106.14 | 0.00 | 10.25 | 97.31 | 7.71 |
| FBL Financial Group, Inc. | FFG | 5.10 | 43.82 | 15.09 | 9.61 | 0.00 | 42.06 | 83.33 | (28.62) |
| Kansas City Life Insurance Company | KCLI | 5.64 | 84.08 | 20.46 | 13.21 | 0.00 | 20.30 | 72.20 | (75.49) |
| Security National Financial Corporation | SNFCA | 10.01 | 55.41 | 22.10 | 24.87 | 46.92 | 0.00 | 36.49 | (87.37) |
| UTG, Inc. | UTGN | 3.28 | 232.19 | 137.80 | 3.28 | 0.00 | 0.00 | 53.49 | (45.58) |
| Group Aggregate | | | | | | | | | |
| Comparable Group Mean | | 8.98 | 78.31 | 45.71 | 31.09 | 8.52 | 12.92 | 73.08 | (50.82) |
| Comparable Group Median | | 7.24 | 49.61 | 21.28 | 19.04 | 0.00 | 7.58 | 77.76 | (60.54) |
| MMHC | | 11.82 | 43.83 | 53.37 | 60.12 | 0.00 | 687.60 | 85.91 | NM |

Source: SNL Financial and Company financial statements

Table of Contents

The Company's benefit ratio for the fiscal period ended December 31, 2017 of 43.8% was lower than the Comparable Group's median benefit ratio of 49.6% and below (more favorable than) the Comparable Group's mean of 78.3%. The benefit ratio includes death benefits, matured endowments, annuity benefits, accident & health benefits, guarantees, group conversions, and life contingent contract pay as a percent of premiums, annuity considerations and considerations for supplementary contracts with life contingencies. Members Mutual's expense ratio was 53.4% for the fiscal period ended December 31, 2017, which was within the range, but above ("worse than") than the median of 21.3% of the Comparable Group. The fiscal period ended December 31, 2017 commission ratio for Members Mutual was 60.1%, which is markedly higher (less favorable) than the Comparable Group's mean and median.

The following table summarizes certain key financial comparisons between the Company and the Comparable Group, based on Members Mutual's fiscal year ended December 31, 2017 financials.

**Financial Condition of the Comparable Group**
**As of 12/31/2017 Unless Otherwise Noted**

| Company | Ticker | Total Assets ($000) | Total Policy Reserves ($000) | Total Equity ($000) | Tangible Equity ($000) | Cash and Investments ($000) | Cash & Investments/ Policy Reserves (%) | Cash and Investments / Assets (%) | Policy Reserves / Equity (x) | Total Equity / Assets (%) | Tangible Equity / Assets (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Torchmark Corporation | TMK | 23,474,985 | 13,931,831 | 6,231,421 | 5,789,830 | 17,853,047 | 128.15 | 76.05 | 2.24 | 26.54 | 24.66 |
| Primerica, Inc. | PRI | 12,460,703 | 6,640,409 | 1,419,101 | 1,367,588 | 3,025,105 | 45.56 | 24.28 | 4.68 | 11.39 | 10.98 |
| FBL Financial Group, Inc. | FFG | 10,066,613 | 7,684,593 | 1,388,850 | 1,378,911 | 8,803,179 | 114.56 | 87.45 | 5.53 | 13.80 | 13.70 |
| Kansas City Life Insurance Company | KCLI | 4,530,670 | 3,213,903 | 737,155 | 737,155 | 3,520,893 | 109.55 | 77.71 | 4.36 | 16.27 | 16.27 |
| Security National Financial Corporation | SNFCA | 982,173 | 608,969 | 148,568 | 145,802 | 671,157 | 110.21 | 68.33 | 4.10 | 15.13 | 14.84 |
| UTG, Inc. | UTGN | 406,445 | 278,257 | 110,432 | 110,432 | 359,220 | 129.10 | 88.38 | 2.52 | 27.17 | 27.17 |
| Group Aggregate | | | | | | | | | | | |
| Comparable Group Mean | | 8,653,598 | 5,392,994 | 1,672,588 | 1,588,286 | 5,705,434 | 106.19 | 70.37 | 3.90 | 18.38 | 17.94 |
| Comparable Group Median | | 7,298,642 | 4,927,156 | 1,063,003 | 1,052,372 | 3,272,999 | 112.38 | 76.88 | 4.23 | 15.70 | 15.56 |
| MMHC | | 666,414 | 437,692 | 196,203 | 194,323 | 404,826 | 92.49 | 60.75 | 2.23 | 29.44 | 29.16 |

Source: SNL Financial and Company financial statements

Members Mutual's cash and investments of $404.8 million at December 31, 2017 were well below the Comparable Group's mean and median of $5.7 billion and $3.3 billion, respectively. The Company's total assets of $666.4 million at December 31, 2017 were significantly below both the Comparable Group's mean of $8.7 billion, and median of $7.3 billion. The Company's total equity of $196.2 million at December 31, 2017 was within the range of the Comparable Group, but significantly below the Comparable Group's mean and median total equity of $1.7 billion and $1.1 billion, respectively. The Company's tangible equity was $194.3 million at December 31, 2017, which was below the mean and median of the Comparable Group at $1.5 billion and $1.1 billion, respectively. The Company's ratios of total equity to total assets and tangible equity to total assets were 29.4% and 29.2%, respectively, at December 31, 2017. These ratios significantly exceed the mean and median of the Comparable Group.

The following table sets forth certain market valuation data for the publicly traded insurance companies comprising the Comparable Group used by Boenning based on closing market prices as of April 11, 2018.

**Trading Performance of Comparable Group**

| Comparable Group | Closing Price ($) | Market Value $MM | Price/ Book (%) | Price/ Tangible Book (%) | Price/ LTM EPS (x) | Price/ LTM Revenue (x) | Price/ Total Assets (%) | Total Equity/ Total Assets (%) | Current Dividend Yield (%) |
|---|---|---|---|---|---|---|---|---|---|
| Torchmark Corporation | 83.42 | 9,497.5 | 153.41 | 165.11 | 6.83 | 2.25 | 40.86 | 25.11 | 0.76 |
| Primerica, Inc. | 96.55 | 4,254.4 | 301.07 | 312.41 | 12.69 | 2.44 | 34.05 | 11.42 | 1.04 |
| FBL Financial Group, Inc. | 70.85 | 1,759.8 | 127.46 | 128.38 | 9.14 | 2.39 | 17.51 | 12.59 | 2.65 |
| Kansas City Life Insurance Company | 43.00 | 416.4 | 56.49 | 56.49 | 8.08 | 0.93 | 9.31 | 15.73 | 2.40 |
| Security National Financial Corporation | 5.38 | 86.7 | 58.22 | 59.32 | 6.18 | 0.31 | 8.83 | 15.13 | 0.00 |
| UTG, Inc. | 25.00 | 83.1 | 76.08 | 76.08 | 17.36 | 2.88 | 20.39 | 27.17 | 0.00 |

Source: SNL Financial.

Table of Contents

Boenning reviewed the trading market price ratios of the Comparable Group for the purpose of developing valuation ratio benchmarks to reach an estimate of value for converted Members Mutual. The principal valuation measure considered by Boenning was the price-to-book value ratio. Boenning also considered the price-to-revenue, the price-to-earnings and price-to-assets ratios. Based on the quantitative and qualitative comparisons with the selected group of publicly traded companies, Boenning applied adjusted market pricing ratios to our pro forma financial data to determine our estimated consolidated pro forma market value. The market pricing ratios determined by Boenning took into account market value adjustments for our size, our earnings prospects, our management, liquidity of our shares of common stock, subscription interest, stock market conditions, dividend outlook and the new issue discount warranted for an equity securities offering.

Boenning determined that the price-to-earnings ratio was not applicable due to our lack of profitability historically and in the most recent reporting periods. Boenning believes price-to-book value is the primary determinant of an investor's interest in a subscription rights conversion of an insurance company. Thus, the price-to-book value ratio takes on additional meaning as a valuation metric. Based on its comparative analyses, Boenning determined that a discount range of approximately 50% to 60% relative to the comparative group based on the price-to-book value ratio is warranted. In Boenning's opinion, these levels of discounts based on the previously discussed market value adjustments for size, earnings prospects, management, liquidity of the issue, subscription interest, stock market conditions, dividend outlook and the new issue discount are reasonable and appropriate for determining the estimated consolidated pro forma market value relative to the Comparable Group's trading ratios.

Boenning's appraisal of our estimated consolidated pro forma market value was prepared as of April 11, 2018. Boenning has agreed to update its appraisal as may be requested by us. These updates will consider developments in general stock market conditions, current stock market valuations for selected insurance companies, the results of the subscription offering, and the recent financial condition and operating performance of Members Mutual.

On the basis of the foregoing, Boenning provided its report, dated April 11, 2018, that the estimated consolidated pro forma market value of converted Members Mutual is $175,000,000, representing a pro forma price-to-book ratio of 51% and the value of the range of the total number of shares of common stock to be issued in the offering is between $148,750,000 and $201,250,000. We determined that the common stock should be sold at $10.00 per share, resulting in a range of 14,875,000 to 20,125,000 shares of common stock being offered in this offering.

If, based on subsequent developments in our financial condition or market conditions generally, the offering range is updated to amend the pro forma market value of converted Members Mutual, we may cancel the offering, extend the offering period and establish a new offering range, hold a new offering or take any other action we deem necessary or advisable, subject to making or obtaining any required regulatory filings or approvals, as applicable.

The appraisal report of Boenning is an exhibit to the registration statement of which this prospectus is a part and is available for inspection in the manner set forth under "Additional Information."

The Illinois Director of Insurance is required to review and approve the plan of conversion, including the appraisal prepared by Boenning in connection with this offering.

**The preceding summary of the appraisal report summarizes the material analyses performed by Boenning, but is not a complete description of all the analyses underlying Boenning's appraisal. The summary includes information presented in tabular and text format. In order to fully understand the financial analyses, the tables must be read together with the accompanying text and the entire appraisal report. These tables alone do not constitute a complete description of the financial analyses performed by Boenning. The preceding summary is qualified in its entirety by the full appraisal report. Copies of the appraisal report are on file and available for inspection at our principal executive offices. Any subsequent updated appraisal report of Boenning will be available for inspection.**

**The appraisal is not intended, and must not be construed, as a recommendation of any kind as to the advisability of purchasing common stock. In preparing the appraisal, Boenning & Scattergood, Inc. relied upon and assumed the accuracy and completeness of financial, statistical and other information provided to it by Members Mutual. Boenning & Scattergood, Inc. did not independently verify the financial statements and other information provided to it by Members Mutual, nor did Boenning & Scattergood, Inc. value independently our assets and liabilities. The appraisal considers Members Mutual only as a going concern and should not be considered as an indication of our liquidation value. The appraisal is necessarily based upon estimates and projections of a number of matters, all of which are subject to change from time to time. We cannot assure you that persons purchasing common stock will be able to sell such shares at or above the initial purchase price.**

Table of Contents

## MANAGEMENT

### Directors, Director Nominees and Executive Officers

The table below provides information about the directors, director nominees and executive officers of Vericity as of the closing of this offering.

| Name | Age | Position |
|---|---|---|
| James E. Hohmann | 63 | Director, Chief Executive Officer, and President |
| James C. Harkensee | 60 | Executive Vice President of Vericity, President and Chief Operating Officer of Fidelity Life |
| Chris S. Kim | 47 | Executive Vice President, Chief Financial Officer and Treasurer |
| John Buchanan | 48 | Executive Vice President, General Counsel and Corporate Secretary |
| Chris Campbell | 48 | Executive Vice President of Vericity, President and Chief Operating Officer of Efinancial |
| Laura R. Zimmerman | 60 | Executive Vice President and Chief Marketing Officer |
| Eric Rahe | 50 | Director and Chairman Nominee |
| Calvin Dong | 31 | Director Nominee |
| Scott Perry | 56 | Director Nominee |
| Neil Ashe | 51 | Director Nominee |
| Richard A. Hemmings | 72 | Director |
| James W. Schacht | 77 | Director |

***Directors***

We believe our board of directors should be composed of individuals with sophistication and experience in many substantive areas that impact our business. In this regard, we believe experience, qualifications or skills in the following areas are the most important: the life insurance industry; insurance company operations; legal/regulatory matters relating to life insurance companies; marketing; direct distribution and technology. We seek to select individuals who possess the personal and professional qualifications necessary for service on our board.

The following persons currently serve as members of our board of directors and have been designated by Members Mutual pursuant to the terms of the standby purchase agreement to serve as directors of Vericity following the completion of the offerings until the 2020 annual meeting of stockholders of Vericity. See "—Corporate Governance—Overview of Our Board Structure."

***Richard A. Hemmings*** has served as the Chairman of the board of directors of Members Mutual since its formation in 2007. From 2007 until 2014, Mr. Hemmings also served as the President and Chief Executive Officer of Members Mutual. Mr. Hemmings also served as the Chairman of the board of directors, Chief Executive Officer (and prior to 2012, President) of Fidelity Life, positions held by him from 2005 to 2014. Mr. Hemmings became a director of Fidelity Life in 2002. Mr. Hemmings was elected to the board of directors of Vericity in 2013. Prior to joining Fidelity Life in 2005, Mr. Hemmings was a partner in the Chicago law firm of Lord, Bissell & Brook LLP and was associated with the firm for 25 years. Mr. Hemmings also serves on the board of Brighthouse Life Insurance Company of New York, a position he has held for over 20 years. Fidelity Life does not do business in the State of New York, and Brighthouse Life Insurance Company of New York conducts its insurance business only in the State of New York.

Mr. Hemmings was selected to serve on our board of directors because of his experience in the life insurance industry; his knowledge of the legal and regulatory matters affecting our operations; and his executive experience with Members Mutual and Fidelity Life.

***James E. Hohmann*** has served as a director, President, and Chief Executive Officer of Members Mutual, and as a director and Chief Executive Officer of Vericity since September 2014. For approximately two years prior thereto, Mr. Hohmann worked as a private consultant in the life insurance industry, including providing consulting services for Members Mutual. From April 2009 until June 2012, Mr. Hohmann served as a director, President, and Chief Executive Officer of FBL Financial Group, an individual life insurance and annuity products company. From January 2007 until January 2009, Mr. Hohmann was an executive officer of Allstate Corporation with accountabilities as President and Chief Executive Officer of Allstate Financial. From December 2004 until December 2006, Mr. Hohmann was President and Chief Operating Officer of Conseco, Inc. Earlier, he served as President and CEO of a newly formed XL Life and Annuity business at XL Capital, was Chief Actuary and then President of the Financial Institutions business of Zurich (Kemper), and worked for nearly 13 years as a management consultant, first for KPMG Peat Marwick, followed by Tillinghast/Towers Perrin (now Willis Towers Watson) where he was Managing Principal of the Chicago Life Practice.

Table of Contents

Mr. Hohmann is a former member of the Board of Directors of American Council of Life Insurers and the Board of Governors for the Property Casualty Insurance Association of America. He also currently serves on the Board of Directors of Bankers Trust (non-public) and is Chairman – Elect of MIB Group Inc., a life insurance industry membership organization. He is a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

Mr. Hohmann was selected to serve on our board of directors because of his executive leadership experience, his expertise in insurance and financial services, and his actuarial background.

***James W. Schacht*** has served as the President of The Schacht Group, Inc., which advises national and international clients with respect to insurance and regulatory matters, since its founding in 2008. Prior thereto, Mr. Schacht was for thirteen years a Managing Director at two international consulting firms. Mr. Schacht has over 45 years of broad-based experience in the insurance industry and all areas of insurance regulation. Mr. Schacht has served as an expert consultant and witness on a variety of insurance, reinsurance, and regulatory issues in litigation, and advises clients on new insurance products, organizing insurance companies, financial and reporting requirements, and securing regulatory approval for a variety of transactions. Mr. Schacht served as the Director of the Illinois Department of Insurance on three occasions. Mr. Schacht serves on the board of directors of Spinnaker Insurance Company, a property and casualty insurer. Mr. Schacht has served on the board of directors of Members Mutual since 2007. Mr. Schacht was elected to the board of directors of Vericity in 2013.

Mr. Schacht was selected to serve on our board of directors because of his experience in the insurance industry and his knowledge of legal and regulatory matters affecting our operations.

***Director Nominees***

The following persons have been designated by the standby purchaser pursuant to the terms of the standby purchase agreement to serve as directors of Vericity following the completion of the offerings until the 2020 annual meeting of stockholders of Vericity. See "—Corporate Governance —Overview of Our Board Structure."

***Eric Rahe*** has served as a Managing Director of J.C. Flowers & Co. LLC since 2014, and serves as a member of the firm's Management Committee. From 2008 to 2014, Mr. Rahe was a Managing Director at Clayton, Dubilier & Rice where he established and led the firm's financial services practice. Previously, he was a senior investment professional at the hedge fund SAB Capital, and before that a Partner at Capital Z Partners, the financial services focused private equity firm. Mr. Rahe began his career at Donaldson, Lufkin & Jenrette. Mr. Rahe serves on the Boards of Directors of AmeriLife Group Holdings and ELMC Group, LLC.

He received an A.B. in Economics from Harvard College, where he graduated magna cum laude, and an M.B.A. from Harvard Business School.

Mr. Rahe has been nominated to serve on our board of directors because of his experience in the insurance and financial services industries. Mr. Rahe has been investing in the insurance industry for over 25 years and has served on the board of directors of a number of insurance companies.

***Calvin Dong*** is a Vice President at J.C. Flowers & Co. LLC, where he has been employed since 2013. Prior to joining J.C. Flowers & Co. LLC, Mr. Dong was a member of the Financial Institutions Group at Barclays Investment Bank in New York for three years, focusing on mergers and acquisitions and capital raising transactions in the insurance sector.

Mr. Dong received a B.S. (Honors) in Finance and Accounting with High Distinction from the Kelley School of Business, Indiana University.

Mr. Dong has been nominated to serve on our board of directors because of his experience in the insurance and financial services industries. Mr. Dong has over 8 years of experience as an investor and banker to the life insurance industry.

***Scott Perry*** joined AmeriLife Group Holdings as CEO in December 2016. AmeriLife is a distributor of annuity, life, and health insurance products and is a portfolio company of a fund advised by J.C. Flowers & Co. LLC. He was previously the Chief Business Officer of CNO Financial Group, Inc., (formerly, Conseco, Inc.), where he oversaw the operations of Bankers Life, Colonial Penn and Washington National, from 2009 until 2016. Prior to that, Mr. Perry served as the President of Bankers Life from 2002 until 2009. Before joining Bankers Life, Mr. Perry worked for 12 years in sales, marketing, and management roles at Golden Rule, Anthem Blue Cross Blue Shield, Premera Blue Cross. Earlier in his career, he advised healthcare payers and providers on strategies to improve operational and financial performance with the Deloitte & Touche Integrated Health Care Group.

Table of Contents

Mr. Perry has served on the boards of LL Global (LIMRA) and the American College. He also served as a board member and Chair of the Greater Illinois chapter of the Alzheimer's Association.

Mr. Perry has been nominated to serve on our board of directors because of his experience in the insurance industry. Mr. Perry has over 28 years of experience in the life insurance industry. As former President of Bankers Life, Chief Business Officer of CNO and CEO of Amerilife, he brings particular expertise in the distribution of a wide variety of life and health products across various distribution channels.

***Neil Ashe*** is the CEO of Faster Horses LLC, which invests in, operates and advises companies that are embracing the power of digital to grow and change their businesses. Mr. Ashe has served in this position since 2017. From 2012 to 2017, Mr. Ashe was the president and CEO of Global eCommerce and Technology for Wal-Mart Stores, Inc. Mr. Ashe was with CNET Networks (NASDAQ: CNET) from 2002 to 2008, having been appointed as CEO in 2006, and, subsequently, the President of CBS Interactive from 2008 until 2011, following the sale of CNET to CBS. He has served on the boards of directors of numerous companies, including CNET and AMC Networks (NASDAQ: AMCX), and was a member of the Georgetown University Board of Regents.

Mr. Ashe has an M.B.A. from the Harvard Business School and a B.S. in Business Administration from Georgetown University.

Mr. Ashe has been nominated to serve on our board of directors because of his experience helping companies use and adopt technology to grow their businesses. Through his experience running several leading internet businesses, Mr. Ashe brings a breadth of experience that will be germane to the Company's internet agency, Efinancial.

***Executive Officers***

Set forth below is biographical information for our executive officers (except for Mr. Hohmann, whose biographical information is set forth above):

***James C. Harkensee*** has served as President and Chief Operating Officer of Fidelity Life since November 2012. From July 1, 2013 to August 4, 2014, Mr. Harkensee served as Interim Chief Financial Officer of Members Mutual. Prior to that, Mr. Harkensee served in various capacities at Fidelity Life, including most recently as Vice President of Product and Corporate Development and prior to that as President of America Direct Insurance Agency, Inc., a subsidiary of Fidelity Life, which he joined in 2005. He was formerly President of Zurich Direct, a direct marketing insurance agency. Mr. Harkensee began his career at Bankers Life & Casualty in 1980, later joining Zurich Life, where he was promoted to Chief Actuary. Mr. Harkensee also serves as Executive Vice President of Vericity. He is a Fellow of the Society of Actuaries.

***Chris S. Kim*** has served as Chief Financial Officer of Vericity and Members Mutual since August 2014. Prior thereto, Mr. Kim served as Chief Accounting Officer of Members Mutual since June 2013. Mr. Kim has over twenty years of experience in public accounting and controllership with a focus on property and casualty and life insurers. He has extensive experience in advising public companies on accounting and financial reporting matters related to capital raising activities and advising clients on complex accounting matters. Mr. Kim also serves as Executive Vice President of Vericity. Prior to joining Members Mutual, he was employed by PricewaterhouseCoopers LLC for a total of seventeen years within the audit and transaction services practice in Kansas City, Chicago, and New York, from 1995-2002 and again from 2004-2013. From 2002-2004, Mr. Kim held the position of Assistant Controller with Employers Reinsurance Corporation, a subsidiary of GE Capital.

***John Buchanan*** has served as Executive Vice President, General Counsel and Corporate Secretary of Vericity and Members Mutual since February 19, 2016. Prior thereto, from 1995 to February 2016, Mr. Buchanan served in various legal roles during a twenty year career at Allstate Insurance Company most recently as Chief Counsel supporting Allstate's agency operations from July 2014 to February 2016, and prior to that as Corporate Counsel supporting direct sales from July 2009 until July 2014. Among other positions at Allstate, Mr. Buchanan led several legal teams within Allstate's P&C and life insurance operations, including acting as lead counsel for Allstate Life of New York. He also served as lead counsel to Allstate's Chief Marketing Officer and Lead Counsel to Allstate's Eastern Region President. Mr. Buchanan served as Secretary on NJ Life and Health Guaranty Fund boards. Mr. Buchanan began his career as a trial attorney with dozens of jury and bench trials on insurance matters.

***Chris Campbell*** has served as President and Chief Operating Officer of Efinancial since July 2017. Mr. Campbell has over 25 years of experience in the insurance industry. Prior to joining Efinancial, he served in various roles at CNO Financial from 2010 to 2017, most recently as SVP Marketing and Communications from 2013 to 2017, where he led initiatives that