**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
<u>**EASTERN DIVISION**</u>

| | | |
|---|---|---|
| YITZCHOK ROKOWSKY, on behalf of himself and all others similarly situated, | : : | Case No. 1:20-cv-456 |
| | : | |
| Plaintiff, | : | |
| | : | Hon. Andrea R. Wood |
| v. | : | |
| | : | |
| VERICITY, INC.; MEMBERS MUTUAL; FIDELITY LIFE ASSOCIATION; and APEX HOLDCO L.P., ERIC RAHE, CALVIN DONG, SCOTT PERRY, RICHARD HEMMINGS, JAMES E. HOHMANN, JAMES SCHACT, LINDA WALKER BYNOE, STEVEN GROOT, JOHN FIBIGER, AND NEIL ASHE | : : : : : : : : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
<u>**AND INCORPORATED MEMORANDUM OF LAW**</u>

## Table of Contents

Page

I.    INTRODUCTION ...........................................................................................................1

II.    FACTUAL STATEMENT ............................................................................................3

    A.    The Demutualization of Members Proceeds Under Illinois Law ........................... 4

    B.    The Stand-By Purchaser ........................................................................... 7

    C.    The Offering and Defendants' Subsequent Reward ............................... 9

III.    ARGUMENT ..............................................................................................................10

    A.    Illinois' 30-day Statute of Limitations Under Its Demutualization Statute Does Not Preclude Action................................................................................................... 10

    B.    Plaintiff's Claims Fall Well Outside the Illinois Review Law ............................ 12

        1.    Defendants Misconstrue Plaintiff's Claims, in a Misplaced Effort to Invoke the Illinois Review Law ...................................................................... 12

        2.    *Ordower* and *Ormond* Establish that Plaintiff's Claims Should Proceed. 16

        3.    Defendants' Authorities are Inapposite .................................................... 17

    C.    Defendants Breached Their Fiduciary Duties To Members And Their Misconduct Is Not Protected By The Business Judgment Rule ............................................. 19

    D.    Plaintiff Has Pled a Breach of Contract Claim .................................................... 23

    E.    Plaintiff Properly Pled Unjust Enrichment ......................................................... 24

    F.    Plaintiff Has Properly Alleged that Defendants Owed Plaintiff Certain Fiduciary Duties to Plaintiff and the Class........................................................................... 25

IV.    CONCLUSION...........................................................................................................25

i

# Table of Authorities

**Cases**

*Andrews v. Equitable Life Assurance Soc'y*, 124 F.2d 788 (7th Cir. 1941) .................................. 21

*Babbitt Municipalities, Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178 (Ill. App. Ct. 2016) ... 22

*Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011) ......................................................... 25

*Collins v. Baylor*, 302 F. Supp. 408 (N.D. Ill. 1969) ................................................................. 15

*Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613 (2d Cir. 1997) ............................................ 16

*Dryden v. Sun Life Assur. Co. of Canada*, 737 F. Supp. 1058 (S.D. Ind. 1989) ......................... 16

*Fiala v. Metropolitan Life Ins. Co.*, 776 N.Y.S. 2d 29 (2004).......................................... 18, 19, 21

*Flanagan v. Bernstein*, No. 93 C 1498, 1996 WL 84184 (N.D. Ill. 1996) .................................. 22

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641,
2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)......................................................................... 7

*Heritage Healthcare Servs., Inc. v. Beacon Mut. Ins. Co.*, No. 02-7016,
2004 WL 253547 (R.I. Super. Jan. 21, 2004) ....................................................................... 20

*Howerton v. Prudential Ins. Co.*, 2012 IL App (1st) 110154 ...................................................... 18

*Lubin v. Equitable Life Assurance Soc'y*, 61 N.E.2d 753 (Ill. App. Ct. 1945)............................. 21

*M.Y. Taxicab, Inc. v. Shoenberger*, 238 F. Supp. 2d 994 (N.D. Ill. 2002) .................................. 19

*Mihelic v. Will County*, Ill., 826 F. Supp. 2d 1104 (N.D. Ill. 2011) ............................................ 11

*Monarch Gems v. Malca-Amit USA, L.L.C.*, 2005 WL 1206426 (N.D. Ill. 2005) ...................... 21

*Ordower v. Office of Thrift Supervision,* 999 F.2d 1183 (7th Cir.1993) ................... 16, 17, 18, 23

*Ormond v. Anthem, Inc.* ("*Ormond I*"), No. 05-cv-1908-DFH-TAB,
2008 WL 906157 (S.D. Ind. Mar. 31, 2008).................................................................. *passim*

*Ormond v. Anthem, Inc.* ("*Ormond II*"), 799 F. Supp. 2d. 910 (S.D. Ind. 2011) ................. *passim*

*Rieff v. Evans*, 630 N.W.2d 278 (Iowa 2001) ............................................................................ 20

*Sadler v. Retail Props. of Am.*, No. 12 C 5882, 2014 WL 2598804 (N.D. Ill. June 10, 2014)..... 20

*Shah v. Metropolitan Life Ins. Co.*, 2003 WL 728869 (N.Y. Sup. Ct. Feb. 21, 2003) ................. 18

*Sherman v. Ryan*, 911 N.E.2d 378 (Ill. App. Ct. 2009) ................................................................. 22

*St. Paul Fire & Marine Ins. Co. v. Great Lakes Turnings, Ltd.*,
   774 F. Supp. 485 (N.D. Ill. 1991) ....................................................................................... 21

*Tierney v. John Hancock Mut. Life Ins. Co.*, 791 N.E.2d 925 (Mass. 2003) ................................ 18

*Wade v. Kessler Institute*, 778 A.2d 580 (N.J. Super. A.D. 2001) ................................................ 24

*Wilson v. Career Educ. Corp.*, 729 F.3d 665 (7th Cir. 2013) ....................................................... 24

*Wright v. Prudential Ins. Co. of Am.*, 285 F. Supp. 2d 515 (D.N.J. 2003) ................................... 18

## Rules

Rule 12 ............................................................................................................................................... 4
Rule 50 ............................................................................................................................................. 22
Rule 56 ............................................................................................................................................. 22

## Code

The Illinois Insurance Code ...................................................................................................... 4, 6
215 ILCS 5/59.1 ................................................................................................................................. 4
215 ILCS 5/59.1(6)(c)(i) ................................................................................................................... 5
215 ILCS 5/59.1(6)(e) ...................................................................................................................... 6
215 ILCS 5/59.1(15) .................................................................................................................. 10, 11
215 ILCS 5/59.6 (i) ........................................................................................................................... 5
735 ILCS 5/3-107(a) ....................................................................................................................... 19

## I.    INTRODUCTION

While the process of converting a mutual insurance company to a public stock company can be complicated, Plaintiff's claims here are simple and straightforward. Plaintiff and the Class each have or had an in-force insurance policy or a master policy under a group insurance policy with Fidelity Life Association, which also provided them with membership interests in Members Mutual Holding Company ("Members Mutual"). As members of Members Mutual, they not only had rights as insureds, but as its owners as well, including the right to vote in the election of directors.

Defendants contend that Members' Board of Directors adopted a plan to demutualize[1] to increase its "access to capital." To read Defendants' brief, one would think that Plaintiff suggested that the demutualization concept itself is unlawful. That is simply not true and contrary to the well-pled facts of his Complaint. What is at issue is that at the conclusion of this demutualization, the policyholders' rights would be extinguished while Defendants took control of the newly formed company, Vericity, Inc. ("Vericity"), and, shortly after, pilfered millions of dollars from it for their own benefit. Indeed, after the dust settled, Vericity's Board issued a special dividend that directed nearly $85 million of Vericity's surplus to Defendants.

Even more egregiously, a number of the Individual Defendants were rewarded with an equity stake in the stand-by purchaser, Apex Holdco L.P. ("Apex") for handing control of Vericity over to it—a lavish benefit not shared with Plaintiff or the Class—and certain Defendants were awarded directorships in the newly formed Vericity. Defendants omit this fact when they try and lump the members together with Vericity's directors, officers and employees as 23.5% owners of the Company.

---

[1] The Second Amended and Restated Members Mutual Holding Company Plan Of Conversion From Mutual Holding Company To Stock Form, Dkt. No. 33 at Ex. 4, is referred to herein as the "the Plan."

Defendants attempt to legitimize their machinations by claiming that they are protected by the Illinois demutualization laws and the Illinois Department of Insurance's (the "Department") approval of the transaction. This is not the case. First, the statute's 30-day limitations period does not apply to Plaintiff's claims because he is not challenging the validity of the Departments' administrative ruling. Alternatively, even if it did apply, the abbreviated limitations period should be equitably tolled here. Second, Plaintiff's claims include conduct that occurred on or around December 9, 2019—well *after* the purported limitations period expired, making it impossible for him, or any other Class member, to bring such a claim. Third, Defendants' position has no legal basis because it runs afoul of the Illinois State Constitution and would abridge Plaintiff's right to a judicial remedy that the legislature did not and cannot unreasonably constrain. Finally, Plaintiff seeks to remedy Defendants' unlawful conduct, which, separate and apart from the Plan approved by the Department, arises from events that were never subject to the Department's review, including misconduct that took place *after* the Department's approval. For instance, the plan documents failed to describe the director equity incentive program, nor did it specify or explain the special dividend.

Not only do Defendants try to skirt the demutualization law, they seek to sidestep blackletter law establishing that the Individual Defendants owe Plaintiff and the Class fiduciary duties in connection with a transaction affecting their ownership rights in the company. The fiduciary duties owed to Plaintiff and the Class, however, do not end there and include Vericity and Members Mutual. While it is accurate that Plaintiff and the Class members had a contractual relationship with these entities, when Vericity and Members Mutual moved to alter and, in some cases, extinguish, their ownership rights, these extracontractual duties were triggered.

Lastly, Defendants' tortured construction of the claims still does not bring them into the

ambit of the business judgment rule. Plaintiff contends that Vericity's and the Individual Defendants' misconduct was a breach of their fiduciary duties of due care, loyalty, and good faith and fair dealing owed to the Plaintiff and the Class. At this stage of the litigation, this is sufficient to rebut the presumptive application of the rule. Nevertheless, even if Defendants' actions here were within their discretion as directors, which they were not, the business judgment rule would only protect them if they acted with adequate information and based on adequate consideration. With respect to each member's subscription rights, Defendants relied on a paltry, four-page actuarial opinion. Further, with respect to the Apex equity incentive plan and the special dividend, there is no indication that any adviser gave Defendants any advice concerning the propriety of each or whether they constituted a conflict of interest. For these reasons, and those explained below, Defendants' motion to dismiss should be denied.

## II.    FACTUAL STATEMENT

Defendant Members Mutual was a mutual insurance holding company organized under the laws of Illinois. ¶¶ 1, 17.[2] In July 2018, Members Mutual's Board of Directors approved the first version of the Plan to convert from a mutual insurance company to a stock insurance company (i.e., "demutualization"). ¶43. After this process was complete, Members Mutual would become a wholly-owned subsidiary of Defendant Vericity. *Id*. Indeed, the stated purpose of this conversion was to increase Members Mutual's "access to capital in order to pursue increased marketing, acquisitions and organic growth of distribution and sales of life insurance" to certain markets, *see* Ex. A at 94 (Prospectus filed June 20, 2019 ("Prospectus"))[3] but a significant portion of that capital was handed out to Vericity's officers and directors and a third-

---

[2] All citations to "¶ __" refer to the Complaint. Dkt. No. 1.

[3] The June 20, 2019 Prospectus attached to Defendants' Memorandum of Law is only 40 pages. See Dkt. No. 33 at A. For completeness sake, Plaintiff is attaching the entire Prospectus which is 215 pages.

party private equity firm. This was a boon to Vericity's insiders and its new majority stakeholder, Apex, but left Members' policyholders sitting on the wrong side of the deal with no stake in the new company and excluded from generous payouts. As described in more detail below, Defendants were able to garner enough votes from policyholders and gain regulatory approval of the conversion by camouflaging the true nature and intent of the transaction.

### A.    The Demutualization of Members Proceeds Under Illinois Law

"A mutual insurance company is owned by its member-policyholders, so a demutualization transaction effectively transfers valuable ownership rights from the policyholders to a new set of shareholders in a stock company." *Ormond v. Anthem, Inc.* ("*Ormond I*"), No. 05-cv-1908-DFH-TAB, 2008 WL 906157, at *2 (S.D. Ind. Mar. 31, 2008) (denying Rule 12 motion over putative class claims stemming from demutualization)[4]; *see* Prospectus at 6 (stating "[l]ike stockholders, the members have certain rights with respect to Members Mutual…"). Plaintiff and the putative Class were policyholders of Members Mutual at the time of the demutualization. ¶¶ 14, 83.

The Illinois Insurance Code ("Code") sets forth the requirements for completing a demutualization. ¶ 37 (*citing* 215 ILCS 5/59.1). The Code required that Members Mutual provide the policyholders subscription rights, without payment, to purchase a portion of the capital stock of the stock company or, alternatively, a portion of a corporation owned by the mutual company for purposes of acquiring or holding all of the converted company's stock or a stock insurance company into which the mutual company will be merged. ¶ 37; 215 ILCS

---

[4] At summary judgment the *Ormond* Court reaffirmed the equivalence of policyholders and stockholders stating that "[m]utual insurance companies are owned by their policyholders (*i.e.* members), who like garden-variety shareholders, have voting rights and share in the company's financial success or failure." *Ormond v. Anthem, Inc.* ("*Ormond II*"), 799 F. Supp. 2d. 910, 913 (S.D. Ind. 2011) (denying summary judgment on breach of duty claims in connection with demutualization.).

5/59.1(6)(c)(i). These subscription rights are to be allocated to eligible members through a fair and equitable formula, which may take into account how different classes of policies of the eligible members contributed to the mutual company's surplus. *Id.*; 215 ILCS 5/59.1(6)(c)(ii). Notably, under 215 ILCS 5/59.6(i), Illinois law only prohibits individual purchases of shares that exceed 5% of the total offering, which here would be 743,750 (5% of 14,875,000) but otherwise did not restrict Members Mutual from allowing policyholders to buy additional shares of Vericity up to this ceiling. As part of its plan of conversion, Members Mutual offered "between 14,875,000 and 20,125,000 shares of common stock at a price of $10 per share on a first priority basis to eligible members and second to the directors and officers of Members," with the goal of raising at least $148 million through the offering. Prospectus at 6, 9. The Company noted that the demutualization would not be completed, however, if Members Mutual did not sell at least 14,875,000 shares in the subscription offering. ¶48.

Knowing this, Members Mutual still restricted how much each policyholder, including Plaintiff, could purchase to no less than 25 shares but up to their "individual maximum purchase limitations." Prospectus at 1. This purchase limit consisted of a "Fixed Component" of 100 subscription rights to each policyholder regardless of the number of qualifying policies they owned and, in some instances—but not all—a "Variable Component" that considered past and future contributions to Fidelity Life's surplus. ¶67; Prospectus at 5. Either way, in most, if not all, instances, the "individual maximum purchase limit" concocted by Defendants was set well below the statutory cap for individual purchases established by Illinois law. *See* ¶ 66 (*citing* 215 ILCS 5/59.6 (i)). In addition to what the policyholders may have purchased under their allotments, as of June 2019, Members Mutual's directors and officers indicated their intention to purchase approximately 2,123,675 shares—a 14% stake in Vericity. ¶56.

In the event that the stock purchases of the policyholders (first priority) and the directors and officers (second priority) fell below 20,125,000, Members Mutual intended to "offer eligible employees under the Employee Bonus Program and *may* offer shares [in its sole discretion to] other potential investors in what [was] refer[ed] to as the community offering." Prospectus at 7, 97 (emphasis added). A community offering is not discretionary, but rather a requirement of Illinois' Code: "any shares of capital stock ***not*** subscribed to by eligible members exercising subscription rights…***shall*** be sold in a public offering through an underwriter." 215 ILCS 5/59.1(6)(e) (emphasis added).[5] Far different from the member offering, the only limitation placed on purchases in the community offering was the 5% cap mandated by Illinois law, or 743,750 shares. *See* Dkt. No. 33 at Ex. 4 ("the Plan")" at 12).

At bottom, the Prospectus made clear that Members Mutual had the "right in [its] absolute discretion…to determine which persons and which subscriptions and orders in this offering meet the criteria provided in the plan of conversion for eligibility to purchase shares of common stock and the number of shares eligible for purchase by any person." Prospectus at 10.

After the conversion plan elements were developed by Defendants, in a letter from Vericity, policyholders were advised that they had a priority right to subscribe for the Company's shares before it became available to other offering participants. *See* Exhibit B (Ex. 99.3 to Vericity's June 4, 2019, Form S-1, General form for registration of securities under the

---

[5] The statutory section includes the following additional language: "If the number of shares of capital stock not subscribed by eligible members is so small or the additional time or expense required for a public offering of those shares would be otherwise unwarranted under the circumstances, the plan of conversion may provide for the purchase of the unsubscribed shares by a private placement or other alternative method approved by the Director that is fair and equitable to the eligible members." 215 ILCS 5/59.1(6)(e). There were more than 11 million shares to be sold after the initial offering, certainly, that would not qualify as "so small" to forgo the community offering; likewise there is no evidence that time and expense precluded a public offering either. It is simply unknown, absent discovery, if or how many shares were made part of any public offering.

Securities Act of 1933).[6] While the letter was accompanied by copies of the flawed Prospectus and Plan, it was devoid of any plan features and stated in bold writing: "**Your Board of Directors urges you to vote 'FOR' approval of the Plan and 'FOR' the approval of the Restated Articles."** *Id.* The letter also stated that the conversion will not result in any changes to the recipient's life insurance policies and, in two separate places noted that he or she was not obligated to purchase shares in the offering, but omitted other critical information including the fact that failure to purchase shares could result in the policyholders losing control of the Company and that a third-party purchaser was waiting in the wings to scoop up a majority of Vericity's shares.

### B. The Stand-By Purchaser

With the "individual maximum purchase limits" in place and regardless of the requirement that any unsubscribed stock be sold through a public offering, Members Mutual entered into a standby purchase agreement with Apex, an affiliate of J.C. Flowers IV L.P., a private equity fund advised by J.C. Flowers & Co., LLC., a private investment firm ("Hedge Fund"). ¶ 50. According to the Prospectus, in fulfilling its standby purchase commitment, "the standby purchaser [would] acquire a majority of our shares issued in the offerings if the number of shares subscribed for in the subscription offering, together with any subscriptions accepted in the community offering, total fewer than 7,437,500 shares." Prospectus at 97. Notwithstanding, even if the subscription offering met the minimum sales (14 million), Members Mutual gave Apex the opportunity to "acquire [the] majority of our outstanding shares…by purchasing additional shares above the offering minimum [14,875,000]…." Prospectus at 123. At bottom,

---

[6] *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011) (recognizing that "judicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute.")

the plan was for Members Mutual to cede Vericity to Apex and the Hedge Fund.

Despite this intention, the Prospectus, nonetheless, warned that Apex's absolute control was a "risk" to investors that "could result in a significant or material adverse effect on [the] business." ¶71; Prospectus at 13, 27. The Prospectus further warned that "if" (not when) the stand-by purchaser acquired more than 50% of Vericity's voting power Vericity would avail itself of the "controlled company" exception to the NASDAQ rules so that it would not have to comply with certain corporate governance requirements, including the requirement that a majority of the board be independent directors, or that the compensation committee, the nominating committee, and corporate governance committee be composed of entirely independent directors. *Id.*; Prospectus at 27. The stand-by purchaser would have the right to designate a majority of the members of Vericity's board and "be able to approve most corporate actions requiring stockholder approval by written consent without a meeting of stockholders." ¶¶72-73. The significance of this cannot be overstated and the adverse impact this would have on members was laid bare in, among other places, Apex's Form 13D filed with the SEC on August 9, 2019. Exhibit C (Apex's Form 13D filed with the SEC on August 9, 2019).

Through its consolidation of power, Apex's Form 13D reveals that Apex (which is essentially controlled by one person—J. Christopher Flowers) now has the authority to monitor the financial condition of Vericity, the value and price of its common stock, and other available investment opportunities available to it. While providing Apex with access to this information alone is not problematic, depending on its impressions and what is best for Apex—not the policyholders or minority shareholders—it is given unfettered power in "(i) proposing measures which they believe would enhance shareholder value, (ii) purchasing additional Common Stock or other securities of Vericity (subject to any applicable restrictions in the Standby Purchase

Agreement), (iii) selling some or all of any securities of Vericity held by the Reporting Persons (subject to any applicable restrictions in the Standby Purchase Agreement), (iv) proposing, whether alone or with others, a transaction that would result in a change of control of Vericity, or (v) otherwise changing their intention with respect to any of the matters referred to in this Item 4." *Id*. at 12. This shift of focus from policyholder value to shareholder value was not conspicuously identified in the materials presented to policyholders voting on whether to approve the conversion plan.

Members Mutual also agreed that Apex's representation on Vericity's new board of directors would favor Apex and include the Hedge Fund's Managing Director, Eric Rahe, Vice President, Calvin Dong, as well as an employee of a portfolio company of the Hedge Fund. Prospectus at 121. Lastly, Members Mutual agreed that Apex, as the standby purchaser, could grant awards of a Class B stock to certain employees, directors and other service providers of Apex and/or Vericity. ¶48; Prospectus at 11. These Class B units were non-voting profits interests in Apex. *Id*. Approximately 20% of these Class B units would be issued directly to Vericity's directors and advisory. Prospectus at 130. None of these Class B profit interests would be offered to the policyholder members. ¶63.

### C.  The Offering and the Defendants' Subsequent Reward

The subscription offering was made to the members (first priority) using the "individual maximum purchase limits" for each policyholder. For Plaintiff, his limit was set at 124 shares (100 "Fixed Component" and 24 "Variable Component") at $10, a total $1,240. ¶14. Plaintiff raised his desire to purchase additional shares with the Board of Directors, but his request was rejected outright. *Id*. The directors (second priority) purchased their full allotted 2,123,675 shares. It is unclear what—*if any*—shares were offered or sold as part of the "Employee Bonus Program" or a "community offering." Prospectus at 7. In total, 3,501,648 shares were sold as

part of the initial offering. Vericity, Inc., Aug. 7, 2019, Form 8-K. Members Mutual then delivered 11,373,352 shares to Apex, a 76.5% controlling interest in the company, which triggered all of the risk factors described in the Prospectus. *See* ¶ 61. By limiting subscription rights, Defendants engineered a transaction that delivered complete control over Vericity to one investor.

On the first day the Vericity share price was published, its price increased 20% to $12. ¶ 78. By August 20, 2019, the share price reached a high of $24. ¶79. Then on November 6, 2019, Vericity announced a special one-time cash distribution of $6.25 per share to common stock holders, which was paid on December 9, 2019. ¶ 81. From this one-time dividend, Apex (and the Hedge Fund) received more than $71 million, the officers and directors got more than $13 million collectively, while, by comparison, Plaintiff got $775. Members Mutual's stated purpose of the demutualization as "access to capital" really meant a windfall to the Directors, Apex, and the Hedge Fund.

III.    **ARGUMENT**

A.    **Illinois' 30-day Statute of Limitations Under Its Demutualization Statute Does Not Preclude Action**

The 30-day limitations period in Illinois' demutualization statute does not apply to Plaintiff's claims. To the extent that it does, not only does equity demand that it be tolled, but it surely does not preclude Plaintiff's common law claims. 215 ILCS 5/59.1(15) states that "[a]ny action challenging the validity of or arising out of acts taken or proposed to be taken under [the demutualization statute] shall be commenced within 30 days after the effective date of the plan."

Here, the issue is neither the final approval of the Plan by the Department nor that Plaintiff was limited in his right to buy additional stock under that Plan. Rather, it is Defendants' conduct surrounding the improper deal Vericity entered into when it consummated the Stand-by Purchaser Agreement with Apex. ¶ 11. Plaintiff alleges that despite the Prospectus

10

acknowledging the possibility of the stand-by purchaser acquiring a majority of the shares, Defendants' conduct in restricting Plaintiff and Class members and shifting the company away from the members and into the hands of Apex was actually Defendants' desired outcome, rather than the just a "risk" as described in the Prospectus. ¶¶ 6-9, 68, 97-98. None of Defendants' case law is applicable as Plaintiff is not challenging the validity of the administrative ruling by the Department. Nor do Plaintiff's claims arise out of acts taken or proposed to be taken under the demutualization statute because the acts by Defendants that are at issue were not accurately reflected in the Plan in the first place. Thus, the limitation in 215 ILCS 5/59.1(15) does not apply here.

Even if the 30-day deadline were to apply, which it does not, principles of equity require tolling here. *See Mihelic v. Will County*, Ill., 826 F. Supp. 2d 1104, 1113 (N.D. Ill. 2011) ("a plaintiff who fails to sue within the limitations period, 'can get an extension of time within which to sue if it would have been unreasonable to expect [him] to sue earlier.'") Defendants can point to no text, context, or legislative history indicating that the Illinois legislature intended 215 ILCS 5/59.1(15) to be anything beyond a standard time bar, and certainly not a jurisdictional statute of limitations as Defendants suggest.

As Defendants admit, 30 days is a short limitations period. *See* Defs. Mem. at 9. While Plaintiff attempted to, and was denied, the opportunity to purchase more stock with the board of directors in July 2019, it was not until December 9, 2019 when Vericity paid the special one-time cash distribution that Plaintiff was unfairly excluded from that Plaintiff was on notice of the nature of the damages. ¶¶ 14, 81. As such, it would have been impossible for Plaintiff to file a civil action within 30 days of August 6, 2019 (effective date of the plan) because Plaintiff could not have reasonably (or even possibly) known the nature of his injuries.

11

Defendants' position is also untenable because it runs afoul of the Illinois State Constitution which specifically provides Plaintiff a right to judicial remedy that the legislature did not and cannot unreasonably constrain. *See* Ill. Const. art. I, § 12 ("Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his … property. . . . He shall obtain justice by law, freely, completely, and promptly.") Regardless, the 30-day limitation does not preclude Plaintiff's various common law claims for breach of fiduciary duty, breach of contract, unjust enrichment, and negligence. *See Ormond II*, 799 F. Supp. 2d at 923 (Indiana's approval of demutualization plan and plaintiffs' "failure to appeal or otherwise challenge that approval within 30 days does not bar [their] common law claims, so long as the nature of the damages or the Defendants' conduct causing those damages could not have been discovered prior to IDOI approval.").

Lastly, Defendants offer no support for the contention that the entire complaint should be dismissed with prejudice merely because of the "finality" of the transaction. This, and whether ownership interests have shifted in the ten months during which Vericity has been public, is irrelevant and not mutually exclusive with the issue of whether Defendants should face the consequences of their unlawful conduct. In essence, Plaintiff does not seek to "unscramble" the proverbial egg but rather claims that Defendants owe parts of the egg (that it unfairly scrambled) to Plaintiff and the Class.

**B.      Plaintiff's Claims Fall Well Outside the Illinois Review Law**

**1.      Defendants Misconstrue Plaintiff's Claims, in a Misplaced Effort to Invoke the Illinois Review Law**

Defendants' arguments concerning the Illinois Review Law proceed from a false premise, namely, that "Plaintiff seeks to overturn a decision of an Illinois agency." Defs. Mem. at 10. To the contrary, and explained above, Plaintiff is *not* seeking to overturn the regulatory approval for

12

the demutualization plan, nor is he launching a "collateral attack" (*id.*) on that approval. Instead, Plaintiff seeks to remedy Defendants' unlawful conduct, which, separate and apart from the Plan approved by the Department, arises from events that were never subject to the Department's review, including misconduct that took place *after* the Department's approval.

While Defendants repeatedly cite the Prospectus in their brief, they gloss over the Plan itself, which they acknowledge is the document actually subject to review by the Department. *See* Defs. Mem. at 5; *see also* the Plan at 9 (describing the process for regulatory approvals, including the preparation and filing on an application for approval of the demutualization plan with Illinois Director, and, separately, the preparation and filing of Registration Statement, including the Prospectus, with the SEC). Defendants' focus on the Prospectus, as opposed to the actual Plan, is unsurprising in light of the fact that the alleged misconduct here is in no way disclosed or excused by the language of the Plan itself subject to review by the Department.

Here, Plaintiff alleges that Defendants undertook a course of conduct where they (1) represented to the Department and the members that demutualization was desirable, if not imperative, in order for the company to "increase its access to capital in order to pursue increased marketing, acquisitions and organic growth of distribution and sales of life insurance to the middle market" (Plan at 2); (2) took steps undisclosed to the Department that put a private equity firm, and Vericity's officers, directors, and management in a position to reap tens of millions of dollars from the transaction; and (3) then announced and paid a special dividend that by and large enriched others at the expense of Plaintiff and proposed Class. Defendants fail to explain how this course of alleged misconduct was considered, let alone approved, by the Department.

Two additional key considerations about the Plan submitted to the Department reveal the

flaws with Defendants' arguments. First, the Plan does not describe the director equity incentive program. As explained above, under this program, Vericity's management team, directors, and advisory board members acquired an ownership interest in the stand-by purchaser, Apex Holdco—thus reaping additional benefits not available to Members Mutual's members. ¶ 58. As the Prospectus explains, "the general partner of the stand-by purchaser may grant awards of Class B units to employees, directors and other service providers of the stand-by purchaser and/or Vericity." ¶ 58 (quoting Prospectus at 11). These Class B units "are non-voting profits interests in the stand-by purchaser that entitle the holders thereof to participate in the appreciation in the value of the stand-by purchaser above an applicable threshold and to thereby share in our future growth."[7] Prospectus at 11; *see also* ¶ 59. Through the equity incentive program, which was "to be established under the terms of the amended and restated limited partnership agreement of the standby purchaser," (*i.e.*, *not* the demutualization Plan subject to view by the Department), Prospectus at 11, Defendants reserved a large volume of Class B shares—representing 20.6% of the fully diluted units of Apex Holdco—for issuance to employees, directors, advisory board members and other service providers of Vericity. ¶ 63. At the same time, the former members of Members Mutual—Plaintiff and the Class—were not afforded any Class B units or other equity in Apex Holdco. *Id.*

Second, the Plan does not specify or describe the special dividend, which was paid months after the Department's approval. This special, one-time dividend of $6.25 resulted in Apex and the individual Defendants receiving tens of millions of dollars, while excluding Plaintiff and the proposed Class from the vast majority of the funds made available from

---

[7] Any suggestion by Defendants, in their reply brief, that the special dividend reflects "future growth" would raise factual issues, given the proximity of the payment of that dividend (December 2019) to the timing of approval of the demutualization (June 2019).

Vericity's one-time cash distribution paid out on December 9, 2019. ¶ 81.

Vericity's letter to policyholder's (Exhibit B) highlights the extent to which the Department's approval should *not* shield Defendants from liability. That letter "urged" policyholders to approve the Plan, while twice noting the lack of any obligation to purchase shares. Especially when viewed within the totality of Defendants' alleged misconduct, the communication was deceptive in its omission of critical information, including the fact that the failure to purchase shares would result in the policyholders losing control of the company, a third-party purchaser was prepared to acquire a majority of Vericity's shares, and the same third-party and certain individuals (but not Plaintiff and the Class) would receive many millions of dollars through a special dividend to be paid within a few short months of the Plan's approval by the policyholders. *See* Exhibit B.

In short, the demutualization "transfer[ed] valuable ownership rights from the policyholders" and, overwhelmingly, to Apex and a small, select group of directors, officers, and managers. *See Ormond I*, 2008 WL 906157, at *2; see also* ¶ 10 (approximately $84 million out of $93 million of the aggregate dividends were paid to the board of directors and Apex). Notably, policyholders, in some cases over the course of decades, had contributed to the surplus of funds that became available through the demutualization.[8] With bitter irony, what was supposedly the

---

[8] Defendants' assertion that members should not expect to share in the "profits" of a mutual company, see Defs. Mem. at 3, misses the point of the courts' reasoning as it would relate to Plaintiff's claims here. For example, in *Collins v. Baylor*, 302 F. Supp. 408 (N.D. Ill. 1969), the court explained that dividends issued to members of a mutual insurance company reflect a "return to policyholders of the unearned, that is, unused, portion of the premiums paid in." *Id.* at 411. Likewise, in the context of a mutual insurance company, policyholders create the surplus, "by paying more for [their] insurance in advance than it should actually cost." *Dryden v. Sun Life Assur. Co. of Canada*, 737 F. Supp. 1058, 1063 (S.D. Ind. 1989) (citation and internal quotation marks omitted). Defendants' implied contention that they should be entitled, as a matter of law, to amass significant funds while structured as a mutual company and then distribute those funds to themselves after the conversion reveals why Plaintiff's claims should go forward, and why, at a minimum, discovery is necessary.

15

means to *raise capital* to benefit the member policyholders turned out to be nothing more than an effort to *shift capital* into the hands of private equity and the individual Defendants, to the detriment Plaintiff and the Class.

### 2. *Ordower* and *Ormond* Establish that Plaintiff's Claims Should Proceed

Defendants' brief suggests, in effect, that they should be afforded immunity for any conduct related to the demutualization by virtue of the Department's approval. That is simply not the case under controlling Seventh Circuit law.

In *Ordower v. Office of Thrift Supervision,* 999 F.2d 1183 (7th Cir.1993), a bank had converted from a mutual to a stock form. *Id.* at 1185. Plaintiffs alleged both that the deal was undervalued, as it failed to sufficiently account for the company's real estate interests. Although the Seventh Circuit held that it could not provide relief for claims challenging the valuation of the company by the Office of Thrift Supervision, i*d.* at 1185-86, the Court allowed Plaintiff's other claims to proceed and held:

> That the [Office of Thrift Supervision] has found the substance of a transaction in compliance with federal law—which is all the OTS's approval establishes—***does not relieve the bank's managers of the duty to tell the truth when asking the depositors to approve the transaction***. The depositors are free to turn down the managers' proposal. A district court accordingly may consider whether the materials describing the transaction and soliciting that approval were complete and accurate.

*Id.* at 1188 (emphasis added); *see also Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 620 (2d Cir. 1997) (citing *Ordower* and explaining that the regulatory approval of the mutual-to-stock conversion at issue "does not lift from the shoulders" of the defendant company, its managers, and agents "the obligation to conduct the sale of its stock in an honest and straightforward manner so that investors are not mislead"). As in *Ordower*, Plaintiff's allegations do not arise from the issue of valuation, but challenge, *inter alia*, the "completeness and accuracy" of how Defendants described the transaction. Had Defendants been up front about

how the demutualization process would serve as a vehicle for transferring company assets to a private equity and a few individuals who profited handsomely from the arrangement, the outcome of the members' vote would almost certainly have been different.

In *Ormond I* the court applied *Ordower* to a similar set of claims as Plaintiff's, and rejected dismissal of most claims, including for breach of fiduciary duty and breach of contract. The court explained: "plaintiffs are not challenging the validity of the [Department's] order approving the demutualization of Anthem…" *Ormond I*, 2008 WL 906157, at *23. The same is the case here. Plaintiff does not seek to set aside the Department's approval. The *Ormond* court further explained that "there is also no statutory scheme through which people aggrieved by events that occur subsequent to the Commissioner's order can seek redress," and cited *Ordower* in support of its decision to deny the motion to dismiss plaintiffs' claims for breach of contract and breach of fiduciary duties. *Id. Ormond* is thus on all fours with the conduct here. Tellingly, Defendants acknowledge that *Ormond* allowed claims to go forward based conduct that occurred post-approval by the Indiana agency, yet Defendants fail to ever mention that the special dividend, paid out months after the Department approved by the Plan. *See* Defs. Mem. at 15 n.3. In so doing, they fail to meaningfully distinguish *Ormond*.[9]

### 3.      Defendants' Authorities are Inapposite

Defendants' remaining authorities related to administrative law principles only further reveal why Plaintiff's claims should proceed. As to other demutualization cases, Defendants cite

---

[9] Defendants attempt to assert that *Ormond* is factually distinguishable, noting that it involves events that occurred after the demutualization plan was approved by the Indiana agency. *See* Defs. Mem. at 15 n.6; *see also Ormond I*, 2008 WL 906157, at *23 (explaining that plaintiffs had alleged that changes were made to proposed plan of conversion after many policyholders had already cast their votes and mailed in their ballots). Here, Plaintiff's allegations are similar, but even stronger on this point, as Plaintiff allege Defendants announced and paid out a special dividend *months after* the Plan had been approved by the Department and policyholders.

a handful of cases that focus on claims that are plainly different from Plaintiff's. Consistent with *Ordower*, these cases stand for proposition that to the extent that plaintiffs take issue with the valuation method and determination of the IPO price that was fully addressed by the agency, such a claim may constitute a collateral attack on the Superintendent's decision. *See Howerton v. Prudential Ins. Co.*, 2012 IL App (1st) 110154, ¶ 29 (in suit arising under New Jersey law, dismissing claims challenging the determination of the fair value to policyholders based on issues plaintiffs' counsel raised previously during public hearings concerning demutualization); *Tierney v. John Hancock Mut. Life Ins. Co.*, 791 N.E.2d 925, 933 (Mass. 2003) (finding that plaintiffs' contention that they should receive a premium above the IPO value set for the demutualization had been addressed by the commissioner); *Wright v. Prudential Ins. Co. of Am.*, 285 F. Supp. 2d 515, 519 (D.N.J. 2003) (explaining that following a public hearing the Commissioner had issued a lengthy opinion "address[ing] each of the concerns that had been raised by commenters at the hearing and affirmed that none of them prevented the Plan from being worthy of approval"); *Shah v. Metropolitan Life Ins. Co.*, 2003 WL 728869 (N.Y. Sup. Ct. Feb. 21, 2003) (finding that plaintiffs merely "disagree[d] with the method of valuation and determination of the IPO price"). Thus, such cases raise issues not present here.

Defendants' remaining authorities, while largely not on point, actually show why Plaintiff's claims should proceed. In *Fiala*, the court held that, with respect to certain claims, defendants "have not established the preclusive effect of the [agency]'s determination," and that evidentiary issues concerning what the agency had been aware of in approving the demutualization plan must be decided at the summary judgment stage of the proceedings. *Fiala v. Metropolitan Life Ins. Co.*, 776 N.Y.S. 2d 29, 31 (2004). Here, Defendants have offered largely conclusory statements about what the Department was aware of and what it considered,

18

and, indeed, largely side-step the critical document, the Plan itself, rendering summary judgment the more appropriate procedural stage for resolving Defendants' arguments.

As to Defendants' contention that Plaintiff should be required to name the Department as a Defendant, *see* 735 ILCS 5/3-107(a), the language of the statute makes clear that the agency is not necessary or proper Defendant here. It provides that only "in any action to review any final decision of an administrative agency" must the agency be a named party. *Id*. Because Plaintiff's claims arise from misconduct separate and apart from the Plan approved by the Department, this is not such an action to "review" a final agency decision. *Id*. Defendant's case law is consistent with Plaintiff's position. *See M.Y. Taxicab, Inc. v. Shoenberger*, 238 F. Supp. 2d 994, 996 (N.D. Ill. 2002) (permitting claims separate from the merits of the agency decision to proceed).

### C. Defendants Breached Their Fiduciary Duties To Members And Their Misconduct Is Not Protected By The Business Judgment Rule

Defendants bafflingly contend that in developing and executing the plan to convert Members Mutual to a stock insurance company and ceding control of it to a third-party purchaser, they did not owe Plaintiff and the Class any fiduciary duties. It is not clear from their brief whether Defendants are arguing that the Company did not owe the members a fiduciary duty or that the Individual Defendants did not, *see* Def. Br. at 15-16, but either way, both assertions are incorrect.

"A fiduciary relationship is shown when a party establishes facts showing an antecedent relationship that gives rise to trust and confidence reposed in another." *Sadler v. Retail Props. of Am.*, No. 12 C 5882, 2014 WL 2598804, at *17 (N.D. Ill. June 10, 2014) (internal quotations omitted). In the relationship between a mutual insurer and a policyholder, the type of claim dictates whether a fiduciary relationship exists. *Ormond II*, 799 F. Supp. 2d at 935 (citation omitted). Where, as here, "the claims involve policyholders who are acting in their capacity as

19

owners, courts generally treat policyholders as being entitled to the same fiduciary duty as owed to stockholders." *Id.*

First, it is blackletter law that Defendants Hemmings, Hohmann, Schact, Bynoe, Groot, and Fibiger, as directors of Members Mutual before the conversion, owed fiduciary duties to Plaintiff and the Class. *See*, *e.g.*, *Rieff v. Evans*, 630 N.W.2d 278, 291 (Iowa 2001) (finding that a mutual insurer's "directors owe a fiduciary duty to its policyholders" in a *de facto* demutualization); *Heritage Healthcare Servs., Inc. v. Beacon Mut. Ins. Co.*, No. 02-7016, 2004 WL 253547, at *5 (R.I. Super. Jan. 21, 2004) ("the claims as alleged implicate the policyholders' rights as owners rather than as insureds. As a result, Defendants owe a fiduciary duty to its policyholders"). While sitting in their capacities as directors of Members Mutual, they conceived and executed a plan of conversion that rewarded them with an equity stake in Apex and these grants made to Vericity's directors are not subject to forfeiture.[10] Moreover, after the IPO closed, Defendants Hemmings, Hohmann, and Schact came out the other side with directorships in the newly-formed Vericity.

Second, not only did the Individual Defendants owe fiduciary duties to the members, but Vericity (as well as its predecessor, Members Mutual) did as well. Defendants' selective reference to the contractual nature of the relationship between a policyholder and its insurer in the Complaint, *see* Def. Br. at 16 (¶ 119), is taken out of context and misconstrues Plaintiff's allegations. Here, as in *Ormond*, Plaintiff and the Class had an equity interest in Members Mutual that was inextricably tied to the insurance policy and its members could not divest themselves of this interest other than by giving up this policy. *See Ormond II*, 799 F. Supp. 2d at

---

[10] The grants of Class B units in the Apex equity incentive plan were provided to the named officers, directors, and advisory board members at the end of the IPO in the following percentages: Hohmann, 5.00%; Harkensee, 1.75%; Campbell, 1.50%; Ashe, 1.00%; Hemmings, 0.80%; Perry, 0.25%; Schacht, 0.80%; Bynoe, 0.80%; Fibiger, 0.80%; and Groot, 0.80%.

936. "Only the corporation could choose to excise the policyholder's equity interest from the insurance contract and extinguish it through a demutualization; therefore, the interest was in essence being held in trust by the corporation." *Id.* Thus, through this position of trust, Vericity and Members Mutual owed their members fiduciary duties. *Id.*

To the extent that Defendants are attempting to raise Illinois' "economic loss doctrine" as a bar to tort liability, this is also unavailing because "the relationship between [Defendants] and its members was more than a garden-variety, arms-length contractual relationship." *Ormond II*, 799 F. Supp. 2d at 937. Rather, Illinois law provides for exceptions to the economic loss rule where, as here, "the tort committed by the defendant is based on an extracontractual duty." *Monarch Gems v. Malca-Amit USA, L.L.C.*, 2005 WL 1206426, at *2 (N.D. Ill. 2005); *see also St. Paul Fire & Marine Ins. Co. v. Great Lakes Turnings, Ltd.*, 774 F. Supp. 485, 490 (N.D. Ill. 1991) (finding economic loss doctrine does not prohibit fiduciary duty claims).[11]

Finally, the business judgment rule does not protect Defendants here.[12] The business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Sherman v. Ryan*, 911 N.E.2d 378, 389 (Ill.

---

[11] *Lubin v. Equitable Life Assurance Soc'y*, 61 N.E.2d 753, 756 (Ill. App. Ct. 1945) and *Andrews v. Equitable Life Assurance Soc'y*, 124 F.2d 788, 789 (7th Cir. 1941) are inapposite. Neither of those cases implicate the holders' extracontractual rights such as those here and instead are based on virtual identical claims where policy holders are seeking their proportionate shares of a portion of undistributed surplus funds. Defendants' reliance on *Fiala*, 776 N.Y.S. 2d at 32 is equally unavailing and its holding contrary to Illinois law, which recognizes mutual insurers as fiduciaries to their policyholders. *See also Ormond II*, 799 F. Supp. at 933 (recognizing *Fiala* as the minority view on whether an insurer is a fiduciary to its policyholder).

[12] As a threshold matter, Plaintiff does not concede that application of the business judgment rule should be decided at this stage of the litigation. Courts have viewed it as an evidentiary presumption that "does not come into play when testing the sufficiency of the pleadings; it is triggered, instead, when the evidence is sufficiency-tested such as on a motion for summary judgment, Rule 56, or for judgment as a matter of law, Rule 50." *Flanagan v. Bernstein*, No. 93 C 1498, 1996 WL 84184, at *3 (N.D. Ill. 1996).

App. Ct. 2009) (citation omitted). This presumption can be rebutted "by showing that the board violated any one of its triad of fiduciary duties: due care, loyalty, or good faith." *Sherman*, 911 N.E.2d at 390. Indeed, a director cannot avail itself of the business judgment protections where, as here, allegations reveal that the company's directors acted fraudulently, illegally, in bad faith, while under a conflict of interest, or without due care and proper diligence. *Babbitt Municipalities, Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178, 1190 (Ill. App. Ct. 2016).

In an attempt to invoke the business judgment rule, Defendants suggest that Plaintiff's claims are based solely on Individual Defendants' "second- or third-priority right to purchase shares in the demutualization" and that their purchase of 14% of the offering minimum was permitted under Illinois law. *See* Def. Br. at 17. This distorts some of Plaintiff's allegations, and completely ignores the rest. First, Plaintiff contends that Vericity and the Individual Defendants breached their fiduciary duties of due care, loyalty, and good faith and fair dealing owed to the Plaintiff and the Class. Indeed, the process of how Apex was selected as the standby purchaser is opaque at best, but one thing is clear, Apex took control of Vericity and the Individual Defendants were paid handsomely for it. Plaintiff does not quibble with the fact that the Individual Defendants eventually purchased shares in the subscription offering. Defendants ignore the thrust of the allegations—that Plaintiff and the Class were arbitrarily constrained from purchasing additional shares beyond their allotment and deprived of the financial benefits of ownership in the new entity. This allowed Defendants to get what they wanted from the beginning—to take control of Vericity from the members and hand it over to Apex. Second, a number of the Individual Defendants were rewarded for this through awards of Class B equity interests in Apex, which provided them—and not Class members—with a considerable, and recurring, boost in compensation. Finally, after the conversion was completed, Vericity's Board

issued a special dividend that directed nearly $85 million of Vericity's surplus to Defendants.[13] These actions violated Illinois law and fall far outside of the protective standards of the business judgment rule.

Even if Defendants' actions here were within their discretion as directors, the business judgment rule would only protect them if they acted with adequate information and based on adequate consideration. With respect to each member's subscription rights, Defendants relied on a woefully inadequate, four-page actuarial opinion. With respect to the Apex equity incentive plan and the special dividend, there is no indication that any adviser gave the Defendants any advice concerning the propriety of each or whether they constituted a conflict of interest. This was a glaring red flag that something was amiss, but there is no suggestion that Defendants ever considered these issues or conducted any further investigation. The business judgment rule does not permit directors to bury their heads in the sand, while simultaneously lining their own pockets with Class B shares and newly minted directorships.

### D.  Plaintiff Has Pled a Breach of Contract Claim

Defendants ignore the law in arguing Plaintiff's breach of contract claim does not exist. Defendants are wrong. As the *Ormond* Court concluded, a defendant's submission of the plan of conversion to the members constitutes a contractual offer, under which they were entitled to receive fair compensation in exchange for their membership interests. *Ormond II*, 799 F. Supp.

---

[13] The misconduct alleged here, which involves bad faith and conflicts of interest, far exceeds the limited conduct described in *Ordower*, 999 F.2d at 1186. In *Ordower*, the plaintiff's chief complaint was that the company assigned a low value to the stock, purportedly allowing managers and employees to pilfer the shares ahead of depositors. *Id.* The court determined that the shares were valued properly. *Id.* Notably, unlike here, some shares were sold on the open market, where a depositor could have purchased additional shares, and there was no third-party purchaser that whose control of the company was a *fait accompli*. Moreover, there was no suggestion the directors negotiated an additional benefit not provided to the depositors, comparable to the Apex equity incentive plan here, or that a special dividend was issued where the transfer of funds to insiders dwarfed those of the depositors.

2d at 931 ("the plaintiffs are entitled to bring a claim for breach of contract based on their assertion that they did not receive fair compensation…") (citations omitted). And under Illinois law, breach of contract includes claims for breach of the implied covenant of good faith and fair dealing. *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013) (reversing district court dismissal of breach of contract claim for good faith and fair dealing where plaintiff alleged the defendant "exercised its [contractual] discretion contrary to the reasonable expectations of the parties.").[14]

Here, just as in *Ormond*, the Plan of Conversion created a contractual relationship with the policyholders. And while the Plan made clear that Plaintiff would be only permitted to purchase up to his "individual maximum purchase limit," it was never disclosed nor was it reasonable to assume that the reason for constraining his rights was to ensure that the company was controlled by the standby purchaser. Just as in *Wilson*, Defendants conduct was contrary to the reasonable expectations of the parties and, as such, Plaintiff has adequately pled a breach of contract claim.

### E. Plaintiff Properly Pled Unjust Enrichment

"Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). Plaintiff has sufficiently alleged that Apex was unjustly enriched as a result of the unnecessary constraints placed on Plaintiff and the other members' purchase rights that ensured one investor would

---

[14] New Jersey law is the same. *Wade v. Kessler Institute*, 778 A.2d 580, 584 (N.J. Super. A.D. 2001) ("The obligation to perform in good faith exists in every contract…").

receive the lion share of the stock and company control. ¶ 131. And, as a direct result of those constraints, the stand-by purchaser received more than $71 million after a one-time dividend was paid in November 2019. ¶ 81. Apex's retention of those benefits is unjust. Defendants' motion should be denied.

### F.  Plaintiff Has Properly Alleged that Defendants Owed Plaintiff Certain Fiduciary Duties to Plaintiff and the Class

The fact that Individual Director Defendants Rahe, Dong, Perry, and Ashe joined Vericity's board after the conversion is immaterial. Plaintiff alleges that the Individual Director Defendants owed certain fiduciary duties such as duties of due care, loyalty, and good faith and fair dealing with respect to their membership interest, the demutualization transaction, and the conversion of Members Mutual to a stock company. ¶¶ 105-106, 108. Plaintiff also alleges that: (i) Defendant Rahe also serves as the Managing Director of the Hedge Fund, which is an affiliate of Apex (¶¶ 4, 20.); (ii) Defendant Dong is Vice President at the Hedge Fund (¶ 21); and (iii) Defendant Perry is the CEO of AmeriLife Group Holdings, a portfolio company advised by the Hedge Fund (¶ 22). Vericity's special cash distribution was announced and paid in late 2019 (during which all Individual Director Defendants were board members) and Apex and the Hedge Fund ¶(of which  Rahe, Dong, and Perry are affiliated) received, along with the officers and directors, many millions of dollars. *See* ¶ 61. These allegations make clear the connections that these Defendants had with Vericity even before they joined the board and benefited from the special cash distribution in late 2019, and thus support Plaintiff's contention that they have a fiduciary duty to Plaintiff and the proposed Class.

## IV.  CONCLUSION

Accordingly, Defendants' motion to dismiss should be denied.

Date: July 2, 2020                          Respectfully submitted,

                             By:     *s/ Mark R. Miller*
                                     Edward A. Wallace
                                     Mark R. Miller
                                     **WEXLER WALLACE, LLP**
                                     55 W Monroe St
                                     Suite 3300
                                     Chicago, IL 60603
                                     (312) 346-2222
                                     *eaw@wexlerwallace.com*
                                     *mrm@wexlerwallace.com*

                                     **SALTZ MONGELUZZI
                                     & BENDESKY, P.C.**
                                     Simon B. Paris
                                     Patrick Howard
                                     Charles J. Kocher
                                     1650 Market Street, 52nd Floor
                                     Philadelphia, PA 19013
                                     215.496.8282
                                     215.496.0999 (fax)
                                     *Sparis@smbb.com*
                                     *Phoward@smbb.com*
                                     *Ckocher@smbb.com*

                                     **ROGERS CASTOR**
                                     Lance Rogers
                                     Daniel J. Mirarchi
                                     26 E. Athens Ave.
                                     Ardmore, PA 19003
                                     610-649-1880
                                     877-649-1880 (fax)
                                     *Lance@RogercCastor.com*
                                     *Dan@RogersCastor.com*

                                     **GUSTAFSON GLUEK PLLC**
                                     Daniel E. Gustafson
                                     Raina Borrelli
                                     Canadian Pacific Plaza
                                     120 South Sixth Street, Suite 2600
                                     Minneapolis, MN 55402
                                     (612) 333-8844
                                     *DGustafson@gustafsongluek.com*
                                     *RBorrelli@gustafsongluek.com*

                                     **BONI, ZACK & SNYDER LLC**

Michael J. Boni
Joshua D. Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
(610) 822-0206 (fax)
*mboni@bonizack.com*
*jsnyder@bonizack.com*